GOLDSTEIN HALL PLLC
Attorneys for Defendants
80 Broad Street, Suite 303
New York, New York 10004
Tel: (646) 768-4127
By:     Brian J. Markowitz (BM-9640)
        bmarkowitz@goldsteinhall.com
        Daniel Goldenberg (DG-1337)
        dgoldenberg@goldsteinhall.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISCTRICT OF NEW YORK

--------------------------------------------------------------- X

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| FMTB BH LLC, | : | Case No. 18-42228 (CEC) |
| Debtor. | : | |
| --------------------------------------------------------------- | : | Adv. Pro. No. 18-01052 (CEC) |
| FMTB BH LLC, | : | |
| Plaintiff, | : | |
| -against- | : | |
| | : | |
| 1988 MORRIS AVENUE LLC, 1974 MORRIS | : | |
| AVENUE LLC, 700 BECK STREET LLC, 1143 | : | |
| FOREST AVENUE LLC, and 1821 TOPPING | : | |
| AVENUE LLC | : | |
| Defendants. | : | |

--------------------------------------------------------------- X

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANT'S MOTION FOR AN
ORDER PURSUANT TO FEDERAL RULE OF CIVIL
PROCEDURE 56 AS MADE APPLICABLE HEREIN
BY FEDERAL RULE OF BANKRUPTCY
PROCEDURE 7056 DISMISSING PLAINTIFF'S
ADVERSARY PROCEEDING AND GRANTING
DEFENDANT'S SUMMARY JUDGMENT_____**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................... 3

PLAINTIFF'S FAILURE TO APPEAR AT EACH TIME OF ESSENCE CLOSING AND
TENDER FULL PERFORMANCE IS FATAL TO ITS CLAIMS FOR SPECIFIC
PERFORMANCE HEREIN ............................................................................................... 3

   A.   New York Law is Clear That Only an Incurable Title Defect Justifies a Purchaser's
Failure to Attend a Time of the Essence Closing, Otherwise a Purchaser is Not Entitled To
Seek Specific Performance ............................................................................................... 3

      *i.   Debtor is Not Entitled to Seek the Specific Performance of the 770 Beck Street Contract
of Sale Because There is No Record of a Single Alleged Incurable Title Defect* ................... 9

      *ii.   Debtor is Not Entitled to Seek the Specific Performance of the 1988 Morris Avenue
Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect* ... 17

      *iii.   Debtor is Not Entitled to Seek the Specific Performance of the 1974 Morris Avenue
Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect* ... 19

      *iv.   Debtor is Not Entitled to Seek the Specific Performance of the 1143 Forest Avenue
Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect* ... 19

      *v.   Debtor is Not Entitled to Seek the Specific Performance of the 1821 Topping Avenue
Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect* ... 19

DEBTOR WAS NOT READY, WILLING, AND ABLE TO CLOSE ...................................... 20

THE DAMAGES DEBTOR SEEKS ARE NOT AVAILABLE .................................................. 20

THERE WERE NO ALLEGED DEFECTS IN TITLE ............................................................ 21

CONCLUSION .................................................................................................................... 22

## PRELIMINARY STATEMENT

Defendants 1988 Morris Ave LLC (incorrectly sued herein as 1988 Morris Avenue LLC), 1974 Morris Ave LLC (incorrectly sued herein as 1974 Morris Avenue LLC), 700 Beck Street LLC, 1143 Forest Ave LLC (incorrectly sued herein as 1143 Forest Avenue LLC) and 1821 Topping Ave LLC (incorrectly sued herein as 1821 Topping Avenue LLC), (collectively the "Defendants"), by their attorneys, Goldstein Hall PLLC, respectfully submit this reply memorandum of law in further support of Defendants' motion for an Order, pursuant to Rule 56 of the Federal Rules of Civil Procedure made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, for summary judgment on the Debtor's claims seeking specific performance and related relief, and for such other relief as the Court deems just, proper and equitable.

Debtor's complaint seeks the Court to direct specific performance of five individual contracts of sale, none of which contain a cross-default provision, all of which Debtor has defaulted under. Defendants (the five distinct signatories to each contract of sale), however, move this court for a grant of summary judgment, dismissing Debtor's complaint as a matter of law and fact, as to each Defendant separately. Debtor has no legally recognized excuse for failing to attend the five separate time of essence closings, which precludes it from seeking specific performance.

As shown in Defendants moving papers and herein, Debtor has not and cannot claim that there were any incurable title defects which would excuse Debtor's nonappearance at the time of the essence closings, and, therefore, there are no material triable issues of fact which would preclude summary judgment.

It is well established that to seek specific performance of a contract of sale, the purchaser must demonstrate that it was ready, willing, and able to perform the contract, regardless of any

alleged anticipatory breach by the seller. Failure to attend a time of essence closing such as the five closings at issue herein is *prima facie* evidence that a purchaser was neither ready, willing, nor able to close. The <u>only</u> excuse a purchaser can have for failing to attend, is if there exist incurable title defects to the property being sold at Law Day, which, as discussed below and in Defendants' moving papers is defined as <u>only</u> alleged incurable title defects, not curable title defects, breaches of contract, objections, violations, issues or other similarly curable and negotiable items.

