Joseph Zelmanovitz
Abraham Neuhaus
**STAHL & ZELMANOVITZ**
747 Third Avenue, Suite 33B
New York, New York 10017
T: (212) 826-6422
F: (212) 826-6402
joezelmanovitz@aol.com
aneuhaus@szlawllp.com

*Attorneys for Plaintiff / Debtor FMTB BH LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:                                                                                  Chapter 11

FMTB BH LLC,                                                                Case No. 18-42228-cec

                                      Debtor.

---------------------------------------------------------------x
FMTB BH LLC,                                                                Adv. Pro. No. 18-01052-cec

                                      Plaintiff,

        - against -

1988 MORRIS AVENUE LLC, 1974 MORRIS
AVENUE LLC, 700 BECK STREET LLC, 1143
FOREST AVENUE LLC, and 1821 TOPPING
AVENUE LLC,

                                      Defendants.

---------------------------------------------------------------x

## PLAINTIFFS RESPONSES TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff FMTB BH LLC ("plaintiff"), by its special counsel Stahl & Zelmanovitz,  hereby responds to Defendants' Statement of Undisputed Material Facts, as follows:

1. On or about June 19, 2017, Plaintiff entered in to five separate, but pertinently-identical contracts of sale, with each individual Defendant. The Contracts were entered in to by Plaintiff as follows:
i. From 1988 Morris Avenue LLC as seller, for the purchase of 1988 Morris Avenue, Bronx, NY, with a down payment of $25,833.33. Exhibit A, the 1988 Morris Contract;
ii. From 1974 Morris Avenue LLC as seller, for the purchase of 1974 Morris Avenue, Bronx, NY, with a down payment of $25,833.33. Exhibit B, the 1974 Morris Contract;

1

iii. From 700 Beck Street LLC as seller, for the purchase of 770 Beck Street, Bronx, NY, with a down payment of $34,444.44. Exhibit C, the 770 Beck Contract;

iv. From 1143 Forest Avenue LLC as seller, for the purchase of 1143 Forest Avenue, Bronx, NY, with a down payment of $34,444.44. Exhibit D, the 1143 Forrest Contract; and

v. From 1821 Topping Avenue LLC as seller, for the purchase of 1821 Topping Avenue, Bronx, NY, with a down payment of $34,444.44. Exhibit E, the 1821 Toping Contract.

**Response:** Admitted.

2. Each of the Contracts provided for an all-cash transaction and did not contain mortgage contingency. Exhibit A, B, C, D, and E, at ¶8 and Rider ¶22. Deposition of Mr. Joseph Reigler dated March 28, 2019 (the "Reigler Depo") *see generally* pages 104 (lines 23-25).

**Response:** Admitted.

3. Each of the Contracts contained a default provision that provided:

If Purchaser defaults hereunder, Seller's sole remedy shall be to receive and retain the Downpayment as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be impossible to ascertain and that the Downpayment constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.
Exhibits A, B, C, D, and E at ¶ 23(a).

**Response:** Admitted.

4. The Contracts further provided that the Defendants were to convey "such title as any reputable title insurance company of purchaser's choosing, licensed to do business in the state of New York shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department." *Id* at ¶ 13.

**Response:** Admitted, but Plaintiff refers to the Contracts themselves for the complete and relevant language of the Contracts, which also includes paragraphs 2 and 7 of the Riders to each of the Contracts.

5. The Contracts also provided that such title was "subject to … [permitted exceptions] … provided same does not render title to the Premises unmarketable." *Id* at ¶ 9(e).

**Response:** Denied. Plaintiff refers to the Contracts themselves for the complete and relevant language of the Contracts, which also includes the Riders. The permitted exceptions to title are set forth in paragraphs 2 and 7 of the Riders to each of the Contracts (*See* para. 1 (Rider binds over inconsistent portions of the Contracts)). *See also* Exhibit I to the Neuhaus Decl. at p. 36.

