Joseph Zelmanovitz
**STAHL & ZELMANOVITZ**
747 Third Avenue, Suite 33B
New York, New York 10017
T: (212) 826-6422
F: (212) 826-6402
joezelmanovitz@aol.com
*Attorneys for Plaintiff / Debtor FMTB BH LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| FMTB BH LLC, | Case No. 18-42228-cec |
| Debtor. | |

-------------------------------------------------------------x

| | |
|---|---|
| FMTB BH LLC, | Adv. Pro. No. 18-01052-cec |
| Plaintiff, | |
| - against - | |
| 1988 MORRIS AVENUE LLC, 1974 MORRIS AVENUE LLC, 700 BECK STREET LLC, 1143 FOREST AVENUE LLC, and 1821 TOPPING AVENUE LLC, | |
| Defendants. | |

-------------------------------------------------------------x

## POST-TRIAL MEMORANDUM
## OF DEBTOR/PLAINTIFF FMTB BH LLC

**STAHL & ZELMANOVITZ**
*Attorneys for Plaintiff / Debtor FMTB BH LLC*
**747 Third Avenue, Suite 33B**
**New York, New York 10017**
**(212) 826-6422**
**joezelmanovitz@aol.com**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    THE CONTRACTUAL PROVISIONS
BREACHED BY DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.    EVIDENCE OF EACH DEFENDANT'S
BREACH OF ITS CONTRACT OF SALE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    Failure To Remove Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        *770 Beck Street* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        *1143 Forest Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        *1821 Topping Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        *1988 Morris Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        *1974 Morris Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.    Failure To Have Buildings Vacant Of Tenants. . . . . . . . . . . . . . . . . . . . . 9

    C.    Failure To Grant Access Before Closing . . . . . . . . . . . . . . . . . . . . . . . . . 9

    D.    Failure To Clear Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        *770 Beck Street* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        *1143 Forest Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        *1821 Topping Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        *1974 Morris Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        *1988 Morris Avenue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    E.    1988 Morris Avenue Was Certainly Not Free Of Roof Leaks . . . . . . . . . . . . . . 17

III.    PLAINTIFF'S EXHIBIT LIST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, Attachment

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## PRELIMINARY STATEMENT

Debtor-Plaintiff FMTB BH LLC respectfully submits this post-trial memorandum of law as ordered by the Court at the close of the trial. In accordance with the Court's directions, this memorandum focuses on the breaches of the contracts of sale, and anticipatory breaches of contract, committed by each defendant with respect to each of the five properties at issue in this case. Those breaches and anticipatory repudiations of the contract as a matter of law excused plaintiff's appearance and participation at the (sham) closing set by defendants for December 18 2017.

As stated by the Court in its Decision Denying (Defendants') Motion for Summary Judgment, entered January 13, 2020 (ECF No. 50), at page 6: "New York law is clear that the Plaintiff was not required to tender performance under the Contracts and appear on a law day if the Defendants breached, or anticipatorily breached, the Contracts." As the trial demonstrated, each defendant breached the contracts of sale in multiple respects: (1) failing to have violations of record removed as of December 18, 2017 as required by the contracts, including violations issued by the New York City Landmarks Preservation Commission which could not possibly be resolved by the closing date; (2) failing to have the buildings vacant of tenants as required by the contracts with respect to three of the properties: 770 Beck Street, 1821 Topping Avenue, and 1143 Forest Avenue; (3) failing to allow plaintiff access to inspect each of the properties before the scheduled closing, as required by the contracts of sale and each of the Addendums to the contracts of sale (Exhibits 6-10, and Defendants' Exhibit QQ)[1]; (4) failing to satisfy title issues by December 18, 2017 with respect to each of the properties, so as to have title cleared and insured by Riverside

---

[1]      References to Exhibits are to the agreed-upon exhibits described in the Pre-Trial Order. Other trial exhibits are denoted by "Plaintiff Exhibit" or "Defendants Exhibit." References to the trial transcript are preceded by the name of the trial witness. For example, "Mikhli Tr. 48" means the testimony of trial witness Izidor Mikhli appearing at page 48 of the trial transcript.

1

Abstract, plaintiff's title company, which did not find that the transaction was ready to close; and (5) with respect to 1988 Morris Avenue, failing to have the roof free of leaks at the time of closing as required by the Seller's Rider to the Contract of Sale. With respect to this latter point, defendants cannot be heard to exculpate themselves from this contractual provision by arguing that the License Agreement (Exhibit 11) was entered into for the purpose of having plaintiff repair and improve that property. There is no dispute that plaintiff was locked out of those properties as of the end of November 2017, and never was granted access thereafter.

