STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:                                                    Chapter 11

FMTB BH LLC,                                              Case No. 18-42228-cec

                       Debtor.
-------------------------------------------------------------x
FMTB BH LLC,                                              Adv. Pro. No. 18-01052-cec

                       Plaintiff,

    -against-

1988 MORRIS AVENUE LLC, 1974 MORRIS
AVENUE LLC, 700 BECK STREET LLC, 1143
FOREST AVENUE LLC and 1821 TOPPING
AVENUE LLC,

                       Defendants.
-------------------------------------------------------------x

**DEFENDANTS', 1988 MORRIS AVENUE LLC, 1974 MORRIS AVENUE LLC, 700 BECK STREET LLC, 1143 FOREST AVENUE LLC AND 1821 TOPPING AVENUE LLC'S POST-TRIAL BRIEF**

**GOLDSTEIN HALL PLLC**
Attorneys for Defendants
80 Broad Street, Suite 303
New York, NY 10004
(646) 646-4100

By:   Brian J. Markowitz
        Daniel Goldenberg

Defendants , 1988 Morris Ave LLC (incorrectly sued herein as 1988 Morris Avenue LLC), 1974 Morris Ave LLC (incorrectly sued herein as 1974 Morris Avenue LLC), 700 Beck Street LLC, 1143 Forest Ave LLC (incorrectly sued herein as 1143 Forest Avenue LLC) and 1821 Topping Ave LLC (incorrectly sued herein as 1821 Topping Avenue LLC), (collectively the "Defendants"), , by and through their attorneys, Goldstein Hall PLLC, respectfully submits this post-trial brief, pursuant to Court's direction at the conclusion of the trial on June 11, 2020.

**A.     Introduction**

At its core, this action has always been about, and the evidence presented at trial has not refuted, whether Plaintiff breached the parties' five individual contracts for sale by failing to appear at the agreed upon scheduled Time of the Essence closing, or whether Plaintiff's appearance was excused. Clearly, the answer to the first question is YES, Plaintiff breached the five Contracts of Sale by failing to appear at the agreed upon Time of the Essence closing. Just as clearly, the answer to the second question is NO, Plaintiff was not excused from appearing at the Time of the Essence closing due to false, *post-hoc* alleged, breaches by the Defendants. The evidence presented in this trial established that Plaintiff's failure to close on these five Contracts for Sale was a result of Plaintiff's failure to secure the needed and necessary financing to close on these properties, along with two other unrelated properties it was attempting to bundle into this purchase.

What the evidence showed was that Plaintiff was unable to obtain the necessary funding to purchase the five properties at issue here. The evidence unequivocally showed that Plaintiff's alleged financial backer did not have sufficient funds in his personal account to close on the properties, and Plaintiff has presented no evidence that it was legally able to use monies from a State regulated nursing home for non-nursing home purposes, or that it ever took the legal steps to obtain the New York State Commissioner of Health's approval for such an investment.

Joel Leifer Cross Examination (Day 2) at Pg. 143:3-5 (Q: "Okay, but on December 18, 2017, according to your M&T Bank Account, this equity recapture account had $62,075 and something cents, correct?" A: "That's what is says"); Id at Pg. 143:24-144:19 (testimony confirming that Mr. Leifer had no authorization at time of closing to supplement the $62,075 in his personal account by withdrawing money from River Manor Corp, a Nursing Home Company co-owned with his Mother and which is under New York State Commissioner of Health's statutory restrictions); Trial Exhibit 45, Pg. 567 (demonstrating that until December 21, 2017, Plaintiff had a daily balance of $62,075.82; the necessary funds to close on each of the property were expressly not in Mr. Leifer's bank account until 3 days after the Closings).

The evidence also showed that Plaintiff has violated the express terms of the Contract Addendums and has failed to pay for mortgage interests through the date of closing, and thereafter. Joel Reigler Cross Examination (Day 1) at Pg. 174-175.

