```
FMTB BH LLC,
        Plaintiff                           Adv. Proc. No. 18-01052-cec

1988 MORRIS AVENUE LLC,
        Defendant
```

## CERTIFICATE OF NOTICE

```
District/off: 0207-1       User: galaimo       Page 1 of 2           Date Rcvd: Aug 31, 2020
                           Form ID: pdf000      Total Noticed: 5
```

```
Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on
Sep 02, 2020.
pla            +FMTB BH LLC,   1335 50 STREET, SUITE 2G,   Brooklyn, NY 11219-6504
9401492        +747 Third Avenue, Suite 33B,   New York, New York 10017,   (212) 826-6422,   ( 10017-2803
9401493        +STAHL & ZELMANOVITZ,   747 Third Avenue, Suite 33B,   New York, New York 10017,
                T: (212) 826-6422,   F 10017-2803

Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.
ust            +E-mail/Text: ustpregion02.br.ecf@usdoj.gov Aug 31 2020 18:58:43
                Office of the United States Trustee,   Eastern District of NY (Brooklyn Office),
                U.S. Federal Office Building,   201 Varick Street, Suite 1006,   New York, NY 10014-4811
ust            +E-mail/Text: ustpregion02.br.ecf@usdoj.gov Aug 31 2020 18:58:43           United States Trustee,
                Office of the United States Trustee,   U.S. Federal Office Building,
                201 Varick Street, Room 1006,   New York, NY 10014-7016
                                                                               TOTAL: 2


              ***** BYPASSED RECIPIENTS (undeliverable, * duplicate) *****
dft            1143 FOREST AVENUE LLC
cc             1143 FOREST AVENUE LLC
dft            1821 TOPPING AVENUE LLC
cc             1821 TOPPING AVENUE LLC
dft            1974 MORRIS AVENUE LLC
cc             1974 MORRIS AVENUE LLC
cc             1988 MORRIS AVENUE LLC
dft            1988 MORRIS AVENUE LLC
cc             700 BECK STREET LLC
dft            700 BECK STREET LLC
ust*           +United States Trustee,   Office of the United States Trustee,   U.S. Federal Office Building,
                201 Varick Street, Room 1006,   New York, NY 10014-7016
cd*            +FMTB BH LLC,   1335 50 STREET, SUITE 2G,   Brooklyn, NY 11219-6504
                                                                         TOTALS: 10, * 2, ## 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

Transmission times for electronic delivery are Eastern Time zone.
```

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Sep 02, 2020                      Signature: /s/Joseph Speetjens

---

## CM/ECF NOTICE OF ELECTRONIC FILING

```
The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email)
system on August 31, 2020 at the address(es) listed below:
          Abraham  Neuhaus   on behalf of Plaintiff   FMTB BH LLC abeneuhaus@yahoo.com,
           an@neuyac.com;abeneuhausesq@gmail.com
          Abraham  Neuhaus   on behalf of Counter-Defendant   FMTB BH LLC abeneuhaus@yahoo.com,
           an@neuyac.com;abeneuhausesq@gmail.com
          Brian J. Markowitz   on behalf of Defendant   1143 FOREST AVENUE LLC bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Defendant   700 BECK STREET LLC bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Counter-Claimant   1143 FOREST AVENUE LLC
           bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Counter-Defendant   FMTB BH LLC bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Counter-Claimant   1974 MORRIS AVENUE LLC
           bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Defendant   1988 MORRIS AVENUE LLC bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Counter-Claimant   1821 TOPPING AVENUE LLC
           bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Counter-Claimant   1988 MORRIS AVENUE LLC
           bmarkowitz@goldsteinhall.com
          Brian J. Markowitz   on behalf of Plaintiff   FMTB BH LLC bmarkowitz@goldsteinhall.com
```

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email)
system (continued)

          Brian J. Markowitz    on behalf of Counter-Claimant    700 BECK STREET LLC
            bmarkowitz@goldsteinhall.com
          Brian J. Markowitz    on behalf of Defendant    1974 MORRIS AVENUE LLC bmarkowitz@goldsteinhall.com
          Brian J. Markowitz    on behalf of Defendant    1821 TOPPING AVENUE LLC bmarkowitz@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Plaintiff    FMTB BH LLC dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Defendant    1143 FOREST AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Defendant    1974 MORRIS AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Counter-Claimant    1974 MORRIS AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Counter-Claimant    700 BECK STREET LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Defendant    1821 TOPPING AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Defendant    1988 MORRIS AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Counter-Defendant    FMTB BH LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Counter-Claimant    1143 FOREST AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Counter-Claimant    1821 TOPPING AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Defendant    700 BECK STREET LLC
            dgoldenberg@goldsteinhall.com
          Daniel Robert Goldenberg    on behalf of Counter-Claimant    1988 MORRIS AVENUE LLC
            dgoldenberg@goldsteinhall.com
          Fred B. Ringel    on behalf of Plaintiff    FMTB BH LLC fbr@robinsonbrog.com,
            cy@robinsonbrog.com;nfm@robinsonbrog.com
          Joseph Zelmanovitz    on behalf of Plaintiff    FMTB BH LLC joezelmanovitz@aol.com,
            aneuhaus@szlawllp.com
          Joseph Zelmanovitz    on behalf of Counter-Defendant    FMTB BH LLC joezelmanovitz@aol.com,
            aneuhaus@szlawllp.com
          Lawrence S. Hirsh    on behalf of Plaintiff    FMTB BH LLC lhirsh@robinsonbrog.com,
            paralegals@robinsonbrog.com

                                                                                    TOTAL: 30

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                                    **Chapter 11**

FMTB BH LLC,                                              Case No. 18-42228-cec

                        Debtor.
-------------------------------------------------------------x
FMTB BH LLC,                                              Adv. Pro. No. 18-01052-cec

                        Plaintiff,

            -against-

1988 MORRIS AVENUE LLC, 1974 MORRIS
AVENUE LLC, 700 BECK STREET LLC, 1143
FOREST AVENUE LLC and 1821 TOPPING
AVENUE LLC,

                        Defendants.
-------------------------------------------------------------x

**JOINT PRE-TRIAL ORDER**

TO THE HONORABLE CARLA E. CRAIG
UNITED STATES BANKRUPTCY JUDGE

        The parties having conferred among themselves and with the Court pursuant to

Bankruptcy Rule 7016,

        NOW, THEREFORE, the following statements, directions and agreements are adopted as

the Pre-Trial Order herein:

        1.        **Nature of the Case**    This action involves five separate contracts of sale for the

purchase by Plaintiff from one of each of the five Defendants of five separate pieces of real

property.  Plaintiff maintains that Defendants are required to specifically perform their

obligations under the contracts of sale and consummate the closings on the purchases.

Alternatively, Plaintiff asserts that Defendants are liable to Plaintiff for damages for breach of

the contracts or for anticipatory breach of the contracts.  Defendants maintain that Plaintiff breached the contracts of sale by not appearing for Time of the Essence ("TOE") closings on December 18, 2017 and, as a consequence, pursuant to the terms of the Contracts and the Contract Addendums, Defendants may keep the down payments made by Plaintiff and may recover additional damages pursuant to the various Contract Addendums to the contracts of sale.

2.  **Jurisdiction-Venue** Debtor/Plaintiff commenced this adversary proceeding pursuant to Sections 105, 365, 542 and 541 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

Debtor/Plaintiff has alleged that this action is a "core" proceeding within the meaning of 28 U.S.C. §157(b)(2)(A), (E), (M), (N), and (O) in that the complaint affects the administration of the bankruptcy estate and involves a determination of the Debtor's property rights within the meaning of §541.  Defendants disagree, and believe this proceeding is a "non-core" proceeding, in that none of the subsection of 28 28 U.S.C. §157(b)(2) apply to the action herein.  Further, there is no basis to determine under any other section of the Bankruptcy Code that this is a core-proceeding, as the claims do not arise under title 11 nor are, they related to the Bankruptcy Proceeding.  This is underscored by the very fact that, even assuming *arguendo*, that Plaintiff is successful in being awarded specific performance, Plaintiff could not purchase the properties at issue.  However, the Court, in its Decision denying Defendants' motion for summary judgment, stated: "A bankruptcy judge may hear a non-core proceeding that is related to a bankruptcy case.  28 U.S.C. § 157(c)(1).  This non-core proceeding is related to this bankruptcy case because the sale contracts are the only scheduled assets of the estate."  In addition, the parties have consented to final adjudication of this adversary proceeding by this Court (ECF Nos. 45, 46).