Here, Debtor failed to attend any of the five time of the essence closings even though there is not a single alleged incurable title defect upon any of the properties to be sold. Therefore, according to law and fact, Debtor is unable to seek specific performance of any of those five contracts of sale and summary judgment is appropriate herein.

Because each contract is separate and none of the five contracts contain a cross-default provision, Defendants' motion and reply herein (unlike Debtor's opposition that conflates all the contracts) will go through the record of each separate contract of sale and demonstrate that there is not a single alleged incurable title defect upon any property.

## ARGUMENT

**PLAINTIFF'S FAILURE TO APPEAR AT EACH TIME OF ESSENCE CLOSING AND TENDER FULL PERFORMANCE IS FATAL TO ITS CLAIMS FOR SPECIFIC PERFORMANCE HEREIN**

**A. New York Law is Clear That Only an Incurable Title Defect Justifies a Purchaser's Failure to Attend a Time of the Essence Closing, Otherwise a Purchaser is Not Entitled To Seek Specific Performance**

As a preliminary matter, Debtor attempts to argue that this "Court already ruled that the title defects were not curable and needed to be resolved prior to closing." *Debtor's Memorandum of Law in Opposition* ("DMOL"), Page 12. That cannot be the case – even if Debtor had actually alleged incurable title defects – because a decision on a motion to dismiss concerns the plausibility of an allegation instead of weighing of the evidence, a proposition stated by this Court. *See* Transcript of July 24, 2018 Motion to Dismiss Hearing (the "Transcript"), Pages 31-32 ("The purpose of Rule 12(b)(6) is to test in a streamlined fashion the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits."). A copy of the transcript is annexed as Exhibit I to the Neuhaus Declaration ("Neuhaus Dec."); *see also Palin v. New York Times Co.*, 17-3801-CV, 2019 WL 3558545, at 5 (2d Cir. Aug. 6, 2019) ("At the pleading stage … [the] … only obstacle is the plausibility standard of *Twombly* and *Iqbal*."). Plainly, there was never a ruling as to whether "title defects were not curable" because it would be procedurally improper and because no such allegations have ever been made. As such, Debtor's argument rings hollow and must be disregarded.

Thereafter, Debtor restates the general rule – "the law requires no one to do a vain thing." *Strasbourger v. Leerburger*, 233 N.Y. 55, 60, 134 N.E. 834, 836 (1922); *see also DMOL*, Page 12. This principle, embodied in the New York Court of Appeals holding that "[t]ender of performance by the purchaser is excused only if the title defect is not curable, for in such a case it would serve

3

no purpose to require the purchaser to go through the futile motions of tendering performance" *Cohen v. Kranz*, 12 N.Y.2d 242, 246, 238 N.Y.S.2d 928 (1963); *Ilemar Corp. v. Krochmal*, 44 N.Y.2d 702, 405 N.Y.S.2d 444 (1978) (*quoting Cohen v. Kranz*). The New York Court of Appeals has never wavered from either of these decisions and, for clarity, defined an incurable title defect as one that is "not within the vendor's power to remedy within a reasonable time." *Cohen*, 12 N.Y.2d at 246, 238 N.Y.S.2d at 928 (1963). However, Debtor attempts to argue that "while defendants are correct … there are apt exceptions." *DMOL*, Page 12, and states that those exceptions are (i) "th[is] Court already ruled that the title defects are not curable"; and (ii) "meaningless acts – the appearance by plaintiff at a sham closing – are not required." *Id*. Taken individually, Debtor's exception's are false, and insufficient to defeat summary judgment. First, as addressed above, this Court never made a factual ruling regarding any alleged incurable title defects, this Court only determined that Debtor's complaint alleged plausible allegations. *See* Transcript Pages 31-32.

As for alleged "meaningless acts," Debtor relies on the cases *Jian Yun Guo v. Azzab*, 162 A.D.3d 754, 754-755, 80 N.Y.S.3d 66, 68 (2d Dep't 2018) and *Goetz v. Trinidad*, 91 N.Y.S.3d 513, 514, 168 A.D.3d 688 (2d Dep't 2019) to illustrate when attending a closing is an allegedly "meaningless act." As will be demonstrated, neither *Jian* nor *Goetz* are applicable to the case *sub judice*.

Taking each case individually, Plaintiff quotes *Jian* for the holding that:

> seller of real property moving for summary judgment on its counterclaim seeking a declaration that the buyer is in default under the contract of sale and that the seller is entitled to retain the down payment as liquidated damages also must make a prima facie showing that the seller was ready, willing, and able to perform on the law day.

4

*DMOL*, Page 11. This opening argument is irrelevant because none of the Defendants are "moving for summary judgment on [their] counterclaim seeking a declaration that the [Debtor] is in default under the contract of sale that the [Defendants] are entitled to retain the down payment as liquidated damages." *Id*. Indeed, none of the Defendants moved this Court on any of its counterclaims, which are unrelated to down payments, but are related to monthly mortgage payments. Simply put, the implied burden Debtor creates by relying on this portion of *Jian* is irrelevant here because Defendants are not seeking summary judgment on any of their counterclaims.