6. The Contracts also provided that "[v]iolations of any covenants and restrictions by existing improvements shall not be deemed an objection to title provided title company insuring title shall agree to insure that such improvements may remain in their present location as long as same shall stand." *Id* at Rider ¶2(f).

**Response:** Admitted.

7. The Contracts do not contain a cross-default provision; a default or breach of one of the contracts is not a default or breach of the remaining contracts. *Id.*

**Response:** Admitted.


8. The Contracts further provided that the "[Plaintiff] acknowledges and represents that [Plaintiff] is fully aware of the physical condition and state of repair of the Premises … and shall accept the same "as is" in the present condition and state of repair …." *Id* at ¶ 12.

**Response:** Denied. Rider 5 to each contract of sale provides, *inter alia*, that "appliances, plumbing, heating and electrical systems shall be in working order and roof should be free of leaks at closing…." Additionally, the Addendums (Exhibit I) require access to the properties and pursuant to the License Agreement dated October 17, 2017 (Exhibit H) plaintiff was permitted to conduct work on the Morris properties. *See generally*, Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment.

9. On August 22, 2017, the Defendants' previous attorney (Malik Pearson) sent Plaintiff's attorney five time of the essence ("TOE") letters, with respect to each of the Contracts, demanding Plaintiff close on each transaction pursuant to the terms of the individual Contracts, with a closing date set for September 14, 2017. Exhibit F, First TOE Letters.

**Response:** Admitted.


10. The September 14, 2017 closing did not occur, leading Defendants' counsel to send a second set of TOE notices to Plaintiff's counsel on September 28, 2017, demanding that Plaintiff close on each transaction pursuant to the terms of each of the Contracts, at the second closing date set for October 2, 2017. Exhibit G, Second TOE Letters.

**Response:** Admitted only to the extent that letters dated September 27, 2017 (Exhibit G) were received by plaintiff, otherwise denied.

11. For reasons not related to any action or inaction of Defendants['], the October 2, 2017 closing did not occur. Instead, on or about October 4, 2017, the Parties engaged in further negotiations that ultimately culminated in the execution of a License Agreement and an Addendum for each of the Contracts. Exhibit H and I, respectively.

**Response:** Admitted only to the extent that the parties executed the Addendum dated October 4, 2017 (Exhibit I) for each of the contracts, and a License Agreement dated October 17, 2017 (Exhibit H) with respect to 1974 and 1988 Morris Avenue, otherwise denied that it was "For reasons not related to any action or inaction of Defendants." *See* Decl. of Riegler para. 5 – 9 that *at least* one of the Properties suffered damages. *See also* Depo. of Strong at p. 65 (water was coming through the roof of a Morris Avenue Property); *See also* Depo. of Saleem at p. 49 ("there were leaks"). *See also* Depo of Telahun p. 38 (all of the Properties were in the same general poor condition).

12. The Addendums provided for, *inter alia*: i. the entire down payment on each of the five properties to be released to the Defendant sellers upon execution. *See* Exhibit I, at ¶ 2. ii. access to the properties by Plaintiff to make alterations and improvements, pursuant to a separate "Access Agreement". *See* Exhibit I, at ¶ 3. On October 17th, 2019, Defendants 1988 Morris Avenue LLC and 1974 Morris Avenue LLC entered into this Access Agreement with the Plaintiff to allow

3

Plaintiff access to the respective properties to perform work on those 5 properties, including flooring, paint scraping, kitchen renovations and staircase repair and renovation. Exhibit H, License Agreement. iii. a final TOE closing date of December 18, 2017. *See* Exhibit I, at ¶ 4. iv. an additional $169,000.00 down payment for each of the five properties. *See* Exhibit I, at ¶ 5. v. Plaintiff to pay monthly mortgage interest for the Properties, from execution of the Addendum to the closing date. *See* Exhibit I, at ¶ 6. vi. Defendants agreed that if it entered into lease agreements with tenants selected by Plaintiff, and provide lease commencement dates to begin after the closing date. Leases shall be conditioned upon and only effective if Plaintiff closes on the property. *See* Exhibit I, at ¶ 7.