In addition, to the foregoing breaches of the contracts of sale, evidence at the trial showed that defendants concealed material information from plaintiff in connection with the Beck Street property. Defendants had represented that there was a commercial daycare tenant that leased space at the building for an annual rental of $24,000, but defendants never disclosed to plaintiff that the daycare tenant never moved into the premises and had repudiated the lease. While all residential tenancies were to be vacant at the time of closing, this one and only commercial lease in all five properties was important to obtain financing for the purchase—precisely why plaintiff in November and December 2017 repeatedly requested that defendants obtain a subordination, non-disturbance, and attornment agreement ("SNDA") from the commercial tenant to show the prospective lender. The refusal to provide the SNDA denied plaintiff the ability to finance the acquisition. *See* testimony of Abraham Weisel, Weisel Tr. 186-187 (plaintiff and its lender were relying on the daycare lease concerning financing the acquisition); Riegler Tr. 117-119 (Riegler received the Bronx Properties Offering Memorandum (Exhibit 58) and examined it before entering into the contract of sale; plaintiff understood from it that the commercial lease space at Beck Street was occupied by the tenant); Riegler Tr. 144-145 (plaintiff assumed at the time of contracting that the annual rent of $24,000 listed in the rent roll for the commercial space was correct). The

prospective revenue from the daycare lease appeared on a rent roll that was provided in the offering memorandum for the sale of the five properties prepared by defendants' broker, Dwane Jones, based on information he received from "the entire team" of the sellers. Jones Tr. 298-315; Exhibit 58, PDF page 1121. Plaintiff was informed that this Beck Street commercial lease was signed. Jones Tr. 320. But plaintiff was never informed that the tenant never occupied the premises and reneged on the lease.

Although the contracts of sale contained no mortgage contingency, and plaintiff could have funded the purchase prices itself through its investors like Joel Leifer and Joel Wertzberger, the financing opportunity was eliminated by this defendants' material misrepresentation. Further, as Mr. Riegler explained, this caused plaintiff to seriously question the bona fides of defendants and their ability to deliver properties as represented, which questions were compounded by defendants' unreasonable denial of access to plaintiff to inspect the properties before closing.

## I.

## THE CONTRACTUAL PROVISIONS BREACHED BY DEFENDANTS

Each of the five contracts of sale and each of their riders to the contract of sale (Exhibits 1-5) are identical except for the purchase price and amount required for the downpayment. For ease of explanation, we use Exhibit 1, the contract of sale between plaintiff and defendant 1988 Morris Avenue LLC as a reference point regarding the contractual provisions at issue.

Paragraph 10 of the contract of sale provides in relevant part:

**Governmental Violations and Orders.** (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date of closing by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises. *The Premises shall be conveyed free of them at Closing.* (Emphasis added.)

3

Irrespective of whether such violations are or are not a "title" issue in which the title company would get involved, under the contracts of sale violations issued by governmental authorities were required to be cleared by the time of the closing. Mikhli Tr. 106. This includes violations issued by the New York City Landmarks Preservation Commission. As Mr. Strong, defendants' on-site manager and designee under the License Agreement, testified, any alterations to a landmark-designated building require a filing with the Landmarks Preservation Commission. To cure any violation, there must be an application filed with the Commission. Strong Tr. 110-111. Strong also stated that in the past it took at least a few weeks, and perhaps up to four months, for defendants to cure violations issued by the Landmarks Preservation Commission. The process could take even longer if the Commission has any objection to the application. *Id.* at 112. These violations cannot possibly be cured at closing. *See also* Pearson testimony, Pearson Tr. 165 (landmark violations do not get cured in a day or two).

The law is very clear that other than the removal of an offensive sign and violations of such minor nature, the Rules of the Landmarks Preservation Commission mandate a process for legalizing or removing violations that involves much more than just paying a fine. As set forth in Title 63, Chapter 11, of the Rules, at section 11-01:

> (e)    A violation is "legalized" when the Commission issues a permit approving and authorizing the work that was done without a permit.

> (f)    A violation is "cured" where the Commission issues a permit authorizing modifications to the illegal condition to make it appropriate, or where the Commission authorizes work to replace the illegal work, and the modification or replacement work is completed, and the Commission has issued a Notice of Compliance.

Paragraph 12 of the contract of sale provides in relevant part:

> **Condition of Property.** Purchaser acknowledges and represents that Purchaser is fully aware of the physical condition and state of repair of the Premises and of all other property included in this sale, . . . and shall accept the same "as is" in their

4

present condition and state of repair, subject to reasonable use, wear, tear, and natural deterioration *between the date hereof and the date of closing . . . . Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.*

Paragraph 13 of the contract of sale provides:

**Insurable Title.** Seller shall give and Purchaser shall accept such title as **any reputable title insurance or abstract company of Purchaser's choosing licensed to do business in the state of New York** shall be willing to approve and issue in accordance with its standard form of title policy approved by the New York State Insurance Department, subject only to the matters provided for in this contract. (Bold typeface in original).

Paragraph 16 of the contract of sale provides in relevant part:

**Conditions to Closing.** This contract and the Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:

.        .        .        .        .