**B.    Plaintiff has not Proven any Contract Breaches to Excuse its Failure to Appear at the Time of the Essence Closing**

Through the course of the Trial, Plaintiff attempted to show that Defendants' acts breached the various Contracts for Sale. However, Plaintiff has not offered any proof with respect to any of these breaches. Indeed, even after trial it is unclear what alleged violations, breaches, or other items Plaintiff bases its case on. As such, Plaintiff failed to prove its prima facia case. Plaintiff's allegations that Defendants failed to clear any violations related to each of the property is misleading because, as evidence demonstrates and will be discussed by property, had Plaintiff appeared at closing, the parties would certainly have been able to clear all such violations are required by contract.

For instance, Plaintiff alleged that Defendants failed to permit access to the properties and therefore are in breach of the Contracts of Sale. However, Plaintiff has not offered

one scintilla of proof that it was ever denied access to the various properties, with the exception of the single December 11, 2017 exchange between Mr. Hsu, Defendants' attorney and Mr. Weisel, Plaintiff's attorney, where Mr. Weisel demanded immediate access for three of the five properties, but, even then, Plaintiff testified that it preferred to "forget about it, let's just close and finish." Joel Reigler Direct Examination (Day 1) at Pg. 137:4-10. Notwithstanding, this does not account for the other two properties for which Plaintiff failed to provide any evidence of denied access. Indeed, to deflect attention from their own failure to appear at the Time of the Essence closing, Plaintiff is arguing that the two Morris Properties were destroyed after contracts were executed. The evidence demonstrated that this pretextual reason is a lie since Plaintiff's Principal, Joseph Reigler admitted: "1974 Morris was a two-family to be converted to a three. We bought it when we knew that we would have to fully build it up, finish, get a CO updated and change it. That we always knew. 1988 was same way." Joseph Reigler Cross Examination (Day 1) 169:10-13.[1]

       The Contracts for Sale provide at Paragraph 12 **Condition of Property**, "Purchaser and its authorized representative, shall have the right, **at reasonable times and upon reasonable**

---

[1] Importantly, as will be discussed, on the second day of trial, Joseph Reigler denied any intention to convert both buildings to include additional residential units. Joseph Reigler Re-Cross Examination (Day 2) at Pg. 352:15-355:7. While it may certainly be legal to convert the building and change its CO, here, Defendants' agents learned about this conversion, and construction invoices confirmed, the installation of additional electrical meters, which were beyond the scope of the license agreement. Ihsan Saleem Cross Examination (Day 1) at Pg. 264:17-265:2; *see also* Rafael Telahun Re-Direct Examination (Day 1) Regarding Trial Exhibit I at pg. 259:12-260-8. As a result of this underhanded, and illegal construction work, Defendants restricted access to require Plaintiff to communicate through counsel. Ihsan Saleem Direct Examination (Day 1) at Pg. 218:24-219:6. Plainly, access was not denied, it was restricted after Plaintiff's were caught exceeding the scope of their work. To now argue (and lie on the second day of trial, under oath) that Defendants were trying to hide "roof leaks" is beyond cavil since both properties were gut rehabs. Id at 355:5-8 (Q: "And your testimony, your sworn testimony here, is that you've never seen leaks in that building [1988 Morris] before?" A: "Correct. When I went into contract, it was a healthy building, correct."). It is respectfully submitted that this Court notice that Witness Reigler perjured himself on re-cross examination: a building cannot be healthy if it was a gut rehab at the same time.

**notice** (by telephone or otherwise) to Seller, to inspect the Premises before Closing." (Exhibits 1 through 5 at paragraph 12) (Emphasis supplied.)

As the evidence at trial showed, Plaintiff requested access to three of the properties (770 Beck Street, 1821 Topping and 1143 Forest Avenue), seeking to have its lender view those properties, within a few minutes of the request. This request is neither reasonable notice nor at a reasonable time. Further, the evidence showed that Mr. Hsu specifically said that "ln any event, my clients have always been willing to provide your clients access with reasonable prior written notice. That does not mean 30min like what happened today. They are busy people so you are asked to provide multiple date and times." (Trial Exhibit 66.) In fact, the evidence shows that Plaintiff's never requested access after this December 11, 2017 exchange. Further, Plaintiff has not provided any evidence that access was denied at any other time.