3.    **Amendments-Dismissals**    Plaintiff does not request any amendment to its complaint other than to update the amount of damages requested in the alternative to specific performance, and for use and occupancy since December 18, 2017.  Defendants do not request any amendments to their Answer or Counterclaim, other than to update the amount of damages requested in the Third and Fourth Counterclaims, as the damages alleged in those causes of action are continuing.  These Counterclaims allege the continuing damage arising out of Plaintiff's failure to pay mortgage payments to Defendants 1988 Morris Ave LLC and 1821 Topping Ave LLC as required under the parties Addendum to Contract.  Defendants are not alleging any new theories of law nor are any additional facts necessary. This is merely a recalculation of the damages to the date of trial of this action, i.e., conforming the pleadings to the proof.

4.    **Relief Prayed**

A.    <u>Plaintiff's Relief</u>: Plaintiff seeks (1) on its First Cause of Action, specific performance of Defendants' obligations under the contracts of sale, including an abatement of the purchase prices to take into account the damages sustained by Plaintiff as a result of Defendants' breaches and monies paid to remedy property damage and other pre-closing payments demanded by Defendants; (2) on its Second Cause of Action for breach of contract, pleaded in the alternative, damages consisting of (i) the amount of the contract deposits and additional deposits paid by Plaintiff, (ii) the amount of approximately $230,430 spent by Plaintiff in alterations, improvements and repairs to the properties, (iii) mortgage payments paid by Plaintiff, and (iv) attorneys' fees; (3) damages corresponding to use and occupancy since December 18, 2017, measured by the amount of rental revenue received by Defendants from

tenants at the properties since December 18, 2017; and (4) on its Third Cause of Action, an order authorizing the Debtor to assume the contracts of sale.

                B.      <u>Defendants' Relief</u>:

Defendants pray for relief as follows: i) dismissal of the Complaint as against each of the Defendants; (ii) judgment in favor of Defendant 1988 Morris Ave LLC on the First Counterclaim as against Plaintiff in the amount of $7,840.00, representing the amount of the monthly mortgage payments owed pursuant to the Addendum to Contract, through the December 18, 2017 closing date; (iii) judgment in favor of Defendant 1821 Topping Ave LLC on the Second Counterclaim as against Plaintiff in the amount of $5,915.00, representing the amount of the monthly mortgage payments owed pursuant to the Addendum to Contract, through the December 18, 2017 closing date; (iv) judgment in favor of Defendant 1988 Morris Ave LLC on the Third Counterclaim as against Plaintiff in the amount of $163,640.00, reflecting 42 months since December 2017 to June 2020 of Plaintiff's obligation to pay the monthly mortgage interest pursuant to the Addendum to Contract, and; (v) judgment in favor of Defendant 1821 Topping Ave LLC on the Fourth Counterclaim, as against Plaintiff in the amount of $124,194.00, reflecting 42 months since December 2017 to June 2020 of Plaintiff's obligation to pay the monthly mortgage interest pursuant to the Addendum to Contract.

        5.     **Undisputed Facts**     The parties agree as to the following undisputed facts:

A.      <u>Liability</u>

        1.      On June 19, 2017, Plaintiff entered into five separate contracts of sale, as follows: (1) to purchase 1988 Morris Avenue, Bronx, NY ("1988 Morris Ave.") from Defendant 1988 Morris Ave LLC (the "1988 Morris Avenue Contract""); (2) to purchase 1974 Morris Avenue, Bronx, NY ("1974 Morris Ave.") from 1974 Morris Ave LLC (the "1974 Morris Avenue

Contract"); (3) to purchase 700 Beck Street, Bronx, NY ("700 Beck Street") from 700 Beck Street LLC ("the 700 Beck Street Contract"); (4) to purchase 1143 Forest Avenue, Bronx, NY ("1143 Forest Ave.") from 1143 Forest Ave LLC (the "1143 Forest Avenue Contract"); and (5) to purchase 1821 Topping Avenue, Bronx, NY ("1821 Topping Ave.") from 1821 Topping Ave LLC (the "1821 Topping Avenue Contract"). (The above-referenced contracts are collectively referred to as the "Contracts" and each a "Contract.")

2.      There was a separate contract, purchase price, and down payment with respect to each property, but each contract was identical with respect to its substantive terms. The Contracts do not contain a cross-default provision or a mortgage contingency, and provide for an all-cash transaction.

3.      At or about the time the Contracts were entered into, Plaintiff made the following down payments pursuant to the terms of the Contracts: (1) $25,833.33 under the 1988 Morris Avenue Contract; (2) $25,833.33 under the 1974 Morris Avenue Contract; (3) $34,444.44 under the 700 Beck Street Contract; (4) $34,444.44 under the 1143 Forest Avenue Contract; and (5) $34,444.44 under the 1821 Topping Avenue Contract. The down payments were held in escrow.

4.      On August 22, 2017, Defendants' prior counsel, Malik Pearson, Esq., sent Plaintiff's counsel a time of the essence letter ("TOE") for each of the Contracts, scheduling closings on the Contracts for September 14, 2017. The closings, however, did not take place.

5.      On September 28, 2017, Mr. Pearson sent Plaintiff's counsel a letter for each of the Contracts, scheduling TOE closings for October 2, 2017. These closings did not take place.

6.      On October 4, 2017, Plaintiff and Defendants executed an Addendum to each Contract, which, among other things, authorized the down payments made under the Contracts to be released to Defendants, provided for an additional deposit of $169,000 per Contract, provided

access to Plaintiff to make alterations and improvements to the properties in accordance with a separate "access agreement" to be agreed upon, and scheduled a third TOE closing date of December 18, 2017.

7. On October 17, 2017, Plaintiff executed a License Agreement (the "License Agreement") with 1988 Morris Ave LLC and 1974 Morris Ave LLC, which, among other things, authorized Plaintiff to access 1988 Morris Ave. and 1974 Morris Ave. and conduct work at those properties.

8. On October 19, 2017, in accordance with the Addendum to each Contract, the initial down payments were released from escrow to Defendants and Plaintiff made the additional deposit of $169,000 under each Contract.

9. On November 14, 2017, Plaintiff's counsel requested from Mr. Pearson that Defendants provide a subordination, non-disturbance, and attornment agreement ("SNDA") regarding the lease to the commercial tenant at the 700 Beck Street property and the SNDA was never provided to Plaintiff.

10. On November 27, 2017, Malik Pearson informed Joseph Riegler that Defendants were retaining new counsel. On December 3, 2017, Jackson Strong informed Joseph Riegler of the new counsel's contact information.

11. On December 6, 2017, Defendants' new attorney, Brian Hsu, Esq., sent five letters to Plaintiff's counsel, stating that the TOE closings on each Contract would be held on December 18, 2018, at 10 a.m., at the offices of Defendants' attorneys.

12. The email from Mr. Hsu accompanying these letters stated: "I look forward to discussing what it will take to get to a closing by 12/18/17. Perhaps later this afternoon or tomorrow."

13.     On December 9, 2017, Plaintiffs' representative, Mr. Joseph Riegler, requested of Mr. Jackson Strong, Defendants' representative, that Plaintiffs be given access to the properties.

14.     On December 14, 2018, Mr. Hsu, reached out by email to Riverside Abstract, the title company, in connection with the upcoming closing.  Plaintiffs' counsel was not copied on this communication.

15.     Plaintiffs' counsel emailed letters to Defendants' counsel rejecting the December 18 closings.

16.     On December 18, 2017, Defendants' counsel appeared at the closings scheduled by Defendants.  A court reporter was called to transcribe the closings.

17.     As of December 18, 2017, the 700 Beck Street, 1143 Forest Ave. and 1821 Topping Ave. properties had tenants occupying space at the properties.

18.     On April 23, 2018, Plaintiff filed a voluntary petition under Chapter 11 of Title 11 of the United States Bankruptcy Code, and commenced this action seeking specific performance of the Contracts, or alternatively, for damages.

9.     On June 21, 2018, Defendants moved to dismiss the adversary complaint pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012(b).  The Court denied the motion on July 24, 2018.

20.     On September 7, 2018, Defendants interposed their Answer and Counterclaims.

21.     After the close of discovery, Defendants filed a motion for summary judgment. The Court denied the motion by Decision dated January 13, 2020.

B.     Damages

Plaintiff asserts that alternatively to the remedy of specific performance, in the event Defendants are found liable for breach of contract and ordered to pay Plaintiff damages, those

damages would be : (1) the amount paid for the initial down payments, totaling $154,999.98 ; (2) the $169,000 paid for each Contract Addendum; (3) the costs and expenses of the alterations and improvements incurred and paid with respect to each property; and (4) prejudgment interest on the amounts paid in (1) and (2) above.  Plaintiff asserts additional damages, which are set forth below as "Plaintiff's Claim for Additional Damages."

Defendants assert that in the event Defendants prevail at trial, Defendants would be entitled to keep the down payments on the contracts of sale and the Addenda thereto paid by Plaintiff.  Defendants assert additional damages, which are set forth below as "Defendants' Claim for Additional Damages."