Next, *Jian* does indeed illustrate why attending a closing – apart from the existence of an incurable title defect – may be a "meaningless in act," but that illustration does not help Debtor's cause. In *Jian*, the purchaser was excused from attending the time of essence closing because the seller told the purchaser to not attend! *See Jian* 162 A.D.3d at 754-755, 80 N.Y.S.3d at 68. Naturally, had Defendants told Debtor to not attend the closing (and Plaintiff did not attend the closing as a result), Defendants would have nobody to blame but themselves. However, in this action, Defendants unambiguously demanded closing and sought confirmation from the title company. Thereafter, Debtor's own title company ("Riverside") sought confirmation from Debtor's attorney who failed to confirm because Debtor was seeking a hard-money lender to close on these transactions. Defendants' Exhibit M; *see also* Exhibit U ("…the bank the initial lender is still not provided a commitment, we are seeking to go ahead with a hard money lender. We have a TOE on all filed, but E 226 especially is very time sensitive with no extensions. We are planning or rather about to schedule this for Monday 11:30 am at seller's attorney office – Shiponi Law in

Forest Hills"[1]). *Jian* does nonetheless does hold that "a seller may demonstrate *prima facie* entitlement to judgment as a matter of law by presenting evidence that a buyer failed to appear at a time-of-the-essence closing," which is exactly what happened here.[2] *Jian* 162 A.D.3d at 754-755, 80 N.Y.S.3d at 68.

Debtor also relies on *Goetz v. Trinidad* to demonstrate another circumstance when attending a time of essence closing may be a "meaningless act." As with *Jian*, in *Goetz*, a vendor commenced an action against a purchaser, and therefore *Goetz'* applicability is already undermined. Similarly, *Goetz* agrees that a purchaser's failure to appear at a time of essence closing entitles a seller with a prima facie judgment. Besides the foregoing well established rules, the issue in *Goetz* is irrelevant to the predicate dispute. In *Goetz*, the plaintiff-seller was precluded from summary judgement because a triable issue of fact existed as to whether the defendant's failure to close was willful – as required by the parties' contract. Specifically, the Court inquired as to whether the purchaser "had a lawful excuse for defaulting given the denial of his application to extend or renew his mortgage commitment, or whether he was willfully defaulted." Here however, it is unclear how *Goetz* is implicated. As far as this record is concerned, Debtor's decision to not appear at each of the five time of essence closing was willful and none of the reasons which Debtor provides are incurable title defects. Moreover – unlike the purchaser in Goetz - Debtor

---

[1] This is a particularly alarming admission because not only were the predicate sales also with no more "extensions," but the closings were also for Monday. Mr. Weisel's e-mail simply demonstrates that Debtor were at the end of the road on all their closings and figured they should appear at one instead of the other, gambling on further extension from the sellers herein while awaiting resolution of the financing.

[2] Moreover, in its ruling, the *Jian* Court cites *Martin v. Burns* 77 A.D.3d 633, 909 N.Y.S.2d 98 (2d Dep't 2010), which held that "[i]n support of his motion, among other things, for summary judgment dismissing the complaint and on his counterclaim for retention of the down payment, the defendant submitted evidence establishing that the plaintiff breached the contract by failing to appear at the closing after the defendant provided the plaintiff with unequivocal notice that he was setting a closing date of July 18, 2008, where time was of the essence, and that the plaintiff's failure to comply would be considered a default." This is exactly what happened here.

admits that it could have purchased all five properties through conventional lending, hard-money lending, or its own cash – but it chose not to. If Debtor was not able to secure conventional lending or hard-money, then it behooved Debtor to "fund the deal on [its] own," but it didn't – and therefore was either not ready, willing, or able to close on Law Day (as evident by its absence). *Leifer Dec.* Page 2, ¶ 2.[3]

Debtor also relies on *Klaiber, LLC v. Coon* 48 A.D.3d 856, 857, 851 N.Y.S.2d 667, 668, (3rd Dep't 2008);and *Kopp v. Boyango,* 67 A.D.3d 646, 650, 889 N.Y.S.2d 200, 204 (2d Dep't 2009) for the proposition that "when a vendor is given notice of the defect prior to the scheduled closing date and does nothing to correct it until after closing date, the purchaser need not tender performance as such tender would be meaningless." *DMOL*, Page 13.

*Klaiber* is not an appropriate case to apply to this action. In *Klaiber*, a Plaintiff-Purchaser commenced an action prior to a scheduled closing, to recover a deposit made in connection with the sale of real property, and then did not appear at the closing because it could not purchase the property as a result of the alleged title defects. In *Klaiber*, the Court ruled that "when the vendor is given notice of the defect prior to the scheduled closing date and does nothing to correct it until after the closing date, the purchaser need not tender performance as such tender would be meaningless."

---

[3] It is important to note that Mr. Leifer is not a member, officer, director, or employee of Debtor. As such Mr. Leifer's alleged ability and desire to close on these contracts is irrelevant. What is bot relevant and unambiguous is that Debtor never secured financing, through any means, and Mr. Leifer did not provide any funds to Debtor for the closings. *Leifer Depo*. Page 105, L 6-22; and Page 107, L 20-23.