**Response:** Plaintiff objects to the numerous bundled facts. Denied. Plaintiff admits only to i, iv and v and with respect to ii and vi refers the Court to the precise text (ii states that the "access shall be detailed in a separate Access Agreement mutually agreed upon between Seller and Purchaser.[,]" and the license agreement was limited to only the two Morris properties), and with respect to iii, plaintiff admits only that the parties agreed to a TOE closing date of December 18, 2017.

13. Thereafter, on or before October 19, 2017, the entire down payment then held by the escrow agent was released to the Defendants and the additional down payment of $169,000.00 per contract was received by the escrow agent. *Complaint* at ¶ 18.

**Response:** Admitted.

14. On or about December 6, 2017, the Defendant's new attorney, Brian Hsu, sent the Plaintiff's attorney five TOE letters stating, with respect to each Contract, that the closings would be held on December 18, 2018 at 10:00 AM, pursuant to the Addendums to the Contracts, at the offices of Defendants' attorneys. Exhibit J, Hsu TOE Letters.

**Response:** Admitted except that the December 6, 2017, 10:15 a.m. email from defendants' counsel Brian Hsu, accompanying the letters, stated: "I look forward to discussing what it will take to get to a closing by 12/18/17. Perhaps later this afternoon or tomorrow." *See* Email annexed to this statement as Exhibit A (Plaint. Bates Number 15).

15. Plaintiff's counsel replied "Confirmed. Looking forward." Exhibit K, Plaintiff's Confirmation.

**Response:** Denied. That email dated December 5, 2017 5:56 p.m. was a day prior and in response to an email from co-counsel confirming the co-counsel relationship. *See* Neuhaus Decl. at para. 3 and Exhibit B thereto (Plaint. Bates Number 15 - 17).

16. On December 11, 2017 – the week prior to closing and for the first time ever, the Parties' counsels engaged in back-and-forth correspondence that was precipitated by Plaintiff's counsel's request for access to three of the five properties on behalf of its, still un-secured and unidentified, lender. Exhibit L, Plaintiff's Bates No. 1.27.1900107 ("As mentioned on the phone, we need access today so try and get us to closing by next week").

**Response:** Denied. *See* Decl. of Riegler at para. 13 – 16; Exhbit B, Decl. of Weisel at paras. 3 – 4; Depo of Jackson Strong pp. 52 – 53, 65; Depo. of Saleem at p. 52, 59.

17. Not only was Plaintiff seeking this access for the first time (the week prior to a third attempt at a TOE closing), Plaintiff stated that it was still attempting to secure financing and that it needed to oblige a potential lender with access to the properties. Exhibit M, Plaintiff's Bates No.

4

1.27.1900106 ("the lender is *en route* already … as this will jeopardize our ability to close by next week."); Exhibit N, Plaintiff's Bates No. 1.27.1900095 ("The lender is near the property and they need access today.").

**Response:** Admitted only to the extent that the Court is referred to the contents of Exhibit M for the precise text of the emails and request for access which was denied by the defendants and otherwise denied. *See* Response 16 incorporated by reference herein. *See also* Decl. of Leifer; Decl. of Riegler at para. 4.

18. While Defendant's were unable to provided access on the date Plaintiff demanded (on little or no notice), Defendants' counsel advised Plaintiff's counsel, "[Defendnats] have always been willing to provide your clients access with reasonable prior written notice. That does not mean 30min like what happened today."; Exhibit O, Plaintiff's Bates No. 1.27.1900093; *see also* Exhibit P, Plaintiff's Bates No. 1.27.1900103 (Mr. Hsu wrote to Plaintiff's counsel that "1988 Morris is an as-is sale, with condition pre-existing the contract signing. Your client know that they were going to deal with the issues out of their own pocket, which is why they executed the license agreement"); Exhibit I, Addendums at ¶ 3; and Exhibit H, License Agreement. Moreover, none of the sales included a financing contingency.