(d) The delivery of the Premises and all building(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with keys to the Premises.

.        .        .        .        .

(g) The delivery by the parties of any other affidavits required as a condition of recording the deed.

Each of the Seller's Rider to Contract attached to the contract of sale provides the following provisions that, pursuant to paragraph 1 of the Rider, override any contradictory provision contained in the contract of sale:

Paragraph 5 of the Rider provides in relevant part:

Purchaser acknowledges that he has inspected the Premises, and is fully familiar with the physical condition and state of repair thereof, and shall accept the Premises "AS IS" and in its present condition, subject to reasonable use, wear, tear and natural deterioration *between now and the closing date*, without any reduction in the purchase price for any change in such condition by reason thereof subsequent to the date of this contract, except that the appliances, plumbing, heating and electrical systems shall be in working order and *roof should be free of leaks at closing.* (Emphasis added.)

Paragraph 2 of the Rider provides that the properties are deemed sold so long as title is marketable. In connection with this provision, this Court noted previously on July 24, 2018, in denying defendants' motion to dismiss the complaint (ECF No. 18, page 36), that "paragraph 7 of the rider provides that upon being informed of title objections, the Defendants were required to remedy those issues by closing or were entitled to reasonable adjournment of the closing if needed. If the sellers chose not to cure the defects, the sellers have the right to cancel the contract and return the deposits. . . . And therefore it appears that paragraph 7 of the rider would govern such that *the sellers were obligated to cure title defects prior to the closing.*" (Emphasis added).

In addition to the contracts of sale and the riders thereto, each Defendant executed an Addendum to Contract dated October 4, 2017 (Exhibits 6-10 or and Defendants Exhibit QQ). Among other things, each Addendum provided for a Time of the Essence closing date of December 18, 2017 and that the Purchaser would be granted access to the property.

With respect to the 1988 Morris Avenue and the 1974 Morris Avenue properties, plaintiff and those defendants entered into a License Agreement, dated as of October 17, 2017 (Exhibit 11), which, among other things, granted plaintiff a license to enter and have access to those properties to make improvements thereon. Paragraph 2 of the License Agreement provides that the term of the license ends at the completion of the closing on the properties on or before December 18, 2017. Paragraph 12 of the License Agreement designates Mr. Jackson Strong as defendants' agent and requires plaintiff to notify him "the morning when Work on the Properties is to be conducted on a given day."

## II.

## EVIDENCE OF EACH DEFENDANT'S BREACH OF ITS CONTRACT OF SALE

### A.    Failure To Remove Violations

The evidence proved conclusively that violations of record existed on each property.

*770 Beck Street:* Exhibit 41 is the title report for all properties, dated January 2, 2018,

two weeks after the purported closing date of December 18, 2017. As testified by Karla Miller,

Riverside Abstract's General Counsel, the report presents the same conditions (violations, etc.)

that existed as of December 18, 2017. Miller Tr. 31.

The Beck Street property had "many" violations of record issued by the New York City

Environmental Control Board. Ex. 41, PDF page 251; Miller Tr. 30. PDF pages 313-314 of

Exhibit 41 report four violations issued by the New York City Department of Buildings and the

Rent & Housing Maintenance Department of the City of New York. Miller Tr. 32. With respect

to the last violation described on PDF page 314, the violation is clearly not a matter of paying a

fine that can be deducted from the purchase price at a closing. It reports the failure "to file a

valid registration statement" "as required by adm code §27-2097," and describes the onerous

legal effects flowing from non-registration. No valid building registration statements were

provided to the title company. Mikhli Tr. 76.

In addition, the title report includes one NYC Fire Department violation. Ex. 41, PDF

pages 341-342. Ex. 41, PDF page 397, reports a sidewalk violation issued by the NYC Highway

Department. As Mr. Izidor Mikhli testified, sidewalk violations must be remedied and removed

from the City's records prior to closing. Mikhli Tr. 71-72. As Mr. Mikhli further testified, the

sidewalk violation is an "impediment" to closing that cannot be rectified at closing. Mikhli Tr.

81.

Finally, Ex. 41, PDF pages 399-402, report outstanding violations issued by the NYC Department of Environmental Protection.

*1143 Forest Avenue.* The title report discloses one ECB violation Ex. 41, PDF page 251); Miller Tr. 30. PDF pages 315-322 describes 52 violations issued by the NYC Department of Buildings and the Rent & Housing Maintenance Department of the City of New York. Miller Tr. 32. Many of these violations require remedial work, such as removing locks, repairing windows, installing outdoor lighting, repairing leaks, painting, repairing and replacing floor tiles, and removing a lead paint hazard.

PDF pages 319-322 and PDF pages 383-388 of Exhibit 41 describe four violations issued by the NYC Landmarks Preservation Commission. *See* Mikhli Tr. 78; Miller Tr. 33. As Mr. Mikhli testified, such violations are an impediment to, and cannot be remedied, at closing. Mikhli Tr. 81.