What evidence Plaintiff *did* present, however, showed that other than the single request of December 11, 2020 (See Trial Exhibit 66), Plaintiff accessed each of the properties on several occasions without incident. The evidence also showed that prior to requesting the December 11, 2017 access, Plaintiff requested access from a source that it knew was no longer authorized to provide such access, consistent with Plaintiff's theory that they can do or say whatever they chose. Plaintiff has presented no other evidence of any requested access or any other access that was denied.

Next, Plaintiff attempts to argue that alleged title issues prevented closing. Again, Plaintiff presented no evidence of any issue relative to title. In fact, Plaintiff's witness, Ms. Miller, the General Counsel of Abstract Title, Plaintiff's title Company, did not testify that any title issues existed which prevented closing. Indeed, after reviewing EACH potential "title defect" whether in the title report or the several e-mail lists, not a single issue was an impediment to closing, a title

defect, or could not otherwise be resolved by counsel at the closing (as outlined by property below). What Ms. Miller did testify to was that when Brian Hsu contacted her to schedule the closing (in accordance with Riverside's closing requirements), and enclosing the required and necessary documents, Mr. Weisel didn't protest that there were title issues, but rather discussed the fact that Plaintiff did not have a lender to close on the properties, and that instead of attending this closing, that he had another closing, on one of the properties Plaintiff was attempting to bundle in this transaction, for the same time, and that he was out of extensions.

Further both Mr. Weisel and Mr. Mikhli testified that neither of them remembers sending Mr. Hsu or Mr. Pearson a contractually demanded "List of Objections"[2] that needed to be cleared and Plaintiff never demonstrated any proof of sending that list. Avi Weisel Cross Examination (Day 1) at Pg. 227:17-18 (Q: "Did you ever send Mr. Hsu a list of title objections?" A: "I don't specifically recall having done it … I have no specific individual memory of sending him title objections"). Pursuant to the Rider to each Contract, "Purchaser shall deliver to Seller's attorney a list of title objections or violations, if any, as may appear on any title examination Purchaser may obtain at least ten (10) days prior to the closing date…" Trial Exhibits 1 through 5 at Rider, Paragraph 7. Additionally, Ms. Miller testified that the title company did not send a copy of any alleged objections to the Defendants. Importantly, this is not a mere nominal obligation.

---

[2] This is not to be confused with a title report and there is no evidence of a title report being circulated prior to January 2, 2018 (several weeks after the December 18, 2017 Time of the Essence closing date) either. Moreover, Plaintiff's counsel could not even remember getting a title bill from its title company - and no such title bill was ever produced. *See* Avi Weisel Transcript at 202:15-24 Q: "Did you receive a title bill form the title company?" A: "I don't recall. I don't recall. Let me say that a little bit better. I don't recall getting one." Q: "Okay. Do you recall communicating with Ms. Newman or anyone else at the title company concerning not getting a title bill?" A: "I don't specifically recall reaching out for the title bill with a phone call afterwards. I may have reached out to her to make sure the title was clear, but I don't have any working memory of that offhand").

This obligation was incorporated into the contracts of sale for the precise purpose of avoiding this sort of litigation. Had Plaintiff informed Defendants of what they believe are impediments to closing (which as will be shown, were not impediments at all), Defendants could have resolved them (as demonstrated to be totally possible).

What the testimony did show, and as will be discussed more fully below, any violations that were against the individual properties, to the extent that they were ever raised – which clearly they weren't – were able to be satisfied at the closing of the properties, by simple measures or by holding money in escrow from the proceeds of the sale. Unfortunately, because of Plaintiff's own action and inaction, Plaintiff failed to appear at the closing.

Accordingly, none of these pretextual alleged breaches are violations of the Contracts of Sale and cannot support a claim for specific performance. Additionally, Plaintiff did not present any evidence to support any of its other causes of action, or alleged theories of recovery, i.e., damages or use and occupancy.