Plaintiff's Claim for Additional Damages

(1) Damages for use and occupancy; i.e., the rental revenue received by Defendants from the properties since December 18, 2017 to date; (2) Costs and expenses of approximately $230,430 spent by Plaintiff in alterations, improvements and repairs to the properties; (3) mortgage payments paid by Plaintiff; and (4) attorneys' fees.

Defendants' Claim for Damages on its Counterclaims.

1.      The Addendum to Contract for 1988 Morris Ave LLC states in pertinent part: "Purchaser agrees to pay monthly mortgage interest for the Property on the amount of $2,957.50 from execution of this Agreement to Closing Date."

2.      The Addendum to Contract for 1821 Topping Ave LLC states in pertinent part: "Purchaser agrees to pay monthly mortgage interest for the Property on the amount of $3,920.00 from execution of this Agreement to Closing Date."

3.      Plaintiff has not paid any of the monthly mortgage payments for 1988 Morris Ave LLC.

4.      Plaintiff has not paid any of the monthly mortgage payments for 1821 Topping

Ave LLC.

5.      At the time of the TOE closing, Plaintiff owed 1988 Morris Ave LLC the amount

of $7,840.00, as set forth in the First Counterclaim.

6.      At the time of the TOE closing, Plaintiff owed 1821 Topping Ave LLC the

amount of $5,915.00 as set forth in the Second Counterclaim.

7.      Because Plaintiff has defaulted on the closing, Defendant 1988 Morris Ave LLC

has incurred additional mortgage payments in the amount of $163,640.00, reflecting 42 months

since December 2017 to June 2020 of Plaintiff's obligation to pay the monthly mortgage interest

pursuant to the Addendum to Contract, as set forth in the Third Counterclaim.

8.      Because Plaintiff has defaulted on the closing, Defendant 1821 Topping Ave LLC

has incurred additional mortgage payments in the amount of of $124,194.00, reflecting 42

months since December 2017 to June 2020 of Plaintiff's obligation to pay the monthly mortgage

interest pursuant to the Addendum to Contract, as set forth in the Fourth Counterclaim.6.  6.

6.      **Plaintiff's Contentions of Fact:**

1.      Paragraph 5 of the Rider to each contract of sale provides, among other things,

that "appliances, plumbing, heating and electrical systems shall be in working order and roof

should be free of leaks at closing. . . ."

2.      Paragraph 16(d) of the contracts of sale provide that the properties were to be

delivered vacant of tenants.

3.      Paragraph 12 of the contracts of sale provide that Plaintiff has the right of

access/inspection of the properties with a request by "phone or otherwise."

4.     Paragraph 7 of the Rider to each contract of sale provides that upon being informed of title objections, Defendants were required to remedy those issues by closing or were entitled to a reasonable adjournment of the closing.

5.     The 1988 Morris Avenue property experienced damage after the contract was entered into, including leaks from the roof.

6.     All of the other four properties were in the same generally poor condition.

7.     The Addenda to the contracts of sale, dated October 4, 2017, authorized Plaintiff to have broad access to the properties.

8.     The License Agreement, dated October 17, 2017, provided in part that Plaintiff was permitted to conduct work and have access to the 1988 Morris Avenue and 1974 Morris Avenue properties.  The License Agreement covered these two properties alone, and not the other three properties.

9.     In November 2017, Defendants locked out Plaintiff and its workers from the two Morris Avenue properties, although repairs to the properties had still not been completed.

10.     At the time of the lock-out, the roof at 1988 Morris Avenue was still leaking.

11.     Access to the properties was important to Plaintiff because (i) access was necessary to obtain financing in any form, whether by conventional financing or private "hard-money" loans; (ii) it was important to conduct due diligence regarding those tenants which the parties would agree would remain, as an exception to the contractual provision requiring the premises to be delivered vacant; (iii) Plaintiff had to ascertain whether there was damage to the

properties; and (iv) Plaintiff had to inspect the repairs and improvements done at the two Morris Avenue properties.

12.     On December 9, 2017, Joseph Riegler on behalf of Plaintiff requested access to the properties through Mr. Jackson Strong, Defendants' managing agent and the person with whom Plaintiff would liaison in communicating with Defendants.

13.     By Email dated December 11, 2017, Mr. Brian Hsu, Defendants' attorney, stated in an email to Plaintiff's attorney that he "was not authorized [to permit access] until we see real movement from your side to get to a closing date."

14.     Access was not permitted Plaintiff until January 22, 2019, through Plaintiff's demand for inspection, which Plaintiff served in this adversary proceeding.

15.     During the period November 2017 through the beginning of December 2017, Defendants' prior counsel, Malik Pearson, Esq., could not be reached to address access and other issues.

16.     Mr. Pearson withdrew from representing Defendants sometime in November 2017, but neither Plaintiff nor its attorneys were informed of that event.

17.     It was not until after Mr. Riegler and Plaintiff's counsel persistently prodded Defendants in preparation for the purported December 18, 2017 closing that Mr. Brian Hsu, on or about December 6, 2017, suddenly notified them that he was the new attorney for Defendants.

18.     At least as early as November 14, 2017, Plaintiff's attorney alerted Defendants, in writing, to multiple title issues affecting each of the properties, which had to be cleared before insurable title could be obtained from the title company.

19.     Included in the title issues of which Plaintiff notified Defendants on November 14, 2017 were the following: Environmental Control Board violations, sidewalk violations, Uniform Commercial Code liens, valid building registration statements, and landmark violations.

20.     Until December 6, 2017, no one from Defendants' side was actually participating in the preparation for the purported December 18, 2017 closing with Plaintiff or Riverside Abstract, representing the title company.

21.     It was not until Thursday, 11:56 a.m., on December 14, 2018, that Defendants' counsel, Mr. Hsu, first reached out to Riverside Abstract to begin to work on clearing title issues.

22.     Mr. Hsu did not copy Plaintiff's counsel on his December 14, 2017 communication to Riverside Abstract.

23.     As of December 14, 2017, Plaintiff was not aware that Defendants had begun to take any substantive steps to clear title.  Plaintiff was only aware that Defendants had requested that Riverside Abstract produce a title closer for the purported closing.

24.     Plaintiff was ready to close on December 18, 2017, if all title issues had been remedied by Defendants and Riverside Abstract was satisfied sufficiently to cause title insurance to be issued.

25.     Plaintiff's counsel requested that Riverside Abstract order a bill for closing.

26.     Riverside Abstract, however, did not consider that there had been adequate preparation for a closing on December 18, 2017.

27.     Long after December 18, 2017, the parties were still working to clear title to the properties.

28.     On Friday, December 15, 2017, three days before the purported closing date, Mr. Hsu sent an email to Leah Newman of Riverside Abstract, at 4:21 p.m., stating: "Is there anything outstanding with you?"  Ms. Newman, as is the case with Mr. Weisel, is a Sabbath observer and had long since left work and was not minding emails.  On that day, the Jewish Sabbath began at approximately 4:20 p.m., a minute before the Hsu email was sent.

29.     Riverside Abstract did not have everything needed to close as of December 18, 2017.

30.     Some of the title matters could not be remedied and resolved by December 18, 2017.

31.     Mr. Hsu did not receive an affirmative response from Riverside Abstract that it was ready to proceed with a closing on December 18, 2017.

32.     As of December 18, 2017, the landmark violations on the properties had not been cleared and they could not be for at least 30 days.

33.     As of December 18, 2017, tax liens existing on some of the properties had not been removed and would not be for several weeks.

34.     Plaintiff had been provided the commercial lease at the 700 Beck Street property, which Plaintiff sought to leave in place because of its desirable rent revenue, which is an exception to the contracts of sale's requirement that Defendants were to deliver the properties vacant of tenants.

35.     The rent roll included in the offering materials distributed by Defendants to Plaintiff regarding the five properties listed the commercial lease at 700 Beck Street.

36.     Defendants did not provide a subordination, non-disturbance, and attornment agreement for the commercial lease at the 700 Beck Street property, despite Plaintiff's requests.

37.     One of the reasons contributing to Malik Pearson's withdrawal as attorney for Defendants was his understanding that the commercial lease at the 700 Beck Street property was not bona fide.

38.     Mr. Hsu did not permit Plaintiff's counsel to conduct any due diligence regarding the 700 Beck Street commercial lease.

39.     As of December 11, 2017, at the latest, Mr. Hsu knew that the commercial tenant at the 700 Beck Street property was not in possession of the premises, but he did not convey that information to Plaintiff's counsel.

40.     The 700 Beck Street, 1143 Forest Avenue, and 1821 Topping Avenue properties all had tenants as of December 18, 2017.  Defendants had no plan to have these tenants leave the premises.