Similarly, in *Kopp*, the Court essentially states that if a seller – who received notice of certain defects – does nothing to cure them prior to the time of essence closing cannot shield itself behind a purchaser's failure to attend a time of essence closing.

However, unlike *Klaiber and Kopp*, Defendants' counsel Mr. Hsu *absolutely* did address matters with Riverside, well in advance and in accordance with Riverside's own written "Closing Requirements," but this effort was ignored because Debtor's counsel never confirmed the five closings – due to its own financing problems since it was still looking for a hard money lender, lack of which "will jeopardize [Debtor's] ability to close …." Defendants Exhibit M; *see also Reigler Dec*., Exhibit C, Page 38 (Plaint. Bates No. 1.27.19000410), Riverside Abstract "Closing Requirements" ¶ 1. In fact, Debtor's counsel wrote to Riverside on December 15 that it did not have a commitment and was closing on a separate parcel. Exhibit U. Though the *Klaiber* and *Kopp* fact-pattern – and implicated legal principles – are similar, their key preclusive difference to this action is that Defendants herein did in fact address the title exceptions in a timely manner. It was Debtor that actually ignored these attempts and rejected confirmation of the time of essence closing (to its own title company).

In sum, Debtor has not and indeed cannot challenge the New York Court of Appeals ruling espoused in *Cohen* and affirmed in *Ilemar* that an incurable title defect is the only justification for a purchaser's failure to attend a time of essence closing. Also, Debtor's additional examples do not negate the New York Court of Appeals rule but just add examples of when a closing could be meaningless none of which are applicable to the facts herein. Accordingly, this Court should hold, as the New York Court of Appeals has held, and apply their identical rule to the following factual analysis; there is not a single alleged incurable title defect, and "[t]ender of performance by the purchaser is excused <u>only</u> if the title defect is not curable, for in such a case it would serve no

purpose to require the purchaser to go through the futile motions of tendering performance."
*Cohen*, 12 N.Y.2d at 246, 238 N.Y.S.2d at 928 (1963).

i.   *Debtor is Not Entitled to Seek the Specific Performance of the 770 Beck Street Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect*

To be eligible to seek specific performance of the 770 Beck Street Contract of Sale, Debtor must have demonstrated that it did not appear at the time of essence closing because of alleged existing incurable title defects upon the property. A review of the complete record reveals that Debtor never alleges a single incurable title defect – before or after the December 18, 2017 time of essence closing (including during litigation). In two catch-all allegations, Debtor opaquely states:

> While defendants assert that plaintiff's letters rejecting defendants' time of the essence closing demands attached to defendants' motion papers as Exhibit V, are insufficient, they generally cover all of the issues and all of the properties mentioned in the complaint and this motion.
>
> …
>
> the letters plaintiff provided to defendants substantially, if not fully, covered the matters presented on this motion for summary judgment.

*DMOL*, Page 14. Accordingly, if Debtor admits that the 770 Beck Street Closing Rejection Letter "generally cover[] all of the issues…" then a review of that Closing Rejection Letter should be enough and this Court's review of possible incurable title defects for the 770 Beck Street property should be limited to the confines of the corresponding Closing Rejection Letter.[4] As discussed in

---

[4] This limitation does not even invoke the well-established Mend the Hold Doctrine, it merely uses Plaintiff's own argument. However, if this Court disregards Plaintiff's own assertion that the Closing Rejection letters "generally cover all the issues," then Defendants' Mend the Hold Doctrine is absolutely binding. Plaintiff argues that this doctrine is inapplicable because it

Defendant 770 Beck's initial moving papers, the 770 Beck Street Closing Rejection Letter fails to allege a single incurable title defect. This Closing Letter states the following "issues":

> 1. The notice provided in your letter is insufficient as Riverside Abstract, the title company has advised us that no one from your offices have been in contact with them regarding clearing title.

> 2. Unless I have confirmation from the title company that you are ready, willing, and able to deliver clear title at Closing, this TOE is premature and being untimely, is hereby rejected.

> 3. Further, the lease presented to us for the 1st floor of this Premises was fraudulent and thus misrepresentation of a material fact, which was one of the base inducements for entering into such a contract of sale.

To point one, not being in contact with a title company is not an incurable title defect. Point One is also completely false and contradicted by e-mails from Defendant 770 Beck's counsel to Riverside, in accordance with Riverside's own first closing requirements ("Closings should be scheduled at least two business days prior to the anticipated date of closing to provide ample time for the Company to provide continuation searches." Reigler Dec.., Exhibit C, Page 38 (Plaint. Bates No. 1.27.19000410)). *See also* Exhibit T; Deposition of Riverside Abstract's General

---

would apply only if a party either relied on the reasons for non-performance originally given or could have cured its performance had the true grounds for rejection been asserted earlier. Here neither exception is applicable because there was no way defendants could have remedied their extensive breaches prior to and on the law date.