**Response:** Denied, *see* Response 16 incorporated by reference herein (defendants had ample notice). Additionally, pursuant to para. 12 of the contracts "phone or otherwise" was specifically authorized. The emails show that access was denied as a negotiating tactic, there was no specified reason why access was not granted other than it was not "authorized" until "we see real movement from your side to get to a closing date." *See* Defendants' Exhibit M.

19. Plaintiff's counsel requests were less than a week before closing and requested same day access in order to secure an unidentified hard money lender. Tellingly, though this access was never requested again, a lender was nonetheless secured ten days later on December 21, 2019 (after the closing). Exhibit Q, Riverside Exhibit 13, ("[Plaintiff has] a new lender now – a hard money lender and the title will need to be updated. Lenders name is TBD but I do have the loan amount ….").

**Response:** Denied, access remained a sore point and was continuously denied. *see* Response 16 incorporated by reference herein. Indeed, access was obtained only through discovery on January 22, 2019, *See* Riegler Decl. at 22. Funding was always readily available. *See* Decl. of Leifer; Decl. of Riegler at para. 4.

20. In the same exchange, Plaintiff's counsel also sought verification with respect to a certain lease. Defendants' counsel verified the existence of the lease inquired about, Plaintiff's counsel then, belatedly, realized it was asking about the wrong lease (Plaintiff meant to ask about a commercial lease), and then, while acknowledging that Plaintiff has been in possession of that commercial lease, nevertheless sought confirmation about the commercial lease's validity. Exhibit R, Plaintiff's Bates No. 1.27.19000094 ("My apologies, I mistakenly attached the wrong lease … please ask your client if the (attached) lease is bona fide (and active and valid) or otherwise and it if its, our offer to close remains."); Exhibit S, Lease.

**Response:** Denied. The legitimacy of the lease at issue and misrepresentation were bona fide issues and of great concern. Ultimately, defendants admitted during discovery that the tenant had never taken possession (the rent roll provided was thus also inaccurate). *See* Decl. of Riegler at paras. 17 - 18, Decl of Mikhli at para. 5, Decl. of Weisel at paras. 3, 5. *See generally* Neuhaus

5

Decl. at Exhibit C at pp. 93 – 103, Hsu Depo. pp. 41 – 42, Strong Depo. at p. 71, Saleem Depo. at 57.

21. Unfoundedly, because Mr. Pearson denied such allegations, Plaintiff's counsel sought to "verify" the lease because Mr. Pearson purportedly "advised that there is no such tenant." Not only was this predicate false, but Plaintiff's counsel had possession of a copy of this lease and never expressed any concern with the lease. In fact, the parties never even discussed "whether that [lease] was still in existence" or "whether the tenant had defaulted on that lease …." Likewise, Plaintiff never made inquiries "concerning the tenant having defaulted on the daycare lease," or "as to [whether] the tenant not occupying the daycare space" prior to this last-minute exchange. Pearson Depo. *see generally* Pages 15-19.

**Response:** Denied. *See* Response 20 incorporated by reference herein.

22. Plaintiff never took any steps to hold Defendants in default on any of the Contracts over any of the foregoing alleged breaches. Despite never attempting to hold Defendants in default Plaintiff attempts to use these alleged non-title defects as reasons to not appear at the December 18th closing, as though both were incurable title defects, which they were not.

**Response:** Denied. *See* generally Decl. of Weisel that defendants wrongfully terminated prior to plaintiff's termination. *See generally*, Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment.