*1821 Topping Avenue.* The title report, Exhibit 41, PDF page 251, lists "many" ECB violations. In addition, the report contains two violations issued by the Rent & Housing Maintenance Department of the City of New York. Ex. 41, PDF pages 323-324: the failure to provide adequate outside lighting and the failure to file a valid registration statement. On their face, these violations are not curable at closing. As stated above, no valid building registration statement was provided to the title company. Mikhli Tr. 76.

*1988 Morris Avenue.* The title report lists one ECB violation, Exhibit 41, PDF page 251. It also lists a sidewalk violation, PDF pages 260 and 398, which, as mentioned above, cannot be cured by mere payment and could not be cured at closing.

*1974 Morris Avenue.* The title report lists "many" ECB violations, Exhibit 41, PDF page 251, and a sidewalk violation, PDF pages 260 and 397.

8

The title report discloses three violations issued by the Landmarks Preservation Commission, PDF pages 333-336, which, according to the testimony cited above, could not possibly be cured at closing.

In addition, five violations were issued by the Rent and Housing Maintenance Department of the City of New York, including those requiring work. PDF page 332.

In sum, each of the five properties had violations imposed against it, including violations that could not be cured immediately at a closing. The attorney for defendants never broached the topic of the removal of violations. Mikhli Tr. 107. The failure to remove the violations before closing violated paragraph 10 of the contracts of sale.

**B.    Failure To Have Buildings Vacant Of Tenants**

The undisputed trial testimony was that all properties, except for 1974 Morris Avenue and 1988 Morris Avenue, were not vacant of tenants as of December 18, 2017, in breach of paragraph 16 of the contracts of sale. Saleem Tr. 216; Telahun Tr. 237-240; Riegler Tr. 149; Weisel Tr. 179; Strong Tr. 110 (as of mid-December 2017, the residential tenants were still in occupancy at the Beck Street, Forest Avenue, and Topping Avenue buildings). Nor was there even a plan by defendants as of December 18, 2017 to have those tenants vacate the premises. *Id.*

**C.    Failure To Grant Access Before Closing**

As the Court pointed out in its decision denying defendants' motion for summary judgment, access afforded by the contracts of sale and the Addenda was important for several reasons. Decision at 7. Although there was no mortgage contingency clause in the contracts of sale, plaintiff desired to obtain financing for the acquisition, which could not be obtained without allowing the lender access to the properties. In addition, as with every purchaser, the purchaser

has the right to know the condition of the properties *at the time of closing* before parting with the multi-millions of dollars in payment of the purchase price. As Mr. Mikhli testified, the right of access to inspect the property, such as afforded by paragraph 12 of each contract of sale, includes access and inspection before closing; this is typically the case especially when, as here, there is a substantial amount of time between the date the contract of sale was entered into and the closing date. Mikhli Tr. 104-106. The contracts allow for ordinary wear and tear since the time of contracting, but not more. At closing, the "appliances, plumbing, heating and electrical systems shall be in working order and roof should be free of leaks at closing." Seller's Rider to Contract, Exhibits 1-5. Plaintiff had the absolute right to check out these conditions and not trust the word of defendants that since the date the contracts were entered into seven months before the closing date of December 18, 2017, nothing material had occurred at each of the buildings.

A reason for entering into the Addenda to the contracts of sale was to provide plaintiff with access to each of the buildings. Mikhli Tr. 36-39. *See* Exhibit 6, PDF page 74; Exhibit 7, PDF page 77; Exhibit 8, PDF page 80; Exhibit 9, PDF page 83; Exhibit 10, PDF page 86. (The signed Addenda are at Defendants' Exhibit QQ.) This contractual right is in addition to the right to access and inspection provided by paragraph 12 of each contract of sale (telephonic notice being sufficient). Mikhli Tr. 52. *See, e.g.,* Exhibit 1, paragraph 12.

The License Agreement with respect to the 1988 Morris Avenue and 1974 Morris Avenue properties (Exhibit 11) granted plaintiff additional access rights with respect to these two properties, up until closing on December 18, 2017. Mikhli Tr. 40-41.