C.   **Plaintiff has not Proven any Breaches of the Contract of Sale for 1143 Forest Avenue LLC**

Plaintiff has not offered any evidence at trial that 1143 Forest Avenue LLC breached its Contract for Sale with Plaintiff. As such, Plaintiff has not proven its prima facia case against Defendant 1143 Forest Avenue LLC. Indeed, Plaintiff presented no evidence of any breaches of the Contract for Sale for this property.

At best, Plaintiff showed that 1143 Forest Avenue had some old landmarks violations against the property. See Trial Exhibit 41, Pgs. 383-388; Riverside Abstract Cross Examination (Day 2) at Pg. 40:17-43:17 (Q: "… its fair to state that none of these listed violations are title defects, correct?" A: "Correct" Q: "And all of these can be theoretically dealt with at closing between parties, correct?" A: "Correct"); Id at Pg. 62:21-63:21 (testimony reveals that

every listed issue could have been done at closing). However, here again, the testimony of both Plaintiff's closing attorney, and the title company, showed that such violations could be cured at closing. In fact, as testified to by Ms. Miller, Landmark violations are not objections to title, and are only shown on the title report for informational purposes. Id at Pg. 70:23-71:2 (Q: "Just to be clear, landmark violations in the title report are for informational purposes only, correct" A: "They're not a title issue and are provided in our title report for informational only, yes.").

Further, the testimony revealed that these violations preexisted the Defendant's purchase of this property. Id at Pg. 41:6-13 (Q: "and theoretically, if wanted to, a purchaser could sell -- a seller could sell the building with this violation on the record, correct?" A: "Correct" Q: "Okay. In fact, as we see, it was transferred already from Warren Smith to one of the Defendants while this violation may have been on it, correct?" A: "Correct"). As such, they were covered by the title insurance policy that covered the Defendant's purchase. These are simple issues that are cleared up at the time leading up to closing. Id at Pg. 62:21-63:21 (testimony reveals that every listed issue could have been done at closing). In fact, even if some issues existed for other properties (hypothetically), as Riverside Abstract agreed that "it is fair to say that a closer could perform one contract of sale and do the closing on December 18th and wait on another one whenever the parties agree to do it." Id at Pg. 70:12-15. However, because the Plaintiff never proceeded to closing in good faith and had no interest in proceeding towards a closing because it could not secure the necessary funding, they never alerted Defendant that this was even an issue to be addressed. Id at 79:9-18; (Q: "Riverside Abstract never attended closings because they were never instructed to attend by the purchaser, correct" A: "Correct").

In addition, the Contract for Sale does not obligate that Seller must clear all violations or be in breach of the Contract for Sale. The Contract for Sale at paragraph 7 of the Rider provides in pertinent part:

> In the event that Seller chooses not to remove such violations or the costs of removal exceed $1,500.00, Seller shall have the right to cancel this contract by retuning to Purchaser all sums paid hereunder plus the net cost of title examination, and upon such repayment the contract shall be deemed null and void, and neither of the parties herein shall have any claims against the other party. **Purchaser may also take title subject to such violations without any abetment to the purchase price, and Seller shall be released from any and all liability in connection with said violations.**

Trial Exhibit 4 (emphasis supplied.) Here, the evidence is clear that neither Plaintiff nor its Title Company ever notified Defendant 1143 Forest Avenue LLC that any violations needed to be cleared up prior to Closing, nor did they ever indicate that they would not take the property subject to the alleged violations, even though Defendants' counsel "reached out consistently" to the title company in an effort to (consistent with Riverside Abstract's Closing Requirements) close and "offered information and requested to fill out any additional material that is necessary. Riverside Abstract Cross Examination (Day 2) at Pg. 46-47; see also Id at 53:8-12 (Q: "So as far as you are aware, Ms. Miller, and Riverside Abstract, there has never been a response to Mr. Hus' December 14th and 15th emails, correct?" A: "I did not find a response"). Further, if the violations would have cost more than $1,500.00 to cure[3], Defendant would have had the right to cancel the Contract.