41.     Plaintiff had first planned to obtain conventional financing for the acquisition of the five properties and, if that failed, to obtain a hard money loan for that purpose.  If such loans were not available, Mr. Joel Leifer would fund the transactions himself.

42.     Joel Leifer is a former member of Plaintiff and an investor associated with Plaintiff.

43.     Joel Leifer had more than $3.8 million in ready funds available as of December 18, 2017.

44.     Plaintiff incurred $230,430 in costs and expenses in the alteration, improvement and repair of the properties.

## 7.     **Defendants' Contentions of Fact**

### A.     **Plaintiff , its Member and "Associates" are Real Estate Speculators who Sought our Defendants**

1.     In or around March 2017, Defendants collectively began marketing the five subject properties through a broker, Marcus & Millichap Real Estate Investment Services, LLC ("Marcus & Millichap").

2.     The marketing materials contained, *inter alia*, a description of the properties, a description of the condition of each property, pictures of each property showing the physical condition of the properties, and a statement of the rent roll for each property.

3.     Eventually, Defendants were approached by Mr. Yaakov Lefkowitz ("Lefkowitz"), of Lefko Capital Group, to purchase the properties.

4.     On May 5, 2017, an initial Deal Terms and Contact Sheet was prepared. The Purchaser was listed as Mr. Yaakov Lefkowitz, of Lefko Capital Group, the purchase price was listed as $3,000,000, and the Properties were to be sold "As-Is, subject to clear title".

5.     On May 23, 2017, Mr. Lefkowitz was provided a rent roll for the tenants of the five properties, as requested by Izidor Mikhli, the attorney representing Mr. Lefkowitz and later representing Plaintiff.

6.     On several occasions in April, May and early June, Mr. Lefkowitz and his agents and associates conducted tours of all of the properties subject to the action.

7.     Following competition with another bidder, Mr. Lefkowitz made a last and final offer of $3,100,000 for the properties, which Defendants accepted.

8.     On June 16, 2017, Mr. Lefkowitz formally informed Defendants of his intent to purchase the properties as previously disclosed in the Deal Terms and Contact Sheet prepared at a purchase price of $3,100,000.

9.     On or about June 16, 2017, Debtor was formed by Izidor Mikhli.  According to the Operating Agreement for FMTB BH LLC the sole member of the Plaintiff was Mr. Joseph Reigler. Mr. Reigler remained the sole member of Plaintiff until his resignation from FMTB on April 4, 2018.

10.     Mr. Reigler is an experienced real estate owner, speculator and developer in the City of New York, with activities that have focused on the Bronx and Brooklyn, specializing in

multi-family and commercial properties. Mr. Reigler is listed on public records as the principal officer or owner of more than 20 properties in the City of New York.

11.     On or about April 4, 2018, approximately four months after the Plaintiff's default under the Contracts, Mr. Reigler transferred his membership interests in FMTB BH LLC to Mr. Joseph Leifer.

12.     Mr. Leifer is an experienced real estate owner, speculator and developer in the City of New York, specializing in multi-family and commercial properties. Mr. Leifer is listed on public records as the principal officer or owner of at least 9 properties in the City of New York.

13.     Ten days later, on April 14, 2018, Mr Leifer assigned his membership interest in FMTB BH LLC to Mr. Martin Ehrenfeld, for whom public records show is also known as Mordechai Ehrenfeld.

14.     Mr. Ehrenfeld is an experienced real estate owner, speculator and developer in the City of New York, specializing in multi-family and commercial properties. Mr. Ehrenfeld is listed on public records and in filings made before the United States Bankruptcy Court as a member of the ownership or principal officer of at least five  properties in the City of New York.

15.     Defendants never met, communicated with or otherwise interacted with Mr. Ehrenfeld.

**B. The Sales Contract**

16.     On June 19, 2017, fully executed copies of the five Contracts of Sale for the five properties was exchanged.  Each individual Contract for Sale were signed by Ihsan Saleem on behalf of the Defendants, and Izidor Mikhli, attorney for the Purchaser.  Closing was set for "on or about sixty days from receipt of fully executed contracts".

17.     Each of the separate contracts were close to identical in form and substance,  Each Contract contained the provision that title to the properties was to be transferred subject to certain permitted exceptions, provided that these exceptions did not render title to the Premises unmarketable.

18.     The Contracts further provided that each Defendant was to convey "such title as any reputable title insurance company of purchaser's choosing, licensed to do business in the State of New York shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department."

19.     Each of the Contracts included at least two typographical errors. The names of Defendants were misspelled and a provision requiring the buildings be delivered vacant was left unstricken. In written and oral communication before, during and after signing  Plaintiff and Defendant reaffirmed the names of the proper selling entities Defendants and the status of the occupancy in place in the respective buildings.

**C.  Plaintiff Was Aware of the Status of the Remaining Tenants**

20. Throughout June, July and August, Defendants provided Mr. Lefkowitz and Mr. Mikhli with updates on changes in the tenancy of the properties.

21. On June 7, 2017 Defendants provided Lefkowitz with a Lease Agreement for a daycare facility (the "Agreement") dated March 25th, 2017 listing Chichi Therapeutic Services Inc. as the lessee. The Agreement was jointly signed by a Chinyelu Fafowora and a Olabanji Fafowora for the tenant and Jackson Strong for 700 Beck St LLC..

22. During lease negotiation, Chichi Therapeutic Services Inc. disclosed its intention to file with the relevant agency of the City of New York, following lease signing, for a permit to operate a second daycare facility within the ground floor unit of 770 Beck Street, Bronx, New. However, Chichi Therapeutic Services Inc. was unable to secure the necessary permits to operate the day care center without required changes to the property to conform to the legal requirements of operating a day care center. 700 Beck Street LLC and Chichi Therapeutic Services Inc. entered into discussions to fund the necessary alterations to obtain the required permit. Those conversations continued through December 2017but did not lead to a mutually amenable deal. By December 5th 2017, Defendant 700 Beck Street LLC decided to conclude those conversations. ChiChi Therapeutic Services Inc. thus did not take possession of the lease.

23. On June 21, 2017, Mr. Lefkowitz requested access to 1974 Morris Avenue to perform certain renovation work at the property. Mr. Lefkowitz represented at that time that Plaintiff intended to finance the purchase of the five Properties and wanted to complete work in order to obtain a mortgage to finance the purchase. It was at this point that Defendants became aware of Plaintiff's intent to finance the properties. Defendants allowed access to 1974 Morris Avenue, but declined to allow any work to be conducted on the premise, citing the terms and conditions of the "As-Is" contract of sale which specifically was not subject to any mortgage contingency.

24. In early July 2017, the tenants at 1988 Morris Avenue vacated the premises. Defendants informed Lefkowitz of the update in tenancy, to which Lefkowitz agreed to the status thereof. Lefkowitz reaffirmed his interest in keeping that building vacant as a major renovation was required to achieve market rate rents at 1988 Morris.

25. On August 1, 2017, Defendant 1821 Topping Avenue LLC communicated to Lefkowitz of its intent to market and lease the first-floor unit, for which a lease had expired on June 30, 2017 and for which the tenant had vacated in late July, at a substantially similar rental rate. Lefkowitz acknowledged this and agreed to the contemplated course of action.

**D. Plaintiff failed to Obtain Financing For the Time of the Essence Closings on September 14, 2017 and October 2, 2017**

26. In late August as the sixtieth day following the contract of sale neared, Lefkowitz introduced (telephonically) Joseph Riegler and Joel Wertzberger and represented that they, along with Joel Leifer, and not Lefkowitz were the principals, actual purchasers and "Senior Partners" behind Plaintiff. Lefkowitz further indicated that they were working on financing the purchase,

despite the Contracts having no mortgage contingency. This representation is also contrary to the FMTB BH LLC Operating Agreement which states that Joseph Reigler is the sole 100% member.

27.     On August 22, 2017, Defendants' then attorney sent the first Time of Essence Letter, setting a Time of the Essence closing date for each property for September 14, 2017.

28.     On August 30, 2017, Plaintiff requested access to the property located at 1974 Morris Avenue and 1988 Morris Avenue. Defendants agreed and allowed access to the requested properties. Plaintiff brought a bank appraiser (presumably for financing purposes), a contractor and other agents of Plaintiff.

29.     On August 31, 2017, Defendants were made aware of an email communication exchange whereby Plaintiff's mortgage broker inadvertently sent Defendants real estate broker (Marcus & Millichap) a new contract of sale (the "Flip Contract") that included the properties belonging to the Defendants along with two unrelated properties being sold to an entity listed as Beck/Morris Mazel LLC.

30.     In later telephonic conversation, Marcus & Millichap inquired about the Flip Contract to which Plaintiff was dismissive and non-communicative.