*DMOL*, Page 14. Besides the reasons set forth in the three rejection letters, which according to Plaintiff's own words "generally cover all of the same issues," it is unknown what these "extensive breaches" are or how they rise to the level of an incurable title defect. This, in of itself, should be enough to grant Defendants' summary judgment because, at a minimum, Plaintiff can only be excused from attending a time of essence closing for alleged incurable title defects rather than "issues." Otherwise, as demonstrated herein, a review of the actual rejection letter proves (as a matter of law and fact) that not a single incurable title defect was alleged.

Of special note however, during the July 24, 2019 Motion to Dismiss Hearing, Debtor's counsel argues that "the three letters were sent right before the sham closing was scheduled. But in our complaint we alleged more than just those three letters." Page 22, Lines 12-16. It is respectfully submitted that the Debtor cannot have it both ways, especially considering the dissonance between the arguments is so compelling. Notwithstanding, the Complaint equally lacks any allegation of incurable title defects.

Counsel, May 9, 2019 (the "Miller Depo.") at pages 21, Line 23 through Page 22, Line 18. That is exactly what Defendants' counsel did. It is also demonstrably false because Mr. Weisel knew Mr. Hsu was in contact with Riverside and specifically failed to confirm the closing because of a lack of financing and the immediate need to close on separate properties. *See* Exhibit U.

In any event, to get around this irredeemable false accusation, Debtor recharacterizes Point One in its opposition papers, for the first time: Debtor complains that it "was not copied on any correspondence that Hsu and his offices may have had with Riverside" to (apparently) imply that Defendants were not aware of this communication.[5] *Reigler Dec*. Page 3 ¶ 9. Not only is copying Debtor not a Closing Requirement (and certainly not an incurable title defect), immediately after Defendants' counsel reached out to confirm closing with Riverside, Riverside then e-mailed Debtor's counsel to ask whether "the closing [is] confirmed on this file …." In other words, not only did Debtor not have the hard-money lender, but it failed to confirm closing with its own title company and – as a result – breached its own title company's closing requirements. *Reigler Dec*., Exhibit C, Page 38 (Plaint. Bates No. 1.27.19000410); *See also Exhibit* T; Miller Depo. at pages 21, Line 23 through Page 22, Line 18; *generally* Page 57 – 63.

Point One also contains the accusation that Mr. Hsu was not "clearing title" with Riverside. As a backdrop, the very use of "clearing" means that something can be cured or something over which a vendor has the power to remedy within a reasonable time (especially considering Riverside's own Closing Requirements consider a shorter period of time is still "ample") and is therefore not incurable. Besides that, Mr. Hsu's e-mail to Riverside specifically says "we would still like to clear up any title issues in advance of the closing …" but there was <u>no</u> response because

---

[5] Besides this *innuendo*, it is unclear what Plaintiff is attempting to establish in its complaint for not being copied. It is an irrelevant point, and certainly not an alleged incurable title defect.

after Riverside went to confirm the same with Debtor, Debtor said that it needed a lender, without which would "jeopardize [Debtor's] ability to close." Defendants' Exhibit M. Review of the correspondence shows that there is not a single outstanding incurable title defect to discuss or address. The foregoing is best illustrated by Riverside's own testimony:

> Q.    December 18, 2018, ring a bell
> A.    Something like that, year
> Q.    And was there a closing then?
> A.    No
> **Q.    And do you know why not?**
> **A.    No**
> Q.    Did your company appear at a purported closing on a closing date?
> A.    I don't think so.
> Q.    And do you know why?
> A.    I know that we got an email requesting – saying that there was going to be a closing, and we sent an email out to [Debtor] and – asking, you know, is this truly happening, because what – that what we'll do on a typical basis, if is one side tells you its closing, we'll confirm with the other side.
> And I don't believe we got clarity from the [Debtor ] that we should be showing up.

*Miller Depo.* at pages 21, Line 23 through Page 22, Line 18 (emphasis added).

Even though Riverside's own Closing Requirements state (in the first paragraph) that two days is "ample time" for Riverside, and Mr. Hsu's email was sent even before that "ample time," it was Debtor who scuppered the closing when it simply could not do what it needed to do – confirm the closing. At this point, Defendants did everything that they were required to; Riverside's own testimony states:

> Q.    Do you know why [Debtor] perhaps did not provide clarity about having the closing?
> A.    Yes. I believe there were emails still about getting documents. I don't remember exactly which ones.
> Q.    And were there emails saying that [Defendants] did not have the document?
> When you say "getting documents," what do you mean?

A.    I believe there were emails still saying **that we needed payoff letters**. I think there was still **some org docs** that were needed at that point. I don't believe we had everything at that point, there was still a punch list.

*Miller Depo*. at pages 21, Line 23 through Page 22, Line 18 (emphasis added)

In other words, the outstanding items were "payoff letters" and "some org docs." *Id*. Overlaying Mr. Hsu's e-mail on this testimony is incredibly revealing, the emails which Ms. Miller alludes to were actually sent by Mr. Hsu to Riverside (before the closing and pursuant to Riverside's Closing Requirements) and in these emails Mr. Hsu specifically addressed and attached: those "needed payoff letters … [and] … some org docs…."