23. On December 14, 2017, Defendants' counsel e-mailed Plaintiff's title company, Riverside Abstract, "to request a closer for our closing on Monday, Dec. 18." Exhibit T, Plaintiff's Bates No. 1.27.19000731-733. Mr. Hsu again e-mailed Riverside, stating "I have attached the draft deeds and ACRIS docs. Is anything outstanding with you? *Id*. Riverside never responded to Mr. Hsu and never produced a responsive email pursuant to a *subpoena duces tecum* served on them., Miller Depo., *see generally* Pages 58-63.

**Response:** Admitted that Mr. Hsu emailed Riverside but did not copy plaintiff's counsel who were not privy to this email. Denied that Riverside never responded. *See* Exhibits X, T to defendants' Motion papers. *See also* Weisel Declaration and the Miller Depo.*,* and Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment (see footnote 6) that the first email was not copied to plaintiff's counsel, and the second email was sent Friday afternoon December 15, 2017 after the relevant recipients had left to observe the Jewish Sabbath.

24. To confirm this scheduling request, per Riverside's regular course of business, Riverside then sought to confirm the closing with Plaintiff. Deposition of Riverside Abstract's General Counsel, May 9, 2019 (the "Miller Depo.") at pages 21, Line 23 through Page 22, Line 18. ("[Riverside Abstract then] sent an email out to the [Plaintiff] and – asking, you know, is this truly happening, because what – that what we'll do on a typical basis, if one side tells you its closing, we'll confirm with the other side. And I don't believe we got clarity from the other side that we should be showing up.").

**Response:** Admitted only that Riverside testified that it sought to find out of a closing was expected otherwise Denied. *See* Depo of Miller that Ms. Miller stated that the closing was not going to happen with Riverside Abstract's participation on December 18, 2017. *See generally*, Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment.

25. On Friday, December 15, 2017, Plaintiff admitted to Riverside Abstract that it was neither ready, willing, nor able to close because it had not secured financing that it need to purchase the properties. Exhibit U, Riverside Exhibit 14. ("the bank the initial lender is still not provided a commitment, we are seeking to go ahead with a hard money lender" and then that Plaintiff "may be closing this with a hard money lender last minute and hence this title clearance needs to be resolved ASAP.")

**Response:** Denied. *See* Decl. of Riegler and Decl. of Leifer that at all relevant times, Leifer could have closed if necessary. *See generally*, Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment.

26. Despite not getting access to the properties, and never requesting access after December 11, 2017, on December 11th, on December 21st, 2017 (a week after the TOE closing) that Plaintiff informed Riverside Abstract that it has secured a lender. Exhibit Q ("[Plaintiff has] a new lender now – a hard money lender and thus the title will need to be updated. Lenders names is TBD but I do have the loan amount …."). Further, this E-Mail confirms that Plaintiff was looking to close on seven properties simultaneously; the remaining two properties were not being purchased from any of the Defendants herein (1022 East 226th Street and 1057 Teller Avenue and Plaintiff never closed on these two properties).

**Response:** Denied. *See* response to 19 and 25.

27. Notwithstanding, on the December 18, 2017 Law Day, Plaintiff failed to appear at the closing and Plaintiff's counsel e-mailed Defendants' counsel three letters, rejecting the TOE closing date due to various alleged issues with each closing. Exhibit V, Closing Rejection Letters.

**Response:** Admitted only that the letters at Exhibit V were provided to defendants. Otherwise, it is denied that plaintiff "failed to appear" but were in fact lawfully excused from appearing for the reasons set forth in the accompanying submissions and the memorandum of law.

28. Taken individually, the three Closing Rejection Letters fail to state any defects to title, let alone any incurable title defects sufficient to excuse Plaintiff's appearance at a TOE closing. *Id*.

**Response:** Denied, each letter refers to the title company's failure to complete the clearing of title with defendants. Additionally a lis pendens is noted with respect to 1821 Topping Ave. *See* Exhibit V.