The need for access to inspect the properties became more crucial when defendants refused to deliver the SNDA for the commercial daycare lease at Beck Street. Mikhli Tr. 88-89; Riegler Tr. 120; Strong Tr. 114-115 (Dwane Jones told Strong not to communicate any longer

10

directly with plaintiff); Mikhli Tr. 46-49 (requested several times that the SNDA be provided, but never received it); Riegler Tr. 148 (requested estoppel letter multiple times but did not receive it); Telahun Tr. 234-235 (Telahun was aware that plaintiff had asked for the SNDA, and did not tell plaintiff that it would not be provided). Of course, we now know that defendants could not deliver the SNDA because the tenant never occupied the space, Strong Tr. 90-91—a fact concealed from plaintiff, Strong Tr. 96 (defendants knew prior to November 2017 that the daycare tenant would not be moving in); Riegler Tr. 119 (defendants never told plaintiff that the commercial tenant had not moved into the space); Jones Tr. 320-321, 323-324 (Jones did not communicate to plaintiff that although the Beck Street commercial lease was signed, the tenant never moved in); Saleem Tr. 225 (he did not tell plaintiff that the commercial tenant would not be moving into the premises); Telahun Tr. 233 (same); Weisel Tr. 186-187 (the lease turned out not to be valid; the space was never occupied); Weisel Tr. 194 (Weisel questions Hsu if the Beck Street lease is bona fide); Weisel Tr. 199-200 (by email dated December 12, 2017, Exhibit 73, PDF page 1291, Weisel inquires as to the status of the "seemingly fraudulent lease." He was not told that the tenant never took possession of those premises). As Ms. Fafowora, an owner of the daycare tenant testified, she realized "at most" within three months from the time she executed the lease (in May 2017) that the tenancy would not work and the tenant would not be moving in. She told this to defendants' agent, Strong. Fafowora Tr. 293. But defendants never disclosed that to plaintiff. Telahun Tr. 248.

In sum, as of December 18, 2017, plaintiff's questions concerning the legitimacy of the Beck Street commercial lease were not assuaged. Riegler Tr. 148. Plaintiff thus had very real concerns about the condition of the properties and, even without such concerns, had the unfettered contractual right to access and inspection.

As we show below, the evidence is clear that such access was denied with respect to each of the five properties.

Access was denied regarding the two Morris Avenue properties. Mikhli Tr. 52-53. Plaintiff was locked out of the properties when defendants changed the locks as of late November 2017, Riegler Tr. 136; Strong Tr. 107-108. Defendants did so although the License Agreement, by itself, afforded plaintiff access to those properties. After that lockout, plaintiff was never able to obtain access to these properties again. Access was denied "multiple times." Riegler Tr. 137.

Plaintiff was also denied access before closing "multiple times" with respect to the other three properties: Beck Street, Forest Avenue, and Topping Avenue. Riegler Tr. 138, 149. For example, access was requested on December 9, 2017 regarding these three properties. There was no response. Riegler Tr. 139-141. Plaintiff never obtained access to these three properties just as it never obtained access to the two Morris Avenue properties. Riegler Tr. 143. Plaintiff even tried to buy access, offering compensation, to no avail. Riegler Tr. 147-148.

Mr. Saleem, one of the principals of defendants, testified that he was aware that in late November and early December 2017 plaintiff was seeking access to the properties. Saleem Tr. 218. Mr. Telahun, the other principal, stated that the first time access was requested was December 10, 2017. Telahun Tr. 249. Not only is this testimony contradicted by his co-owner Saleem, but in addition, it is not credible in light of the documentary evidence. Moreover, defendants' agent, Jackson Strong, testified that the instruction to lock out plaintiff from the Morris Avenue properties came from Mr. Telahun, or Mr. Saleem, or defendants' attorney. Strong Tr. 99-100. Defendants' broker, Mr. Dwane Jones, also testified that plaintiff had requested access in late November 2017. Jones Tr. 328-329. He remembers plaintiff being

12

locked out and that the decision to do so came from defendants, who notified Jones about it. Jones Tr. 332-334.

In any event, even the denial of access on December 10 or December 11 in the face of a closing on December 18 is a breach of the contract of sale and Addendum.

The denial of access to plaintiff was detailed in the testimony of Mr. Abraham Weisel, one of plaintiff's transactional attorneys, and in his email correspondence with Mr. Brian Hsu, defendants' attorney. *See, e.g.,* Exhibit 28, PDF pages 173-174; Exhibit 31, PDF page 183. As Mr. Weisel testified, the issue of access for plaintiff came up numerous times and plaintiff was rebuffed each time. Plaintiff was unreasonably denied access. Weisel Tr. 179-180. Weisel found it very strange that someone who was supposedly insisting on closing on the TOE date would deny something as simple as access to the purchaser—if defendants truly wanted to close. Weisel Tr. 187-188, 190-191.

The flat denial by Mr. Hsu on December 11, 2018, a week before the TOE date, says it all: *"I am not authorized at this time to provide that access. We need to see real movement from your side to get to a closing date."* Exhibit 30, PDF page 181 (emphasis added); Weisel Tr. 191. Which provision in the contracts of sale gave defendants this right to shut out plaintiff? —None. Mr. Hsu's other excuse for denying access—the supposed need for "reasonable prior *written* notice," Exhibit 32, PDF page 135(emphasis added)—is unacceptable. The contracts of sale do not require written notice. Indeed, defendants' broker, Mr. Dwane Jones, testified that the request for access made by telephone was standard. Jones Tr. 331.