---

[3] Indeed, each of the five Contracts of Sale contain an identical provision, with each Contract for Sale containing a different monetary threshold. As the evidence showed, Plaintiff never alleged or sent notice that it would not take subject to any violations that weren't cured. Contrary to Plaintiff's attorney's contention during the trial, it would have been Plaintiff's obligation to notify Defendants that it would not take pursuant to such alleged violations, notice that Plaintiff never

However, here again, Plaintiff never provided Defendant with a copy of the list of title objections or violations (at a minimum, in accordance with Contract, Trial Exhibits 1 through 5 at Rider, Paragraph 7), so Defendant never had a chance to determine if it was going to cure (or if it needed to cure) any of the alleged violations. Riverside Abstract Cross Examination (Day 2) at Pg. 46-47; 53:8-12

As such, Plaintiff has not proven its prima facia case and therefore cannot be award specific performance or any other form of damages and the case must be dismissed as against Defendant 1143 Forest Avenue LLC.

**D.  Plaintiff has not Proven any Breaches of the Contract of Sale for 1821 Topping Avenue LLC**

Plaintiff has not offered any evidence at trial that 1821 Topping Avenue LLC breached its Contract for Sale with Plaintiff. As such, Plaintiff has not proven its prima facia case against Defendant 1821 Topping Avenue LLC. Indeed, Plaintiff presented no evidence of any breaches of the Contract for Sale for this property.

Here again Plaintiff presented no evidence of any title defects that would prevent closing of title or that would excuse Plaintiff's non-appearance at the Time of the Essence closing, with the single exception of the possible existence of a Lis Pendens and tax liens on the property. Riverside Abstract Cross Examination (Day 2) at Pg. 63:22-64:9. However, as the testimony has proven, the Lis Pendens and tax liens were actually discharged by a previous order of the Bankruptcy Court and - either way - were not an impediment to closing, just as the case was for 1974 Morris Avenue wherein Riverside Abstract simply sent a boilerplate undertaking for signature, to resolve the matter at Closing. Riverside Abstract Cross Examination (Day 2) at Pg.

---

gave to any of the Defendants, as otherwise the default would be, as was the case here, that the Plaintiff would take subject to the violations.

26:2-22 (Riverside Abstract's General Counsel agrees that the discharges were only requested after closing and Defendants' counsel quickly resolved the issue by incorporating the requisite language and sending a copy to Riverside Abstract, within 6 days); see also Riverside Abstract Cross Examination (Day 2) at 68:12-16. Again, while these items may have appeared on a title report, arguing that a discharged lien and Lis Pendens, discharged by an order of the Bankruptcy Court, is intellectually dishonest, just as it is to claim that such items are a breach of the Contract of Sale, or an impediment to closing.

Again, as the evidence has proven, Plaintiff never provided Defendant with a list of objections or violations. As such, Defendant never even had a chance to inform Plaintiff about why these issues are either a title objection or a violation that needs to be cured.

As such, Plaintiff has not proven its prima facia case and therefore cannot be award specific performance or any other form of damages and the case must be dismissed as against Defendant 1821 Topping Avenue LLC.

E.      **Plaintiff has not Proven any Breaches of the Contract of Sale for 1974 Morris Avenue LLC**

Plaintiff has not offered any evidence at trial that 1974 Morris Avenue LLC breached its Contract for Sale with Plaintiff. As such, Plaintiff has not proven its prima facia case against Defendant 1974 Morris Avenue LLC. Indeed, Plaintiff presented no evidence of any breaches of the Contract for Sale for this property nor did Plaintiff present any evidence of any alleged violations or title issues with respect to 1974 Morris Avenue.

As the evidence at trial showed, 1974 Morris Avenue was put up for sale in the middle of a gut rehabilitation. IhsanSaleem Direct Examination (Day 2) at Pg. 251:11-15 ("1974. Okay. Morris Avenue, during the time that it was being marketed for sale, it was a gut renovation. The studs were open, didn't have any working, you know, electrical, plumbing or HVAC. It was

in the framing phases of construction"); (Day 1) at Joseph Reigler Cross Examination (Pg. 169. This is undeniable. The building was unoccupied and inhabitable. Plaintiff, having viewed the building multiple times before and after entering into the Contract for Sale, were fully aware of the condition of this building at the time of the Contract for Sale Execution. Dwane Jones Direct Examination (Day 1) at Pg.301:15-304:20; Joseph Reigler Cross Examination (Pg. 169. This is undeniable.