31.     On September 5, 2017, Joseph Reigler contacted the Defendants and informed them (i) they had worked out a financing solution which included the "bundling" of Defendants properties with unrelated properties to be purchased by Plaintiff or affiliates, (ii) they were expediating survey work at the properties (presumably for financing purposes), (iii) they were requesting further access to 1974 Morris and 1988 Morris Avenue, (iv) that the separate buildings they intended to bundle with Defendants properties had a TOE close date of September 13, 2017 and (v) that they intended to close on Defendants properties by or before September 18, 2017.

32.     On September 6, 2017, Plaintiff and their agents once again accessed 1974 Morris and 1988 Morris as allowed by Defendants.

33.     On September 7, 2017, Plaintiff informed Defendant that (i) they believed the condition at 1988 Morris had deteriorated, (ii) that they needed more time to close on the Contracts and (iii) that they needed access to complete work at properties in order to finance the purchases (despite there being no mortgage contingency).

34.     Defendants reaffirmed to Plaintiff that they did not agree to any changes to the Contracts and did not agree to allow the Plaintiff to begin work prior to closing.

35.     Due to no fault of the Defendants, Plaintiff failed to close on or before September 14, 2017. Indeed, as of September 27, 2017, Plaintiff had failed to agree to schedule a closing.

36.     By letter dated September 27, 2017, Defendants' then attorney sent the second Time of Essence letter, stating that Plaintiff has failed to close on or before the Time of the Essence date and setting October 2, 2017 as the new Time of the Essence date.

**E. The Contract Addendums**

18

37.     On September 28, 2017, Plaintiff informed Defendants that they had received the latest Time of the Essence request and that the principal challenge to closing was the rent roll submitted to their lender did not provide for enough of a financing base to allow the Plaintiff to close. Plaintiff fearing the loss of their deposit and acknowledging their inability to close made an offer to Defendants of the following as consideration to enter into an amendment to the Contracts:

      a      that as consideration for entering into a new Time of the Essence closing, that the entire down payment for each Property was to be released to each of the Defendants immediately;

      b      access to the properties by Plaintiff to make certain alterations and improvements, pursuant to a separate "Access Agreement" to be entered into between Plaintiff and each Defendant;

      c      a final Time of the Essence closing date of December 18, 2017;

      d      an additional $169,000.00 down payment to be paid by Plaintiff to each of the Defendants to be applied toward each Contract;

      e      the immediate release to the Defendants of the additional deposit amounts by wiring proceeds directly to Defendants rather than to an escrow account;

      f      with respect to Defendants 1988 Morris Avenue LLC and 1821 Topping Avenue LLC, Plaintiff agreed to pay the monthly mortgage interest for those two properties, from execution of the Addendum to the closing date;

      g      Defendants agreed to enter into lease agreements with tenants selected by Plaintiff, provided lease commencement dates begin after the closing date. Leases shall be conditioned upon and only effective if Plaintiff closes on the property.

38.     Due to no fault of the Defendants, Plaintiff failed to close on or before October 2, 2017.

39.     Instead of closing on the Properties, and after the October 2, 2017 Time of the Essence closing date, On October 4, 2017, while Plaintiff was already in default of Contracts of Sale and therefore had already forfeited their entitlement to the down payment, Plaintiff and the Defendants entered into Addendum Agreements memorializing the offer which was accepted by the Defendants as outlined above as an amendment to the Contracts.

40.     Rather than enter into a license agreement with each Defendant, on or about October 17, 2017, 1988 Morris Ave LLC, 1974 Morris Ave. LLC, and the Plaintiff executed a license agreement, authorizing the Plaintiff to access 1974 Morris Ave. and 1988 Morris Ave. to perform specified work at those properties.

41.     Plaintiff immediately breached the material terms of the Addendum by (i) failing to properly obtain permits and provide evidence of proper insurance and contractor and tradesmen licensure and (ii) failing to pay the agreed upon mortgage payments. Defendants allowed Plaintiff

to have unrestricted access to all properties despite this transgression in an effort to be commercial and work towards a closing under the terms of the Contracts in good faith.

42.     Pursuant to agreements between Plaintiff and their contractor, the work at 1988 Morris Avenue largely consisted of cosmetic work, i.e., painting, new vinyl tiles, work to partition the units differently than currently configured, adding two additional electrical panels for the two new units created by Plaintiff and roof work.

43.     It is Defendants belief that Plaintiff was seeking to reconfigure the unit profile of 1988 Morris Avenue in order to present a larger "pro forma" rental income capacity for the building which in turn would increase the amount of financing that could be obtained by Plaintiff.

44.     Pursuant to agreements between Plaintiff and their contractor, the work at 1974 Morris Avenue consisted of bathroom renovations.

45.     Plaintiff substantially completed the work it was planning to complete in both 1988 Morris Avenue LLC and 1974 Morris Avenue LLC.

**F.     The SDNA was not Required or Appropriate Under the Circumstances**

46.     On November 14, 2017, Plaintiff's counsel requested from Defendants' then counsel that Defendants provide a subordination, non-disturbance, and attornment agreement regarding the lease to the commercial tenant at the 700 Beck Street property.

47.     Although 700 Beck Street LLC (which owned 770 Beck Street, Bronx, New York) entered into a commercial lease with ChiChi Therapeutic Services Inc., for the operation of a day care facility, ChiChi Therapeutic Services Inc. had yet to take possession of the leased premises, because of a failed inspection of the premises by an agency of the City of New York pursuant to the application requirements necessary for a permit to conduct daycare activities in the intended unit. Defendants and ChiChi Therapeutic Services Inc. continued negotiations through early December on funding the remedies and alterations to the unit required by the aforementioned inspection.

48.     Defendants accordingly communicated to Plaintiff that a subordination, non-disturbance and attornment agreement was not available as the tenant in question at 770 Beck Street had not yet taken possession of the unit.

**G.     Plaintiff's Attempt to Renegotiate the Contracts**

49.     It is important to note that the Contract for the 770 Beck Street property did not state that Defendant 700 Beck Street LLC was required to provide such documentation.

50.     On November 27, 2017, Plaintiff informed Defendants that it wanted (i) a $20,000 discount to the purchase price for 770 Beck Street, Bronx, New York due to a lack of a tenant in the ground floor unit, (ii) a credit of $80,000 for the alleged cost of the work conducted to alter and improve the Morris Avenue properties, (iii) the option to close on three of the properties, subject to the price adjustments requested in early December 2017 (iv) and agreement to close on the Morris Avenue properties within a new, additional 60 day period.

51.     On November 27, 2017, Defendant rejected the offer.

**H.  Plaintiff's Untimely Requests to Access the Properties**

52.     On November 27, 2017 Malik Pearson, Defendants previous counsel, informed Mr. Joseph Riegler, Plaintiff's sole member, that the Defendants were retaining new counsel.

53.     On November 30, 2017, Mr. Reigler sent a text message to Jackson Strong stating that they need to get ready for closing.  In response Jackson Strong informed Joseph Reigler that "communication should flow through either the attorney or the broker."

54.      On December 3rd, 2017 Jackson Strong, Defendants' employee, provided Joseph Riegler with Defendants' new counsel's contact information.

55.     Following Plaintiff's completion of the requested repairs to the 1988 Morris Ave. and 1974 Morris Ave. Properties on or about December 3, 2017, Plaintiff sought to make additional untimely requests to access the Properties and further delay the Time of the Essence closings on December 18, 2017.

56.     Despite knowing Mr. Strong was no longer authorized to communicate with Mr. Reigler, On December 3, 2017, Mr. Reigler again contacted Mr. Strong by text message, which Mr. Strong again reiterated to Mr. Reigler that "the owners told me I am not authorized to communicate with the [buyer] (you) before the sale is comple[te]."

57.     On December 6, 2017, Defendants' new attorney, Brian Hsu, Esq., sent five letters to Plaintiff's counsel, both formally introducing him and his firm to the Plaintiff's attorney, and reiterating that the Time of the Essence closings on each Contract would be held on December 18, 2018, at 10 a.m., at the offices of Goldstein Hall PLLC.

58.     Notwithstanding that Reigler had Defendants' new counsel's contact information for nearly one week, on December 9, 2017, Mr. Riegler, requested of Mr. Strong, that Plaintiff be given additional access to the properties to conduct further alterations.  Because Mr, Strong was not authorized to communicate with Mr. Reigler, Mr. Strong did not respond.

59.     On December 10, 2017, Plaintiff communicated to Defendant via email communication that they intended to stay in contract for "2-3 years with a [lean] on all 5 properties" if Defendant does not "sit at a table to negotiate something". Defendant requested a $300,000 price reduction in order to close this deal.

60.     On December 11, 2017, Plaintiff's attorney emailed Mr. Hsu, that they required access to three of the properties, 700 Beck Street, 1143 Forest Avenue and 1821 Topping Avenue, for the purposes of having the properties viewed by Plaintiff's lender.