….[W]e would still like to clear up any title issues in advance of the closing. I have attached the following:
1) Org. docs for the sellers
2) Resolution for the sellers appointing me as the signatory. Ill provide signed ones at closing (if not before)
3) Exception #8 b, c, and d – these are against prior sellers or held in escrow so I can put you in touch with our title company to omit if not already done so.
4) Exception #8 a, e, f, g, or h – they are either against similar names or we'll pay/hold.
5) Exception 28/37 – I have attached the bankruptcy order that should resolve this issue. If not, please let me know.
6) Mortgage – payoff letters for various mortgages attached.

Defendants' Exhibit T. The chronology then becomes very clear: Riverside never responded to this email because after Riverside got this e-mail from Mr. Hsu, they then reached out to Debtor's transactional attorney, it was the Debtor who responded that it was still seeking a hard-money lender because "the bank the initial lender is not provided a commitment, we are seeking to go ahead with a hard money lender" and had another, more pressing, closing on that day, Defendants' Exhibit U. Indeed, Mr. Hsu cured any issue regarding these items when he forwarded them and

neither Riverside nor Debtor have ever claimed the foregoing documents did not satisfy these alleged exceptions.

Fundamentally, by Riverside's own Closing Requirements, all these matters were dealt with more than two days prior to closing and that is considered "ample time." The only requirement remaining was for Debtor to confirm its attendance, and Debtor failed to do so, evidencing Debtor's unreadiness, inability, and unwillingness to close.

With respect to point two raised in the 770 Beck Closing Rejection Letter, Debtors transactional counsel states "I never received any confirmation via email or phone call from Riverside, that they were ready to insure title … for a December 18, 2017 closing," as if this is somehow an incurable title defect or evidence of one. *Avi Weisel's Dec.*, Page 4, ¶ 13. This is a non-sequitur and false. As with Point One, Riverside sought Debtor's confirmation – in accordance with its own Closing Requirements – and Debtor failed to confirm because Debtor was seeking a last minute hard money lender. Besides that, as with Point One, *assuming arguendo*, Riverside was to make this confirmation, its failure to do so does not create an allegation that there is an incurable title defect. Nowhere in this chronology is there an allegation of an existence of an incurable title defect to justify Debtor's failure to attend 770 Beck Street's property time of essence closing.

As for Point Three, this alleged lease matter is not an incurable title defect as a matter of law and fact, and importantly by Debtor's own admission. Debtor admits that this is yet another "issue" and, more illustratively Debtor's transactional attorney separates this matter from "title issues" altogether: "I tried to move the ball forward to a closing, including repeated requests for access, status of title, clarity regarding representations made regarding the Beck street commercial lease, to no avail." *Weisel Dec.* Page 2, ¶5. In other words, this Point Three is separate and distinct

from the "status of title." The Complaint makes a similar distinction when it pleads that "in addition to the need to resolve the title issues, before closing could occur the Sellers were required to address a question that arose as to the status of a purported lease for the first floor …." *Complaint at ¶ 22.*

It is unambiguous that even Debtor does not consider Point Three as an alleged incurable title defect, but really just a "question that arose." *Id.* Point Three is Debtor's transparent attempt to conflate and muddy the waters. If taken at face value, Debtor never alleges Point Three to be an incurable title defect and specifically lists it separately from "title issues." Further, the allegation is false because an executed lease was provided. Defendants' Exhibit S. At most, this is Debtor merely speculating that if a tenant failed to allegedly take possession then a commercial lease is not *bona-fide*. However, regardless, issues of whether a lease existed or not is a not a title defect at all,[6] Point Three is insufficient to defeat Defendant 770 Beck Street's motion for summary judgment. Moreover, because this alleged lease issue is unique to 770 Beck Street, Point Three is definitely irrelevant as to the whether summary judgment is warranted as to the other Contracts of Sale.

Finally, though Debtor asserts that the Closing Rejection Letters "generally cover all of the issues," Plaintiff does add one additional matter concerning 770 Beck: "Defendants cannot even

---

[6] Similarly false is Debtor alleging that Mr. Hsu precluded Debtor's due diligence concerning the commercial lease. Not only did Debtor sign an addendum to the 770 Beck Street contract after Defendant's previous attorney allegedly failed to provide an SNDA (which is not evidence of a lease' bona-fides), but Debtor had almost two years to do whatever due diligence it wanted and instead waited until the Friday prior to the Debtor's third attempt at closing to <u>suddenly</u> request phone numbers of a commercial tenant. Most telling is that Debtor did not make this request because it was concerned about the commercial lease bona-fides, but because Debtor's yet to be secured hard money lender was concerned. This is not Mr. Hsu's preclusion of due diligence; this is Debtor's inconceivable attempt to blame Defendants' for its own inability to close on Law Day and is a border-line bad faith allegation.

dispute that they were incapable of delivering vacant Properties on December 18, 2017." *DMOL*, Page 13.