29. The first Closing Rejection Letter was regarding 770 Beck Street and stated:

1.The notice provided in your letter is insufficient as Riverside Abstract, the title company has advised us that no one from your offices have been in contact with them regarding clearing title.

2.Unless I have confirmation from the title company that you are ready, willing, and able to deliver clear title at Closing, this TOE is premature and being untimely, is hereby rejected.

3.Further, the lease presented to us for the 1st floor of this Premises was fraudulent and thus misrepresentation of a material fact, which was one of the base inducement for entering into such a contract of sale.

Exhibit V, Closing Rejection Letter at 770 Beck Street.

There is no incurable title defect mentioned in this letter. The first point is false and is not an incurable title defect because Mr. Hsu's December 14th e-mails demonstrate that Plaintiff' was in contact with Riverside regarding title, but it was, instead, Riverside that failed to respond to Mr. Hsu's e-mails. Also, failing to correspond with a title company in order to schedule a closing is not a title defect. Similarly, Plaintiff's own e-mails demonstrate that Plaintiff (rather than Defendants) did not confirm Closing when asked by Riverside and in the same exchange stated that it did not yet secure a hard-money lender – only to be secured after Closing. The second point is false and is not an incurable title defect because Riverside's general counsel admits that it does not provide confirmation about a purchaser's readiness, willingness, and ability to deliver clear title, but merely coordinates and schedules the closing upon a purchaser's confirmation. Finally, the third point is false and is not an incurable title defect because Plaintiff was unable to establish any fraud related to the alleged lease and the existence or non-existence of a lease is not an incurable defect. Indeed, Plaintiff raised its concerns regarding the lease for the first time on December 11th, 2019.

**Response:** Objection, this is argument and not the subject of an undisputed statement of fact. Denied. *See* generally, the accompanying submissions and memorandum of law.

30. The second Closing Rejection Letter was regarding 1988 Morris Avenue and stated:

1.The notice provided in your letter is insufficient as Riverside Abstract, the title company has advised us that no one from your offices have been in contact with them regarding clearing title.

2.Unless I have confirmation from the title company that you are ready, willing, and able to deliver clear title at Closing, this TOE is premature and being untimely, is hereby rejected.

3.After entering into such a contract, the contract vendee discovered that that there was substantial damage to the Premises which if not repaired would incur further deterioration and damages to the Premises. Such damages to the Premises left the Premises in a condition that were in no way similar to what was represented to the Contract vendee at the time of entering into such contract of sale. Despite such substantial damage to the Premises including structural damages this has not been addressed by your client.

Exhibit V, Closing Rejection Letter at 1988 Morris Avenue. There is no incurable title defect mentioned in this letter. The first point is false and is not an incurable title defect because Mr. Hsu's December 14th e-mails demonstrate that Plaintiff' was in contact with Riverside regarding title, but it was Riverside that failed to respond to Mr. Hsu's e-mails. Also, failing to correspond with a title company in order to schedule a closing is not a title defect. The second point is false and is not an incurable title defect because Riverside's general counsel admits that it does not provide confirmation about a purchaser's readiness, willingness, and ability to deliver clear title, but merely coordinates and schedules the closing upon a purchaser's confirmation, and – as discussed – it was Plaintiff that failed to confirm closing when asked by Riverside (rather than Defendants). Finally, the third point is false and is not an incurable title defect because documentary evidence demonstrates that Plaintiff entered into the License Agreement and Addendum *after* learning of any alleged damage and Plaintiff, itself, proceeded to cure it. the issues of this property's condition was addressed pre-closing by the parties. Specifically, On October 17th, 2019, the parties entered into a license agreement wherein Plaintiff was permitted to address these pre-existing issues and the license agreement was further contemplated by and incorporated into the Addendums. As such, Plaintiff was well aware of the alleged damages and took steps to address them. Accordingly, Plaintiff cannot cite the alleged damages as a reason to not appear at the Closing. Further, Plaintiff's own testimony reflects that, in accordance with the license agreement, most – if not all – repairs were completed; "he didn't finish the job completely because he still needed to finish some stuff up, but the bulk of it was done." Reigler Depo. at page

119, Lines 4-6. The third Closing Rejection Letter was regarding 1974 Morris Avenue; 1821 Topping Avenue, and 1143 Forrest Avenue and stated:

1. The notice provided in your letter is insufficient as Riverside Abstract, the title company has advised us that no one from your offices have been in contact with them regarding clearing title.