Access was also requested a number of times by telephone during the period between December 12, 2017 and December 18, 2017, after Mr. Hsu's flat rejection on December 11.

Plaintiff was denied access each time, either directly or by having Mr. Weisel's telephone messages left unanswered. Weisel Tr. 223-226.

Mr. Weisel, an experienced transactional real estate attorney, had never before experienced someone "as persistently and definitively refuse access." Mr. Weisel commented: "It still strikes me as odd, this constant refusal to provide access . . . ." Weisel Tr. 225. It can only be concluded from defendants' the unreasonable refusal to provide access to plaintiff to inspect the five properties that all of this was part of a scheme by defendants to set up a sham closing and keep the close to 1 million dollars in downpayments when plaintiff did not attend the so-called closing.

**D.    Failure To Clear Title**

Each of the five properties had title issues, which served as impediments to closing on December 18, 2017, even putting aside the many violations of record that existed at the time in violation of defendants' contractual obligation to remove them. Riegler Tr. 150 (as of December 18, 2017, defendants had not satisfied all title issues and all conditions for closing). As stated above, pursuant to paragraph 7 of each of the Seller's Rider to Contract, these title violations had to be cured prior to closing. They were not. Moreover, as set forth below, many violations could not simply be taken care of by seller showing up at closing and deciding then and there to remedy the title violations.

Since at least November 14, 2017, plaintiff had alerted defendants to the multiple specific title issues affecting the Beck Street, Forest Avenue, and Topping Avenue properties. Exhibit 19; Mikhli Tr. 51-52.

In addition, as Mr. Mikhli testified, defendants received title objections more than 10 days before the closing; a title report with objections had been delivered to defendants. Mikhli

Tr. 64-65, 67, 88. There was no testimony from anyone representing defendants that disputed this. The title exceptions and issues had to be cleared before closing, but were not. Mikhli Tr. 55-56. These objections pertained to each of the five properties. As Riverside Abstract's General Counsel testified, the transactions were not ready for closing in September 2017, or in December 2017. Miller Tr. 11-12. There existed open issues such as tax liens, Miller Tr. 24-26, and no-consideration deeds in the property records which were not remedied. Miller Tr. 14-15, 18. (*See* below.) As Mr. Weisel testified, all title issues had not been resolved as of December 18, 2017; defendants were never ready to close from a title perspective. Weisel Tr. 183-184.

The title report of January 2, 2018 (Exhibit 41), which includes the same title violations as existing as of December 18, 2017 (Miller Tr. 31), contains the many title violations regarding the five properties, none of which was removed prior to December 18, 2017, and many of which could not be removed on December 18, 2017:

*770 Beck Street.* The property records disclosed a "no-consideration" deed, which required Riverside Abstract to review, "prior to closing," an affidavit from the attorney who supervised the e execution and delivery of the deed and/or a grantor's affidavit. (PDF 257). If other than the party's current attorney had to issue the affidavit, this would have to be provided before closing (irrespective of the contracts riders' requirement at paragraph 7 that all title issues had to be cleared before closing). This documentation was never provided. Mikhli Tr. 69-70.

The sidewalk violation on this property, which we mention above in the section of this memorandum regarding the failure to remove violations, is also listed as an exception to title that had to be cured before closing but was not. PDF 257; Mikhli Tr. 71-72.

The property records also revealed the existence of a mortgage, which required that the title company receive the original note and bond marked "paid," the original mortgage marked

"paid," and an original satisfaction of mortgage in recordable form. The records also revealed the existence of a credit line mortgage. That required proof to be provided to the title company that the credit line had been frozen, a payoff letter from the lender stating that the account has been frozen, and an affidavit from the mortgagor containing information about the mortgage. (PDF 258). All of this was not done. Payoff letters were required to be provided before closing. Mikhli Tr. 76-77.

*1143 Forest Avenue.* The property record disclosed a no-consideration deed, which required Riverside Abstract to review, "prior to closing," an affidavit from the attorney who supervised the execution and delivery of the deed and/or a grantor's affidavit. (PDF 258). If other than the party's current attorney had to issue the affidavit, this would have to be provided before closing. This was never provided. Mikhli Tr. 77. The records for this property also disclosed a mortgage that required the same documentation as with the 770 Beck Street mortgage. (PDF 258).

*1821 Topping Avenue.* The property records revealed a private mortgage, that required the same documentation as with the 770 Beck Street and 1143 Forest Avenue mortgages. (PDF 258).

*1974 Morris Avenue.* Records showed that a tax lien was on record that had no evidence of having been discharged. (PDF 259). In fact, after December 18, 2017, it took defendants 23 more days, until January 10, 2018, to resolve this title issue by finally providing an undertaking to Riverside Abstract in a form satisfactory to the title company. Exhibit 43, PDF pages 530-535.