As the evidence showed, the Contract for Sale provided at paragraph 5 of the Rider as follows:

> Purchaser acknowledges that he has inspected the Premises, and is fully familiar with the physical condition and state of repair thereof, and shall accept the Premises "AS IS" and in its present condition…

Trial Exhibit 2. The undisputed evidence presented at the trial shows that Plaintiff was well aware of the condition of 1974 Morris Avenue. Indeed, the parties entered into a license agreement specifically for the purpose of Plaintiff wanting to complete the construction so that the premises would appraise higher so that Plaintiff could finance the purchase. Izidor Mikhli Direct Examination at Pg. 35:12-16 ("What we did was we offered to go in and repair the building at our own cost. So, what we did was we put together a license agreement that allowed my client to enter the building a correct what was necessary for us on our side to be able to close"). Plaintiff presented no evidence that it was ever prevented from proceeding with the construction project. In fact, Plaintiff testified that it concentrated its construction on 1988 Morris Avenue, and not 1974 Morris Avenue. Joseph Reigler Cross Examination (Day 1) Pg. 169:1-7 ("I don't remember exact details. I know the plumbing started and some contracting. I don't remember the details. The chunk of it was done in 1988").

Plaintiff presented no evidence during trial of any defects to title or any other alleged violations which would have prevented closing of title or which would have excused Plaintiff's non-appearance at the closing. Riverside Abstract Cross Examination (Day 2) at Pg. 64:10-65:24. As such, Plaintiff has not proven its prima facia case and therefore cannot be award specific performance or any other form of damages and the case must be dismissed as against Defendant 1974 Morris Avenue LLC.

**F.     Plaintiff has not Proven any Breaches of the Contract of Sale for 700 Beck Street LLC**

Plaintiff has not offered any evidence at trial that 1974 Morris Avenue LLC breached its Contract for Sale with Plaintiff. As such, Plaintiff has not proven its prima facia case against Defendant 700 Beck Street LLC. In fact, the sole allegation as against Defendant 700 Beck Street LLC was the fact that the 770 Beck Street tenant did not take possession of the premises pursuant to the lease.

While Plaintiff attempts to portray this as a fraudulent lease, nothing could be further from the truth. The unrefuted evidence presented at trial showed that the lease was a valid and enforceable lease. Chichi Therapeutics Direct Examination (Day 2) at Pg. 278:3-22. The premises were zoned for use as a day care center or a residential unit. Defendant marketed the premises as a day care center and the tenant was an experienced day care center operator. Upon inspection by the City of New York, the premises required numerous items changed in order to legally operate as a day care center. Id. The cost for these renovations, securing necessary licenses, permits, and registrations, and installing necessary equipment, was to be borne by the tenant. Trial Exhibit 12 at paragraphs 2, 5, 9, 15, and 17. After recognizing the extent of the work needed to be performed, Tenant decided to not take possession of the premises and Defendant retained the down payment. Chichi Therapeutics Direct Examination (Day 2) at Pg. 278 19-21 ("there was a

lot of things to be done outside and inside and it was a lot. And because of that, I didn't want to continue with that"). Nothing was fraudulent.

Additionally, Plaintiff's argument that this constitutes an alleged breach under the Contract for Sale is a red herring. The Contract for Sale is provided that the property was actually to be delivered vacant. While Plaintiff likely wanted the property to be delivered with a tenant because it made for easier prospects of obtaining financing, the fact that a tenant was not in place cannot be considered a breach of the Contract for Sale. Joseph Riegler Re-Direct Examination (Day 2) at Pg. 343:8-12 (Q: "Now let me ask you a question about the daycare center lease. Is it your understanding that under these contracts for sale, the tenancies were supposed to be delivered vacant?" A: "At closing, yes.")