61.     Here again, it is important to remember, that this Contracts all called for a cash closing, and did not contain a mortgage contingency.  Further, it is important to note, that while the Contracts provided "Purchaser and its authorized representatives shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the

Premises before Closing", such inspection is in connection with the condition of the property, not with respect to valuation by Purchaser's lender.

62.     At this time Defendant believed that

a     Plaintiff had no interest in consummating the transaction proposed by the Contracts given the written communication indicating a requested price reduction and setting a new closing date (notwithstanding the mutually agreed Time of the Essence date of December 18, 2017).

b     Plaintiff was in breach of the Addendum Agreements by not paying the mortgages as required and by conducting work on the Morris Avenue Properties without the required permitting.

c     Plaintiff was attempting to assign or otherwise transfer the rights afforded by the Contracts to yet another third party as evidenced by the accidental receipt by Defendant of the Flip Contract. As a reminder, Defendants initially interfaced with Lefkowitz, who later indicated that the real purchasers would be Mr. Leifer, Mr. Wertzberger and Mr. Reigler. Now a new entity, "Beck/Morris Mazel LLC" was introduced as the purchaser. It is important to note, that Mr. Wertzbergr has been sued in New York at least a dozen times, with claims relating to insurance fraud, property fraud and breach of contract.

63.     As Mr. Hsu advised Plaintiff's counsel, he was not authorized to provide access for Plaintiff's lender, particularly, where, as here, the Contracts provided for an all cash transaction, did not contain a mortgage contingency, access had been provided previous to this request on multiple occasions, and where notice was unreasonably requested for access on the same day. Indeed, Mr. Hsu advised Mr. Abraham Weisel, a newly appointed attorney for Plaintiff and purported Co-Counsel to the Plaintiff, that access would be granted on reasonable notice. However, Plaintiff never requested access again.

**I.     Defendants Moved Forward With the Contractually Agreed Upon Closings Date**

64.     The Contracts provide that the Properties are being sold "AS IS…subject to reasonable use, wear and tear and natural deterioration between now and the closing date," and that "the appliances , plumbing, heating and electrical systems shall be in working order and roof shall be free of leaks at closing."

65.     The Contracts also provide that Defendants would convey "such title as any reputable title insurance company of purchaser's choosing, licensed to do business in the state of New York shall be willing to approve and insure in accordance with its standard form of title policy approved by the New York State Insurance Department."

66.     Plaintiff was aware and agreed to all the tenancies on the Properties.

**J.     Defendants Were Ready to Close, but Plaintiff Was Not Ready, Willing and Able to Close**

67.     As the date for the time of the essence closing was approaching, and because Defendants did not receive any objections to title from Plaintiff, on Thursday December 14, 2017, Defendants contacted Plaintiff's title company, Riverside Abstract, to arrange for the closing on Monday, December 18, 2017 as mutually agreed to under the Addendum Agreements.

68.     On December 14, 2017. Mr. Hsu provided Riverside with the necessary documents to get to closing on December 18, 2017, and asked if any additional documents were necessary. Riverside Abstract never advised that any additional documents were necessary.

69.     Instead, on December 15, 2017, Riverside Abstract contacted Plaintiff's attorney asking if the closing was going forward on December 18, 2017.

70.     Instead of raising any alleged objections to title or alleged breaches of contract, Mr. Weisel advised Riverside Abstract that these five properties were being purchased in connection with two other properties – being sold by entities not related to the Defendants' here – and that he had a time of the essence closing on one of those properties, at the seller's attorneys office in Queens, New York on December 18, 2017, and that they were out of extensions for the purchase of that property.  Although Plaintiff's counsel had another scheduled closing in Queen, New York, Plaintiff never informed Defendants or Defendants' counsel of his scheduling conflict.

71.     Mr. Weisel also confirmed that the bank had not provided a commitment for the purchase of these Properties and that Plaintiff was seeking to go ahead with an unspecified hard money lender.

72.     Indeed, Plaintiff never advised Riverside Abstract that it was ready, willing and able to close.

73.     Riverside Abstract never advised Defendants of any defects to title or any other issues that prevented the Time of the Essence closing from taking place on December 18, 2017.

74.     Plaintiff never advised Defendants of any defects to title or any other issues that prevented the Time of the Essence closing from taking place on December 18, 2017.

75.      In fact, neither Plaintiff nor Riverside Abstract ever communicated prior to the time of the essence closing that there were any impediments to closing.

**K. Defendants Declare That Plaintiff is in Default**

76.     At the appointed time of the Time of the Essence closing, Plaintiff's failed to appear at the closing.  Defendants contacted a court reporting company and placed Plaintiff's defaults on the record.

77.     At the closing, on the record, Defendants showed that they were capable and ready to convey clear title to the Plaintiff on each of the five properties.

78.     On December 19, 2018, Mr. Hsu sent five letters to Plaintiff's attorney declaring Plaintiff in default of the five Contracts and that the Contracts would be deemed canceled, null and void.

79. Plaintiff had already agreed to and accordingly (previously) released directly to the benefit of Defendants both the original down payment and the additional down payment as consideration to enter into the Addendum Agreement, which it then defaulted under by:

        a        not adhering to the terms and conditions of the Contracts as it relates to closing on the properties owned by Defendants on December 18, 2017;

        b        failing to pay the monthly mortgage amounts owed to Defendants; and

        c        conducting work at the Morris Avenue properties without proper permitting and licensure.

80. Plaintiff never declared Defendants to be in default of the Contracts.

81. By email dated December 18, 2017, Abraham Weisel forwarded three letters dated December 15, 2017, authored by Izidor Mikhli, purporting to reject the time of the essence closings for each of the five properties.

82. Each of the purported rejection letters identified specific grounds upon which Plaintiff alleged justify its non-appearance at the time of the essence Closing.

83. Taken individually:

        a        With respect to 770 Beck Street, Plaintiff alleged (i) that "Riverside Abstract, the title company has advised us that no one from your offices have been in contact with them regarding clearing title," (ii) that unless Plaintiff's counsel receives "confirmation from the title company that you are ready, willing and able to deliver clear title, this TOE is premature and being untimely, is hereby rejected," and (iii) "the lease presented to us for the 1st floor of this Premises was fraudulent and thus a misrepresentation of material fact, which was one of the base inducement[s] for entering into such a contract of sale.";

        b        With respect to 1988 Morris Avenue, indicating (i) that "Riverside Abstract, the title company has advised us that no one from your offices have been in contact with them regarding clearing title," (ii) that unless Plaintiff's counsel receives "confirmation from the title company that you are ready, willing and able to deliver clear title, the TOE is premature and being untimely, is hereby rejected," and (iii) a vague allegation that the Plaintiff discovered that there was "substantial damage" to the premises which was not addressed by the Defendant;

        c        With respect to the remaining properties: 1974 Morris Avenue, 1821 Topping Avenue, and 1143 Forrest Avenue in the subject line, however the body of the letter only addressed one property, 1821 Topping Avenue. The letter indicated (i) that "Riverside Abstract, the title company has advised us that no one from your offices have been in contact with them regarding clearing title," (ii) that "1821 Topping Avenue has a lis pendens filed against the Property which is not yet clear as per Title," and (iii) that unless Plaintiff's counsel receives "confirmation from the title company that you are ready,

willing and able to deliver clear title at Closing, this TOE is premature and being untimely, is hereby rejected."

84.     All of the reasons set forth in the three letters were pretextual.

85.     Plaintiff did not close on the Properties because Plaintiff could not secure the necessary funding to purchase the properties.

86.     Contrary to Plaintiff's contentions, Plaintiff could not rely on Mr. Leifer to provide the necessary funding to close on the Properties and instead sought but were unable to secure hard money financing.

87.     Mr. Leifer did not possess the necessary capital to close on the Properties on December 18, 2017 but portrayed that he had access to capital from three sources which could have theoretically provided funding to consummate the purchases as stipulated by the Contracts:

    a      the operating account of a nursing home, River Manor Corporation, regulated by the State of New York whose ownership entity he was a minority member of and for which he was not listed as the Principal Executive Officer in publicly available state filings;

    b      the real estate account of the same nursing home, whose ownership entity he was also a minority member of and for which he was not the Principal Executive Officer in publicly available state filings; and

    c      his personal assets.

88.     At the time of the Time of the Essence closing date (December 18, 2017), Mr. Reigler was the sole member of FMTB BH LLC, the purchaser identified in the Contracts. Neither Mr. Leifer, nor River Manor Corporation were members of FMTB BH LLC.