This matter was never alleged, let alone as a reason to not close in the 770 Closing Rejection Letter nor in the Complaint and must be disregarded. Debtor specifically states that the Closing Rejection Letters generally cover all of the issues in the complaint, if not fully. Neither the Closing Rejection Letters, the Complaint, nor the previous opposition to the motion to dismiss mention a single word about tenancies and vacancies. This is also not an incurable title defect for the simple reason that it has nothing to do with title, whatsoever. Further, in connection with Debtor's argument about the applicability of the Mend the Hold Doctrine, this is precisely why it is applicable: Had Defendant 770 Beck Street knew this was a reason for rejection (which it was not), then Defendant 770 Beck Street – at the very least – would have addressed this issue during discovery instead of being surprised by this allegation during summary judgment. Notwithstanding the fact that Defendants have been precluded from conducting meaningful discovery regarding this alleged issue, Mr. Telahun did, in fact, testify that the

> parties can agree to the tenancy status of the building at close …I believe that was agreed to verbally and that objection was never raised, I will swear. It was understood by both parties involved, when the tenancy of the building was disclosed in the offering memorandum. Both parties agreed to that transaction pursuant to that offering memorandum

which included the tenancies. *Telahun Depo.*, Page 75, Lines 5-14. This is unopposed testimony. Debtor's Hail Mary attempt to create an issue of fact to defeat summary judgement must be ignored.

In sum, besides all the points raised here, there is not a single other allegation to justify Debtor's failure to attend the 770 Beck Street closing. Specifically, the record is devoid of any alleged incurable title defects and therefor Defendants must be granted summary judgment.

ii.    *Debtor is Not Entitled to Seek the Specific Performance of the 1988 Morris Avenue Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect*

Debtor's rejection for the closing of 1988 Morris Avenue, sets forth the same first two reasons as Debtor's rejection of 770 Beck Street which suffer from the same deficiencies. Debtor then adds the following third reason:

> After entering into such a contract, the contract vendee discovered that that there was substantial damage to the Premises which if not repaired would incur further deterioration and damages to the Premises. Such damages to the Premises left the Premises in a condition that were in no way similar to what was represented to the Contract vendee at the time of entering into such contract of sale. Despite such substantial damage to the Premises including structural damages this has not been addressed by your client.

Exhibit V, Closing Rejection Letters at 1988 Morris Avenue.

First, Debtor argues that the License Agreements did not cover all five of the properties. It is unclear what all five of the properties has to do with 1988 Morris Avenue access. Accordingly, it is submitted that as far as 1988 Morris Avenue is concerned, the license agreements specifically covered access, repair, and a litany of other rights pertaining to 1988 Morris Avenue. Debtor admits this. Accordingly, access was certainly provided for 1988 Morris Avenue under the license agreement.

Second, Debtor alleges Defendant 1988 Morris denied Debtor access (apart from that provided under the license agreement). Denial of access is not an incurable title defect; it is only an issue here because Debtor's unconfirmed hard-money lender asked for it last minute. Debtor

tries to argue that it was inspecting repair work, but that is squarely contradicted by (i) the fact that the repair work was the purpose of the license agreement so Debtor had access to inspect and perform the repair work; and (ii) Debtor's own testimony that "the bulk of the stuff was done" leaving maybe only a toilet to fix, but the material work such as "to repair the entire roof" was done as the "first thing."[7] *Reigler Depo.* at page 119, Lines 4-6.

Third, Debtor tries to side-step the issue about whether Debtor really asked for the access last minute by stating that one of Debtor's then-agent, Mr. Jackson Strong, was asked for access two days prior – December 9th. *DMOL*, Page 4. However, on December 3rd, 2018, Mr. Jackson Strong commanded Plaintiff to "conduct all further contact via [Mr. Hsu] or Dwane. The owners told me I am not authorized to communicate with the [buyer] (you) before the sale is complete." *Reigler Dec.*. at Page 11. So, despite receiving this clear direction, Plaintiff continued to pester Jackson Strong and waited until the "last minute" to contact Mr. Hsu for access. In other words, all of Plaintiff's opposition arguments relying on Mr. Strong are false and the asking Mr. Hsu for access within thirty minutes of the requested access is certainly last minute (especially considering it was upon Debtor's potential hard-money lender's behest.

Further, the December 9 access request to Mr. Hsu was for the "beck, forest, and toppings" addresses (*Id* at Page 12) and, pursuant to the Closing Rejection Letters, access is only listed as a justification to reject the 1988 closing. Exhibit V, Closing Rejection Letters at 1988 Morris Avenue. Consequently, the December 9th access request is completely irrelevant.

---

[7] Remarkably, despite this being Mr. Reigler's own testimony, Mr. Reigler then swears in its Affidavit that "together with the failure of defendants to provide access (with known damage in the case of at least 1988 Morris) … closing was merely a ploy." *Riegler Dec.* ¶ 21. Mr. Reigler's internal contradiction (not to mention admitting that access is separate and apart from an incurable title defect) must be noticed and accordingly Mr. Riegler's credibility doubted.