2.Unless I have confirmation from the title company that you are ready, willing, and able to deliver clear title at Closing, this TOE is premature and being untimely, is hereby rejected.

Exhibit V, Closing Rejection Letter at 1974 Morris Avenue, 1821 Topping Avenue, and 1143 Forrest Avenue. As with the other letters, there is no incurable title defect mentioned in this letter as both points are identical to the other two and neither, as discussed, are incurable title defects.

**Response:** Objection, Exhibit V is misquoted by omission with respect to the lis pendens and 1821 Topping Avenue, this para. 30 is argument and not the subject of an undisputed statement of fact. Denied. *See* generally, the accompanying submissions and memorandum of law.

31. On December 18, 2017, the Defendant sellers appeared at the offices of their attorneys, Goldstein Hall PLLC, at 10:00 a.m., to close on the Contracts, pursuant to the December 5, 2017 TOE letter and the Addendums. A court stenographer was present to transcribe testimony. The Defendants and their attorneys waited for approximately one hour, to provide time for the Plaintiff to appear. Upon the elapse of a reasonable amount of time, it was apparent that the Plaintiff would not appear at the closing. The Defendants' attorneys testified before the stenographer that they had appeared at the TOE closings, that Defendants were ready, willing and able to close, and that the Plaintiff and its attorneys failed to appear. A copy of the stenographer's transcript for each of the five closings are collectively annexed hereto as Exhibit W, Closing Transcripts.

**Response:** Denied that this was anything but a sham closing. *See* generally, the accompanying submissions and memorandum of law.

32. On December 19, 2018, the Defendants' attorney sent letters to the Plaintiff's attorney informing him that the Plaintiff was in default of the Contracts and that the Contracts would be deemed canceled, null and void. Defendants' attorney further informed Plaintiff's counsel that the Additional Down Payment would be kept as liquidated damages pursuant to the default provisions of the Contracts. Exhibit X, Default Letters.

**Response:** Admitted. However it is also clear that defendants were trying to close subsequent to December 18, 2017. *See, e.g.*, Exhibit 16 to the Telahun Depo. (email dated December 20, 2017 from Rafael Telahun); Exhibit B to the Mikhli Decl.; Exhibits B - C to the Weisel Decl.); Depo of Karla Miller, Esq. p. 23 "(I don't believe we had everything at that point, there was still a punch list."); p. 25 ("As of December 18, we did not have everything."); p. 39 ("My understanding is not everything was cleared up by December 18."); and pp. 52, 66 (same). Some of the items that had to be resolved were not actually available on the law date. *see id.* at pp. 48 – 49, 87 - 89. *See generally* 24, 26 – 17, and could have taken a long time to remedy. *Id.* at pp. 48 – 49. *See generally,* Plaintiff's Memorandum of Law in Opposition to the Motion for Summary Judgment.

Dated: New York, New York
        August 2, 2019

                            **STAHL & ZELMANOVITZ**
                            *Attorneys for Plaintiff / Debtor FMTB BH LLC*

                            By: */s/ Joseph Zelmanovitz*
                                  Joseph Zelmanovitz
                                  Abraham Neuhaus
                            747 Third Avenue, Suite 33B
                            New York, New York 10017
                            (212) 826-6422
                            joezelmanovitz@aol.com
                            aneuhaus@szlawllp.com