16

There also was a no-consideration deed that required the same documentation as with the no-consideration deed for the 770 Beck Street property. There also was a notice of pendency filed against the property as to which the title report stated: "clearance required." (PDF 260).

In addition, the sidewalk violation mentioned above regarding the failure to remove violations was also listed in the title report as an exception to insurance and thus a title violation that had to be cleared before closing. (PDF 260).

*1988 Morris Avenue.* The sidewalk violation on this property mentioned above regarding the failure to remove violations is also listed in the title report as an exception to insurance and thus a title violation that had to be cleared before closing. (PDF 260). The property records also revealed the existence of a mortgage, which required the same documentation as with the other properties' mortgages. (PDF 260).

**E.  1988 Morris Avenue Was Certainly Not Free Of Roof Leaks**

The Seller's Rider to each contract of sale provides that each of the five buildings had to be free of leaks from the roof at the time of closing. Defendants' own witnesses testified that this was not the case regarding 1988 Morris Avenue. Strong Tr. 103 (in September 2017, water was coming through the roof at 1988 Morris Avenue); Saleem Tr. 259-263 (testimony on defendants' case: "Leaks were always present" at 1988 Morris Avenue).

Nor can defendants argue that this should have been corrected by plaintiff in connection with the License Agreement. Defendants locked out plaintiff as of the end of November and never allowed access to plaintiff thereafter.

**III.**

**PLAINTIFF'S EXHIBIT LIST**

As directed by the Court, attached to this memorandum is a list of the trial exhibits relied on by plaintiff, with reference to the trial witness at which the exhibit was discussed and the page of the trial transcript where the testimony appears.

**CONCLUSION**

For all of the foregoing reasons, judgment should be awarded in favor of plaintiff, ordering defendants to specifically perform each of the five contracts of sale and to convey each of the five properties to plaintiff (x) for the price set forth in the contracts of sale, less (y) the total amount of downpayments received to date by defendants, plus (a) prejudgment interest thereon at the New York statutory rate of 9% per annum (CPLR 5004) and (b) the costs and disbursements of this action. In addition, plaintiff respectfully requests that the Court grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 30, 2020

                        **STAHL & ZELMANOVITZ**
                        *Special Counsel For*
                        *Plaintiff / Debtor FMTB BH LLC*

                        By: */s/ Joseph Zelmanovitz*
                            Joseph Zelmanovitz
                        747 Third Avenue, Suite 33B
                        New York, New York 10017
                        (212) 826-6422
                        joezelmanovitz@aol.com

| Designation | Exhibit | | |
|---|---|---|---|
| A-PL | Exhibit 1 | | |
| A-PL | Exhibit 2 | | KEY |
| A-PL | Exhibit 3 | | A-PL = Agreed |
| A-PL | Exhibit 4 | | PL - Plaintiff Exhibit |
| A-PL | Exhibit 5 | | D - Defendants Exhibit |
| A-PL | Exhibit 6 | | |
| A-PL | Exhibit 7 | | |
| A-PL | Exhibit 8 | | |
| A-PL | Exhibit 10 | | |
| A-PL | Exhibit 11 | | |
| A-PL | Exhibit 12 | | |
| A-PL | Exhibit 14 | | |
| A-PL | Exhibit 15 | | |
| A-PL | Exhibit 16 | | |
| A-PL | Exhibit 17 | | |
| A-PL | Exhibit 19 | | |
| A-PL | Exhibit 20 | | |
| A-PL | Exhibit 21 | | |
| A-PL | Exhibit 22 | | |
| A-PL | Exhibit 23 | | |
| A-PL | Exhibit 24 | | |
| A-PL | Exhibit 25 | | |
| A-PL | Exhibit 28 | | |
| A-PL | Exhibit 29 | | |
| A-PL | Exhibit 30 | | |
| A-PL | Exhibit 31 | | |
| A-PL | Exhibit 32 | | |
| A-PL | Exhibit 33 | | |
| A-PL | Exhibit 37 | | |
| A-PL | Exhibit 40 | | |
| A-PL | Exhibit 41 | | |
| A-PL | Exhibit 43 | | |
| A-PL | Exhibit 45 | | |
| A-PL | Exhibit 53 | | |
| A-PL | Exhibit 54 | | |
| A-PL | Exhibit 55 | | |
| A-PL | Exhibit 57 | | |
| A-PL | Exhibit 58 | | |
| A-PL | Exhibit 62 | | |
| A-PL | Exhibit 66 | | |
| A-PL | Exhibit 73 | | |
| A-PL | Exhibit 86 | | |
| A-PL | Exhibit 93 | | |
| PL | Exhibit 95 | | |
| D | Exhibit QQ | | |