As such, Plaintiff has not proven its prima facia case and therefore cannot be award specific performance or any other form of damages and the case must be dismissed as against Defendant 700 Beck Street LLC.

**G.    Plaintiff has not Proven any Breaches of the Contract of Sale for 1988 Morris Ave LLC**

While a large portion of testimony during the trial was regarding 1988 Morris Avenue LLC, in fact, Plaintiff failed to prove its prima facia case of any breaches of the Contract of Sale.

The evidence presented at trial shows that Plaintiff and its representatives, Yankov Lefkowitz and Joseph Reigler visited the property on numerous occasions before the signing of the Contract of Sale. Rafael Telahun Re-Direct Examination (Day 1) at Pg. 242-243; Dwane Jones Direct Examenation (Day 2) at Pg. 301-302. Despite Mr. Reigler testifying that he never visited the top floor apartment (Joseph Reigler Cross Examination (Day 1) at Pg. 159), there has never been any question that Plaintiff "would have to fully build it up, finish, get a CO updated and

change it" - it was "in the process of being gut rehabbed." Id at 169[4]. The witnesses that testified that they visited the top floor apartment before the Contract of Sale all testified that the apartment was full of leaks at the time of the Contract of Sale was executed. Dwane Jones Direct Examination (Day 1) at Pg. 301:1-11 (Q: "And during your 20-something visits to the property, did you ever see leaks in the apartments?" A: "Yes…"); Pg.301:15-304:20; Ihsan Saleem Cross Examination (Day 1) at Pg. 229:5-10 (Q: "Was there in fact leaks in the roof while it was being -- before the contract date?" A: "Yes."); Rafael Telahun Direct Examination (Day 1) at Pg. 242:15-17 (Q: "…And, was the roof leaking at the time the contract of sale was entered into? A: "That is correct."); Ihsan Saleem Cross Examination (Day 1) at Pg. 264:17-265:2

As the evidence showed, the Contract for Sale provided at paragraph 5 of the Rider as follows:

> Purchaser acknowledges that he has inspected the Premises, and is fully familiar with the physical condition and state of repair thereof, and shall accept the Premises "AS IS" and in its present condition…

Trial Exhibit 1. At Plaintiff's request, and in order to facilitate Plaintiff in obtaining financing on the property, Plaintiff asked for permission to begin renovations on 1988 Morris Avenue "at its [Plaintiff's] own risk." Trial Exhibit 15. This ultimately resulted in the parties entering into a license agreement, wherein Plaintiff was permitted to make repairs to the premises. As part of making these repairs, Plaintiff (at its own risk) repaired the roof and fixed the leaks. Joseph Reigler Cross Examination (Day 1) at Pg. 165:20-168:2 ("the first focus was the roof. That was A, B, and C…" Q: "So was the work substantially completed?" A: "Yes. Substantially"). Again, it is

---

[4] As indicated earlier, Plaintiff's agent, Mr. Reigler perjured himself on his re-cross (on the second day), when he unequivocally stated that 1988 was actually a healthy building at time of executing the contract. Joseph Reigler Cross Examination (Day 2) at 355:5-8.

important to remember that Plaintiff, by its own admission, did this work at its own risk and it was beyond the scope of the license agreement. Joseph Reigler Re-Cross Examination (Day 2) at Pg. 353-4; *see also* Ihsan Saleem Cross Examination (Day 1) at Pg. 264:17-265:2. It is equally important to note that this work was completed. Joseph Reigler Cross Examination (Day 1) at Pg. 165:20-168:2 ("So was the work substantially completed?" A: "Yes. Substantially"). Plaintiff was attempting to maximize the value of the property so that it could obtain financing. As such, the Plaintiff's theory that access was necessary because of an alleged roof leak is misleading, the roof was not leaking by Plaintiff's own admission and access was never actually denied: Plaintiff was actually granted restricted access because of its own failure to abide by the License Agreement - not because Defendants were trying to obstruct Plaintiff. Restricted access was an entirely self-inflicted issue by Defendants and cannot be used as a sword against Defendants. Ihsan Saleem Direct Examination (Day 1) at Pg. 218:24-219:6 (Q: "When you say access was limited, does that mean it was denied?" A: "No. They just have to go through a process to request the access … They just had to request access so that we could make sure that there was some accountability, because there had been damage done by their contractors to the property"). Stated otherwise, 1988 Morris did not have an "access" issue whatsoever and Plaintiff failed to demonstrate a single piece of evidence wherein access was rejected to 1988 Morris.