89.     Furthermore, given the monies required to consummate the transaction relative to the account balances of River Manor Corporation submitted by Plaintiff and the rules and regulations governing the activities of licensed nursing homes in the State of New York, it would be presumed that Mr. Leifer would have needed:

    a      Approval by the office of the Attorney General for the State of New York allowing such a substantial transfer of assets under the Attorney Generals duties to oversee the financial and operational conduct of nursing homes as it seeks to ensure the ability of nursing homes to deliver care consistent with the standards set forth by the requisite local, state and federal guidelines.

    b      A resolution by the Board of Directors of River Manor Corporation consenting to allowing a substantial transfer of operating assets, despite its ongoing operating expenses including payroll for its caregiver staff and cost of materials and facility utilization, which together constitute the costs of delivering care for its patients consistent with its regulatory requirements thereof.

c        A solvency opinion or a comfort letter by a properly certified accounting or financial advisory firm attesting to the solvency of River Manor Corporation and the allowance of such a material transfer of operating assets to an unrestricted, unaffiliated third party entity under the presumed terms and conditions governing use of corporate assets outlined under credit agreements River Manor Corporation may be party.

90.     Mr. Leifer has not and presumably cannot provide evidence of the aforementioned approvals and consents.

91.     The properties owned by Defendants are not sanctioned for any sort of healthcare activities, thus the use of funds controlled by River Manor Corporation, a regulated nursing facility, for the purchase of the Defendants properties would be for an unrelated activity.

92.     It is important to further note, again, that Mr. Leifer is not identified as the Principal Executive Officer of River Manor Corporation according to filings made with the New York Secretary of State, Division of Corporations

93.     Furthermore, it is important to note that River Manor Corporation and Mr. Leifer, among others, together, were listed as the principal defendants in a matter brought before the United States District of Court for the Eastern District of New York on August, 31, 2017 (which was less than ninety days prior to the Time of the Essence Closing date of December, 18 2017) in a class action compliant that alleged that River Manor Corporation had withheld "overtime compensation, agreed upon wages, unlawful deductions, and other damages" for licensed practical nurses ("LPNs") employed by River Manor Corporation.

94.     Additionally, Mr. Leifler lacked the personal funds to consummate the transaction. The Plaintiff submitted financial statements for Mr. Leifler show an account balance of $62,075.82 as of December 18, 2017, well shy of the necessary funds to close on the five Contracts as stipulated.

**L.  Plaintiff was Participating in a Fraudulent Mortgage Scheme**

95.     As further evidence of the pretextual nature of the three rejection letters to the default notices and evidence of a failed scheme to finance the closing as stipulated by the Contracts, Defendants note the following:

a        As previously mentioned, a Flip Contract was inadvertently sent to Defendants accidently by Plaintiffs mortgage broker;

b        The Flip Contract had a closing date of December 18, 2017, the same Time of the Essence closing date stipulated by the Contracts and the associated Addendum Agreements;

c        The Flip Contract listed the Sellers as:  (i) Debtor; (ii) 1022 East 226 ST BH LLC, an entity organized by Abraham Weisel and which is  affiliated with Joel Wertzberger based on publicly accessible records; (iii) 1057 Teller Avenue LLC, an entity which corporate records indicated was never registered or organized until February 23,

2018, well over 60 days following the Time of the Essence Closing date of December 18, 2017. The entity was organized by Abraham Weisel;

      d      Furthermore, public records indicate that 1057 Teller Avenue LLC never acquired the deed of the property that the Flip Contract purported would be sold by 1057 Teller Avenue LLC until February 27, 2018.

96.      Thus on December 18, 2017, one of the Sellers, namely 1057 Teller Avenue LLC, was unregistered, unincorporated and did not have possession of the deed to the property (1057 Teller Avenue, Bronx, New York) to which it was supposed to confer to Purchaser pursuant to the Flip Contract

97.      Thus on December 18, 2017, the Flip Contract could not have possibly been consummated as contemplated.

98.      Clearly there was some issue with closing on 1057 Teller Avenue that prohibited Plaintiff from to "bundling" that property with those belonging to Defendants as stipulated by the Flip Contract

99.      Additionally, Plaintiff was attempting to fraudulently obtain a mortgage, utilizing a commonly known scheme whereby a corporate entity controlled by a party sells properties to a separate corporate entity, controlled by that same party at a significantly inflated price all on a single day. In so doing, the party in question is able to obfuscate the "true" purchase price of the properties and instead use an inflated figure to obtain a mortgage. The inflated figure is construed such that the mortgage obtained based on that inflated figure is enough to finance 100% of the "true", underlying purchase price of the properties. Such activities are expressly prohibited by nearly all mortgage lenders under terms that specifically address transactions between "related parties". The Defendants put forth the following body of facts to substantiate its belief that Plaintiff was attempting to orchestrate a similar scheme here:

      a      the Purchaser in the Flip Contract was noted as Beck/Morris Mazel, LLC which was organized by Joel Leifer on August 28, 2017;

      b      Thus the Seller and Purchaser of the Flip Contract share all of the same members, namely, Joseph Reigler for Debtor and Joel Wertzberger for the other two entities which collectively comprise Seller and Joel Leifer for Purchaser;

      c      Mr Abraham Weisel was the attorney for Seller, Mr. Izidor Mikhli was the attorney for Purchaser. Both were agents and co-counsel for Debtor;

      d      As has been represented throughout this matter, Joseph Reigler, Joel Wertzberger, Joel Liefer, Abraham Weisel and Izidor Mikhli are associates of each other and of the Debtor;

      e      the Flip Contract thus involved parties that were all associates or members of Debtor and was thus a contract by and between members and associates of Debtor;

      f      Debtor was party to the Contract to purchase properties from Defendants;

g       The underlying purchase price of the five properties belonging to Defendant and the ultimate filed transactions of the other two properties included in the "bundle" identified by the Flip Contract was $4,534,000;

h       The Flip Contract however listed a sale price of $6,965,000 on the very same day that the underlying properties were to be actually acquired for $4,534,000;

i       It is important to note that the actual purchase price of the seven buildings ($4,534,000) dividend by the Flip Contract purchase price ($6,965,000) is exactly equal to sixty-five percent (65%). Sixty-five percent is the typical limit for privately originated hard money commercial loans;

j       the Flip Contract was provided to Skyline Capital Group, a Brooklyn New York based licensed mortgage broker who, as evidenced by the email communication, was attempting to use the Flip Contract to obtain a hard money loan from commercial lenders;

k       Clearly Debtor was attempting to use the mortgage fraud scheme as outlined above whereby it sells properties purchased on a single day for a certain "true" purchase price to a related entity controlled by the same party for a significantly inflated purchase price and using that inflated purchase price to obtain a mortgage in an amount exactly equivalent to 100% of the "true", underlying purchase price. In so doing, Debtor and its members and affiliates were attempting to conduct a related party transaction to acquire real property without any capital of their own under false pretenses.

**M. Shortly after Plaintiff Defaulted on the Contracts, Defendants were able to Refinance the Properties with no Title Objections**

100.    As evidenced in the public records, Defendants were able to refinance, with a new third party lender, four out of the five properties owned by Defendants immediately following the December 18, 2017. No adjustments were made to the title record for each of these properties prior to those refinancing activities and after the December 18, 2017 date. Furthermore, Defendants were able to tender, clear, insurable and marketable title to each of the relevant properties to the new third party lender.

101.    The fifth property owned by Defendants, was later refinanced as needed upon maturity of its existing mortgage. No adjustments were made to the title record for that property from December 18, 2017 through the date of refinancing whereby a marketable and insurable title was conferred to a new third party lender.

**N. Plaintiff cannot Purchase the Properties even if Awarded Specific Performance.**

102.    To date, Plaintiff does not have sufficient funds to close on the five properties at issue herein.

8.     **Issues of Law**

General Issues

1.     Whether Plaintiff's failure to appear for the closing on the Contracts on the TOE date scheduled by Defendants, December 18, 2017, is fatal to Plaintiff's claims for specific performance and breach of contract.  *Lower v. Vill. Of Watkins Glen*, 17 A.D.3d 829, 794 N.Y.S.2d 140, 142 (N.Y. App. Div. 3d Dep't 2005); *Madison Invs. v. Cohoes Assoc.*, 176 A.D.2d 1021, 1021-1022, 574 N.Y.S.2d 980 (N.Y. App. Div. 3d Dep't 1991); *Goetz v. Trinidad*, 68 A.D.3d 688, 689, 91 N.Y.S.2d 513 (2d Dep't 2019).

2.     Whether Plaintiff's attendance at the scheduled closing was excused as a matter of law because of Defendants' breach of contract or anticipatory breach.  *See* above authorities.