Accordingly, Plaintiff's opposition fails to defeat Defendant 1988's argument that Plaintiff failed to allege a single incurable title defect to justify Plaintiff's failure to close.

iii.    *Debtor is Not Entitled to Seek the Specific Performance of the 1974 Morris Avenue Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect*

Besides the same two listed reasons for rejection, as set forth in 770 Beck Closing Rejection Letter which suffer the same defects, the record is absolutely devoid of a single incurable title defect to justify Plaintiff's failure to consummate the sale of 1974 Morris Avenue. Accordingly, Defendant 1974 Morris Avenue is entitled to summary judgment dismissing the complaint as against Defendant 1974 Morris Avenue.

iv.    *Debtor is Not Entitled to Seek the Specific Performance of the 1143 Forest Avenue Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect*

Besides the same two listed reasons for rejection, as set forth in 770 Beck Closing Rejection Letter which suffer the same defects, the record is absolutely devoid of a single incurable title defect to justify Plaintiff's failure to consummate the sale of 1143 Forest Avenue. Accordingly, Defendant 1143 Forest Avenue is entitled to summary judgment dismissing the complaint as against Defendant 1143 Forest Avenue.

v.    *Debtor is Not Entitled to Seek the Specific Performance of the 1821 Topping Avenue Contract of Sale Because There is No Record of a Single Alleged Incurable Title Defect*

Besides the same two listed reasons for rejection, as set forth in 770 Beck Closing Rejection Letter which suffer the same defects, the record is absolutely devoid of a single incurable title defect to justify Plaintiff's failure to consummate the sale of 1821 Topping Avenue. Accordingly, Defendant 1821 Topping Avenue is entitled to summary judgment dismissing the complaint as against Defendant 1821 Topping Avenue.

## DEBTOR WAS NOT READY, WILLING, AND ABLE TO CLOSE

Debtor devotes a section entitled "Plaintiff was and remains ready and willing to close." A crucial element missing in the title is "ability." Debtor argues that – in the end of the day – it could have closed via conventional lending, hard-money lending, or its own cash, but for "defendants set[ting] up a proper closing." *DMOL*, Page 15.

The record shows a different picture. Besides Debtor's correspondence with Riverside wherein Debtor desperately hopes for a hard-money lender, Debtor's counsel wrote to Mr. Hsu saying "the lender is *en route* already … this will jeopardize our ability close by next week." Defendants' Exhibit M. Surely that admission does not support Debtor's now courageous ability to close in cash. Debtor expressly wrote that failure to secure the lender would jeopardize its ability close no finance contingency contract of sales. Tellingly, although Debtor now claims it had sufficient cash to close these contracts, the simple inexcusable truth is Debtor never agreed to close in cash, and – instead – awaited financing. Further, the record is clear that Mr. Weisel, Debtor's then counsel, failed to confirm the closing date and even stated that Debtor had a more pressing closing in a different borough.

In sum, Debtor – by its own admission – was either unready, unwilling, or unable to close. Either way, at least one of those crucial elements were missing. But for, Debtor's decision to not appear at the five time of essence closings, each of the five properties would have been sold. The blame is with Debtor.

## THE DAMAGES DEBTOR SEEKS ARE NOT AVAILABLE

Debtor states  that "where a seller draws a prospective buyer into a transaction when it cannot possibly convey marketable title and then itself stymies the efforts of the buyer to remove the encumbrance, the seller may not rely on the language of the rider to keep the buyer's down

payment." *DMOL*, Page 15. As demonstrated, this is not the case here. It was Defendants whose efforts were stymied by Debtor. Defendants' counsel attempted to work with Riverside, but Debtor – in an effort to create a pretextual reason for its own unreadiness, unwillingness, and inability – failed to confirm the imminent time of essence closing. *Reigler Dec*., Exhibit C, Page 38 (Plaint. Bates No. 1.27.19000410); *See* Exhibit M, N, and T; Miller Depo. at pages 21, Line 23 through Page 22, Line 18.

## THERE WERE NO ALLEGED DEFECTS IN TITLE

Debtor argues that "because ... Riverside did not agree to insure the Properties as of December 18, 2017, Defendants breached each of the Contracts. As demonstrated, the record is clear as to why Riverside never insured title – it was never asked to by Debtor. Defendants reached out to Riverside and when Riverside asked for confirmation from Debtor (in accordance with Riverside's own rules), it was the Debtor that failed to confirm and stopped the closing process from being finalized. *See DMOL*, Page 16.

In other words, it is not that Riverside affirmatively disagreed with insuring the properties, it is that Riverside never got Debtor's confirmation to do so.

## <u>CONCLUSION</u>

Wherefore, for the foregoing reasons, Defendants respectfully request that the Court grant their Motion to Summary Judgment and award such other and further relief as the Court deems just proper and equitable.

Dated: New York, New York
      August 14, 2019

                              **GOLDSTEIN HALL PLLC**
                              /S/ Brian J. Markowitz
By:          **BRIAN J. MARKOWITZ, ESQ.**
                              DANIEL GOLDENBERG, ESQ.
                              Attorneys for Defendants
                              *1988 MORRIS AVENUE LLC, 1974 MORRIS AVENUE LLC, 700 BECK STREET LLC, 1143 FOREST AVENUE LLC and 1821 TOPPING AVENUE LLC*
                              80 Broad Street, Suite 303
                              New York, New York 10004
                              Tel. (646) 768.4105
                              Fax. (646) 219.2450