| Witness | Designation | Exhibit | Trial Transcript Page(s) | Notes |
|---|---|---|---|---|
| **Day 1: 6/10/20** | | | | |
| **Izidor Mikhli - Direct** | A - PL | Exhibit(s) 1-5 | 22 | |
| | A - PL | Exhibit 1 | 23 | |
| | A - PL | Exhibit 6 | 35,38 | |
| | A - PL | Exhibit 7 | 38 | |
| | A - PL | Exhibit 8 | 39 | |
| | A - PL | Exhibit 10 | 39 | |
| | A - PL | Exhibit 11 | 39 | |
| | A - PL | Exhibit 12 | 57 | |
| | A - PL | Exhibit 14 | 33,41 | |
| | A - PL | Exhibit 15 | 41,42 | |
| | A - PL | Exhibit 16 | 42 | |
| | A - PL | Exhibit 19 | 55 | |
| | A - PL | Exhibit 22 | 53 | |
| | A - PL | Exhibit 23 | 54 | |
| | A - PL | Exhibit 40 | 57 | |
| | | | | |
| **Re-Direct Izidor Mikhli** | A - PL | Exhibits 1-5 | 106,115 | |
| | A - PL | Exhibit 1 | 104 | |
| | A - PL | Exhibit 6 | 128 | |
| | A - PL | Exhibit 11 | 129 | |
| | A - PL | Exhibit 14 | 121 | |
| | A - PL | Exhibit 15 | 120 | |
| | A - PL | Exhibit 20 | 131,135 | |
| | A - PL | Exhibit 53 | 145 | |
| | A - PL | Exhibit 54 | 146 | |
| | A - PL | Exhibit 55 | 146 | |
| | A - PL | Exhibit 57 | 144 | |
| | A - PL | Exhibit 58 | 117 | |
| | A - PL | Exhibit 86 | 127 | |
| | | | | |
| | | | | |
| **Witness** | | **Exhibit** | Trial Transcript Page(s) | **Notes** |
| **Direct Islan Saleem** | A - PL | Exhibit 1 | 211,220 | |
| | A - PL | Exhibit 17 | 235 | |
| | A - PL | Exhibit 58 | 226,227,236 | |
| | D | Exhibit QQ | 212 | |
| | | | | |
| **Direct Rafael Telhaun** | A - PL | Exhibit 17 | 235 | |
| | A - PL | Exhibit 58 | 236 | |
| **Witness** | **Designation** | **Exhibit** | **Page(s)** | **Notes** |
| **Day 2: 6/11/20** | | | | |

| Direct Karla Miller | A - PL | Exhibit 21 | 82 | |
| | A - PL | Exhibit 37 | 35 | |
| | A - PL | Exhibit 41 | 26, 29-33 | |
| | A - PL | Exhibit 43 | 23 | |
| | | Exhibit 93 | 72,74,76 | |
| | PL | Exhibit 95 | 33-35 | Note: PL 95 Admitted P. 34 |
| | | | | |
| **Direct Jackson Strong** | A - PL | Exhibit 11 | 101 | |
| | A - PL | Exhibit 12 | 91 | |
| | A - PL | Exhibit 20 | 105-107 | |
| | A - PL | Exhibit 46 | 93,113 | *Depo pages 27-28,70 |
| | | | | |
| **Re-Direct Jackson Strong** | A - PL | Exhibit 20 | 131 | |
| | | | | |
| **Direct Joel Leifer** | A - PL | Exhibit 45 | 134-135 | |
| | | | | |
| **Direct Malik Pearson** | A - PL | Exhibit 16 | 167-168 | |
| | | | | |
| *Witness* | *Designation* | *Exhibit* | *Trial Transcript Page(s)* | *Notes* |
| **Direct Abraham Weisel** | A - PL | Exhibit 12 | 186,197 | |
| | A - PL | Exhibit 19 | 182 | |
| | A - PL | Exhibit 22 | 184 | |
| | A - PL | Exhibit 24 | 185 | |
| | A - PL | Exhibit 25 | 187-191 | |
| | A - PL | Exhibit 28 | 191 | |
| | A - PL | Exhibit 29 | 178 | |
| | A - PL | Exhibit 30 | 191 | |
| | A - PL | Exhibit 31 | 193,198 | |
| | A - PL | Exhibit 32 | 198-199 | |
| | A - PL | Exhibit 33 | 192 | |
| | A - PL | Exhibit 37 | 200 | |
| | A - PL | Exhibit 40 | 202 | |
| | A - PL | Exhibit 62 | 194 | |
| | A - PL | Exhibit 66 | 197 | |
| | A - PL | Exhibit 73 | 199 | |
| | | | | |
| **Cross Dwane Jones** | A - PL | Exhibit 10 | 334 | |
| | A - PL | Exhibit 12 | 319 | |
| | A - PL | Exhibit 58 | 314-316 | |
| | | | | |
| | | | | KEY |
| | | | | A-PL = Agreed |
| | | | | PL - Plaintiff Exhibit |
| | | | | D - Defendants Exhibit |