However, as testified to at trial and evidenced by the construction contracts, Plaintiff did more than just make repairs to the property. Plaintiff attempted to reconfigure the property and add additional units to the premises. See Rafael Telahun Re-Direct Examination (Day 1) Regarding Trial Exhibit I at pg. 259:12-260-8 (Q: "…This is an invoice from ANC Contracting Co, Inc. re: 1988 Morris, and you can see it's for additional work …. [c]an you read that?" A: "Upgrade electrical service adding two extra new meters and two new panels, filling for two new

extra new meters." … Q: "Are you aware of why you would need two additional meters at an apartment building?" A: "Yes. If you're adding two new units." … Q: "I direct your attention to number five, can you that one, please?" A: "Yes. Installed new two-meter bank. Install two new panels." Q: "And number six?" A: "Wire boiler and add two emergency switches." Q: "…why would these be necessary." A: "You would do this if you're adding two new units"). Plaintiff also performed shoddy work, worked without permits, and damaged the premises. IhsanIhsan Saleem Cross Examination (Day 1) at Pg. 264:17-265:2; see also Rafael Telahun Direct Examination (Day 1) at 256:19-259: 4; 260:6-8 (Q: "Are you aware of why you would need two additional meters at an apartment building?" A: "Yes. If you're adding two new units"). This resulted in Defendant terminating the License Agreement for cause and restricting access to the premises.

Here again, the evidence is clear, Defendant did not breach the Contract of Sale. Plaintiff, caught in doing improper work, without a permit, altering the number of units in the premises, and unable to secure the necessary financing (Trial Exhibit 21 ("Yes as the bank the initial lender is still not provided a commitment, we are seeking to go ahead with a hard money lender"); Jackson Strong Cross Examination (Day 1) at Pg. 134:7-20), attempted to renegotiate the contract. Trial Exhibit 25 at Pg. 154 ("The attached lease is in effect, so I don't know what you are talking about. The only bad faith is asking for $150,000 for a fully executed lease"). When Defendants would not agree to renegotiate, Plaintiff illegally and improperly tried to hold that the Time of the Essence closing date was premature or "unwarranted" even though the Time of the Essence date was agreed to by the parties and set forth as the Contract Addendums. Avi Weisel Cross Examination (Day 2) at Pg. 209:22-212:21.

Accordingly, at Plaintiff's own risk, it performed the necessary repair work to fix the leaks at 1988 Morris Avenue. Therefore, leaks were not an impediment to closing on this

property.  At best, if Plaintiff thought it was due some monetary credit for this work, this could have been raised at the closing.  Because Plaintiff never appeared at the Time of the Essence Closing, these issues were never addressed between the parties.  As such, Plaintiff has not proven its prima facia case and therefore cannot be award specific performance or any other form of damages and the case must be dismissed as against Defendant 1988 Morris Avenue LLC.

**H.**     **Conclusion**

For all of the reasons set forth herein and as presented at the trial of this matter, Plaintiff has failed to prove its prima facia case and as such, its case must be dismissed, Plaintiff cannot be awarded specific performance against any of the Defendants.  Further, Plaintiff has not offered any evidence to support any of its claims for damages against any of the Defendants.  On the contrary, Defendants have proven their prima facia case for entitlement to recovery of all sums due from Plaintiff for reimbursement for mortgage payments that Plaintiff was contractually obligated to pay, but never did.

Dated: New York, New York
       June 30, 2020

                                         **GOLDSTEIN HALL PLLC**
                                         *Attorneys for Defendants.*
                                         80 Broad Street
                                         New York, New York 10004
                                         (646) 768-4127

                                         By:    /s/ Brian J. Markowitz
                                                   BRIAN J. MARKOWITZ