3.     Whether, Plaintiff was ready, willing and able to perform under the Contracts. *Friedman v.* Kucher, 34 A.D.3d 726, 727, 826 N.Y.S.2d 104 (N.Y. App. Div. 2d Dep't 2006). 533 *Park Ave, Realty, LLC v. Park Ave. Bldg. & Roofing Supplies, LLC*, 156 A.D.3d 744, 68 N.Y.S.3d 110, 114 (N.Y. App. Div. 2d Dep't 2017); *Zeitoune v. Cohen*, 66 A.D.3d 889, 887 N.Y.S.2d 253, 255 (N.Y. App. Div. 2d Dep't 2009).


Additional Legal Issues of Plaintiff

1.     Whether the forfeiture of a down payment in excess of the contract price, as would be the case here if Defendants prevail on liability, is not recoverable without a showing of damages.  *See generally Pizzurro v. Guarino*, 147 A.D.3d 879, 880, 47 N.Y.S.3d 103 (N.Y. App. Div. 2d Dep't 2017).

2.      Whether Plaintiff would be entitled as additional damages to use and occupancy from December 18, 2017. *Cohn v. Mezzacappa Bros., Inc.*, 155 A.D.2d 506, 508, 547 N.Y.S.2d 367, 369 (N.Y. App. Div. 2d Dep't 1989).

3.      Whether Plaintiff anticipatorily breached the Contracts by (i) failing to provide Plaintiff with access to the properties, (ii) failing to satisfy title issues in advance of the closing, (iii) misrepresenting the status of the commercial lease for 700 Beck Street, and (iv) failing to have the 700 Beck Street, 1143 Forest Ave., and 1821 Topping Ave. properties vacant of residential tenants as required by the Contracts, thereby relieving Plaintiff from performance under the Contracts and rendering Plaintiff liable for specific performance and breach of contract. *Lower v. Vill. of Watkins Glens, supra; Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.*, 60 N.Y.2d 997, 459 N.E.2d 492, 471 N.Y.S.2d 267 (N.Y. 1983).

4.      Whether Defendants breached the Contracts by (i) failing to provide Plaintiff with access to the properties, (ii) failing to satisfy title issues in advance of the closing, (iii) misrepresenting the status of the commercial lease for 700 Beck Street, and (iv) failing to have the 700 Beck Street, 1143 Forest Ave., and 1821 Topping Ave. properties vacant of residential tenants as required by the Contracts.

5.      Whether Defendants are barred from relitigating issues of fact and law determined by the Court in its Decision on Defendants' motion for summary judgment.


Additional Legal Issues of Defendants

1.      Whether Plaintiff is estopped from claiming any alleged breaches of the Contract other than the breaches alleged in the Rejection Letters. *Rode & Brand v. Kamm Games, Inc.,*

181 F.2d 584, 587 (2d Cir. 1950); *Engelbert v. Zeitlin*, 2018 N.Y. Slip Op. 32703, 15 (N.Y. Sup.

Ct. 2018)

2.      Whether Plaintiff is entitled to judgment against all of the Defendants for defaults

alleged to have been committed by one Defendant, where, as here, the Contracts are separate,

distinct, entered into with separate corporate entities, and do not contain cross default provisions.

3.      Whether the allegations set forth in the Rejection Letters constituted material

defects that rise to the level of anticipatory repudiation of any of the Contracts.

4.      Whether Plaintiff is entitled to specific performance in a real estate transaction

without establishing as a matter of law that it was ready, willing and able to close on December

18, 2017.

5.      Whether Plaintiff may rely on the bank statement of a non-member LLC , which

operates as a nursing home, to establish  that Plaintiff was ready, willing and able to close on

December 18, 2017.

6.      Whether Plaintiff may rely on the bank statement of Mr. Joel Leifer, which shows

that there was insufficient funds in the account on the date of the time of essence closing on

December 18, 2017, to establish that Plaintiff was ready, willing and able to close on December

18, 2017.

7.      Whether Plaintiff's monetary damages on an alleged breach of a real estate

purchase contract is limited to the return of the deposit and out-of-pocket expenses.

8.      Whether Plaintiff's lack of sufficient funds to close on the Premises if awarded

specific performance precludes an award of specific performance. *Pesa v Yoma Dev. Group,*

*Inc.*, 18 N.Y.3d 527, 533, 965 N.E.2d 228, 231, 942 N.Y.S.2d 1, 4 (2012); *Internet Homes, Inc.*

*v. Vitulli*, 8 A.D.3d 438, 439, 778 N.Y.S.2d 534, 535 (2d Dep't 2004); *Contro v. White*, 176 A.D.2d 1052, 1053, 574 N.Y.S.2d 982, 983-84 (3d Dep't 1991)

9.    **Special Trial of Issues**    The parties do not believe that the separate trial of any of the issues is feasible and advisable.

10.    **Previous Substantive Motions**    On June 21, 2018, Defendants moved to dismiss the adversary complaint pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012(b).  Following oral argument on July 25, 2017, this Court denied the Motion to Dismiss on July 24, 2018.  An Order denying the Motion was entered August 2, 2018 (ECF # 15).

On August 14, 2019, Defendants filed a motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, for summary judgment on the Debtor/Plaintiff's claims seeking specific performance and related relief.  Following oral argument on August 21, 2019, the Court denied the Motion for Summary Judgment pursuant to an Order dated January 13, 2020.

11.    **Witnesses**    A list of Plaintiff's witnesses and a brief summary of their anticipated testimony appear on Schedule 11a.  A list of Defendants' witnesses and a brief summary of their anticipated testimony appear on Schedule 11b.

12.    **Experts**    The parties are not calling expert witnesses at the trial of this action.

13.    **Exhibits**    A list of all exhibits stipulated to be admissible, and those additional exhibits proposed by the parties appear on Schedule 13.

14.    **Requested Evidentiary Rulings**

Plaintiff seek evidentiary rulings denying  (1) the admissibility of matters pertaining to the period preceding the execution of the contracts, June 19, 2017, as not material or relevant,

and barred by the parol evidence rule; (2) the admissibility of statements allegedly made by Chichi Therapeutic Services Inc., the purported "commercial tenant" at the 700 Beck Street property, and its officers, shareholders or directors, on the grounds of hearsay; (3) the admissibility of any evidence supporting paragraphs 29-30 of Defendants' Contentions of Fact, as not material or relevant, and prejudicial; (4) the admissibility of the any evidence supporting paragraphs 89-91 of Defendants' Contentions of Fact, as lacking foundation and a matter of expert testimony of which there is none; (5) the admissibility of any evidence supporting paragraphs 93, 95-99 of Defendants' Contentions of Fact, as not material or relevant, and prejudicial; (6) the admissibility of any evidence supporting paragraphs 100-101 of Defendants' Contentions of Fact, as not material or relevant; and (7) the admissibility of evidence proffered by Defendants that is inconsistent with the Court's Decision on Defendants' motion for summary judgment.

Defendants seek an evidentiary ruling on the issue of whether Plaintiff is limited to the alleged events of default enumerated in the letters written by Plaintiff's counsel, Izidor Mikhli, dated December 15, 2017 and delivered to Defendants' counsel, by email dated December 18, 2017, from Abraham Weisel, purporting to reject the time of the essence closings (the "Rejection Letters"). Specifically, the Rejection Letters identify specific grounds which Plaintiff alleged justify its non-appearance at the TOE Closing. Pursuant to the "Mend the Hold" doctrine, Plaintiff must be limited to the specific allegations contained in those letters as the alleged grounds that excused Plaintiff's default of the TOE closing.

15.  **Trial Counsel**          Counsel who will try the case for the respective parties are:

For Plaintiff:          Joseph Zelmanovitz
                        Stahl & Zelmanovitz
                        747 Third Avenue, Suite 33B
                        New York, New York 10017

(212) 826-6422 or (due to Covid-19 situation) 917-763-8363

      For Defendants:     Brian  J.  Markowitz
                              Daniel    Goldenberg
                              Goldstein Hall PLLC
                              80 Broad Street, Suite 303
                              New York, New York 10004
                              (646) 768-4100

16.    **Estimate of Trial Time**      Defendants estimate that the trial will take two (2) days. Plaintiff estimates that the trial will take up to three (3) days.

17.    **Trial Date**     The Court has set down trial for June 10 and June 11, ~~2017~~ ***2020 (CEC)***. Plaintiff believes that the length of the trial will depend on the successful implementation of the special logistics being used for the trial as ordered by the Court on May 26, 2020.

18.    **Miscellaneous**      There are no other appropriate matters that will aid in the disposition of the action.

19.    **Modification of Order**      IT IS FURTHER ORDERED that the Court may in order to prevent manifest injustice or for good cause shown, at the trial of the action or prior thereto upon application of counsel for either party, made in good faith, or upon motion of the Court, modify this Pre-Trial Order upon such conditions as the Court may deem just and proper.



**Dated: Brooklyn, New York**
      **August 31, 2020**
                                                         **Carla E. Craig**
                                     **United States Bankruptcy Judge**