UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
In re

                                                        Case No. 18-42228-CEC

FMTB BH LLC,

                                                         Chapter 11

                                      Debtor.
--------------------------------------------------------------------X
FMTB BH LLC,

                                      Plaintiff,

-against-                                          Adv. Pro. No. 18-1052-CEC

1988 MORRIS AVENUE LLC,
1974 MORRIS AVENUE LLC,
700 BECK STREET LLC,
1143 FOREST AVENUE LLC,
1821 TOPPING AVENUE LLC,

                                      Defendants.
--------------------------------------------------------------------X

<u>DECISION</u>

APPEARANCES:

                                          Brian J. Markowitz, Esq.
Joseph Zelmanovitz, Esq.              Daniel Robert Goldenberg, Esq.
Stahl & Zelmanovitz                  Goldstein Hall PLLC
747 Third Avenue                      80 Broad Street
Suite 33B                                Suite 303
New York, NY 10017                New York, NY 10004
Counsel for the Plaintiff           Counsel for the Defendants

CARLA E. CRAIG
Chief United States Bankruptcy Judge

FMTB BH LLC (the "Plaintiff") commenced this adversary proceeding seeking specific performance in connection with five contracts of sale to purchase five parcels of real property from 1988 Morris Ave LLC, 1974 Morris Ave LLC, 700 Beck St LLC, 1143 Forest Ave LLC, and 1821 Topping Ave LLC (collectively, the "Defendants"). The Defendants assert counterclaims for breach of contract for failing to tender monthly payments as required under the contracts with 1988 Morris Ave LLC and 1821 Topping Ave LLC.

The Defendants contend that the Plaintiff cannot obtain specific performance because the Plaintiff was not ready, willing, and able to close on law day. The Plaintiff asserts that it was ready, willing, and able to close, but did not appear at the closings because the Defendants breached the contracts.

A trial was held on June 10, 2020 and June 11, 2020. For the following reasons, the Plaintiff did not default under the contracts by failing to appear and tender performance on law day because the Defendants breached the contracts and were unable to transfer the properties in compliance with the contracts. Therefore, the Plaintiff may assume the contracts pursuant to 11 U.S.C. § 365 upon a showing that it can cure the nonpayment defaults or provide adequate assurance that such defaults will be cured promptly and that it can close under the contracts.

<u>JURISDICTION</u>

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. A bankruptcy judge may hear a non-core proceeding that is related to a bankruptcy case. 28 U.S.C. § 157(c)(1). This non-core proceeding is related to this bankruptcy case because the sale contracts are the only scheduled assets of the estate. <u>See Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)</u>, 980 F.2d 110, 114 (2d Cir.

1992) ("The test for determining whether litigation has a significant connection with a pending bankruptcy proceeding is whether its outcome might have any 'conceivable effect' on the bankrupt estate.").  Absent consent of the parties to entry of a final order, the bankruptcy judge is directed to submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings of fact and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected. 28 U.S.C. § 157(c)(1).  The parties have consented to final adjudication of this adversary proceeding by this Court. (ECF Nos. 45, 46).[1]

## BACKGROUND

Unless otherwise noted, the following facts are undisputed, or are matters of which judicial notice may be taken.

On June 19, 2017, the Plaintiff entered into five separate contracts of sale, as follows: (1) to purchase 1988 Morris Avenue, Bronx, NY ("1998 Morris Ave.") from Defendant 1988 Morris Ave LLC for $516,666.67 (the "1988 Morris Ave. Contract"); (2) to purchase 1974 Morris Avenue, Bronx, NY ("1974 Morris Ave.") from 1974 Morris Ave LLC for $516,666.67 (the "1974 Morris Ave. Contract"); (3) to purchase 700 Beck Street, Bronx, NY ("700 Beck St.") from 700 Beck Street LLC for $688,888.89 (the "700 Beck St. Contract"); (4) to purchase 1143 Forest Avenue, Bronx, NY ("1143 Forest Ave.") from 1143 Forest Ave LLC for $688,888.89 (the "1143 Forest Ave. Contract"); and (5) to purchase 1821 Topping Avenue, Bronx, NY ("1821 Topping Ave.," and together with 1988 Morris Ave., 1974 Morris Ave., 700 Beck St., 1143 Forest Ave., the "Properties") from 1821 Topping Ave LLC for $688,888.89  (the "1821

---

[1] Citations to "ECF No. []" are to documents filed in Adv. Pro. No. 18-01052-CEC, identified by docket entry number.  Citations to "Case No. 18-42228-CEC, ECF No. []" are to documents filed in the main bankruptcy case, In re FMTB BH LLC, identified by docket entry number.

Topping Ave. Contract," and, together with the 1988 Morris Ave. Contract, the 1974 Morris Ave. Contract, the 700 Beck St. Contract, the 1143 Forest Ave. Contract, and the 1821 Topping Ave. Contract, the "Contracts," and each, a "Contract"). (JPTO ¶ 5(A)(1), Exs. 1-5.)[2]

The Plaintiff made the following down payments pursuant to the Contracts: (1) $25,833.33 under the 1988 Morris Ave. Contract; (2) $25,833.33 under the 1974 Morris Ave. Contract; (3) $34,444.44 under the 700 Beck St. Contract; (4) $34,444.44 under the 1143 Forest Ave. Contract; and (5) $34,444.44 under the 1821 Topping Ave. Contract. (JPTO ¶ 5(A)(3).) The Contracts did not contain a mortgage contingency. (JPTO ¶ 5(A)(2).) Each Contract provided that, in the event of a default by the Plaintiff, the remedy of each Defendant was limited to retaining the down payment made under that Contract. (Exs. 1-5 at ¶ 23.) The Contracts do not contain a cross-default provision, and therefore, a default under one Contract is not default under the other Contracts. (JPTO ¶ 5(A)(2).)

On August 22, 2017, the Defendants' former real estate counsel sent the Plaintiff's counsel a time of the essence letter for each Contract, scheduling closings for September 14, 2017. (JPTO ¶ 5(A)(4).) Those closings did not occur, and on October 27, 2017, the Defendants' counsel sent a second set of time of the essence letters, scheduling closings for October 2, 2017. (JPTO ¶¶ 5(A)(4), 5(A)(5).) Those closings also did not occur. (JPTO ¶ 5(A)(5).)

On October 4, 2017, the Plaintiff and the Defendants executed an addendum to each Contract (collectively, the "Addenda"), which, among other things, authorized the down payments made under the Contracts to be released to the Defendants, provided for an additional deposit of $169,000 per Contract, and scheduled a third time of the essence closing date of

---

[2] Citations to "JPTO" are to the Joint Pre-Trial Order (ECF No. 72); citations to "Ex." are to the agreed upon exhibits listed in Schedule 13 of the Joint Pre-Trial Order and citations to "Defs. Ex." are to the Defendants' Exhibits listed in Schedule 13 of the Joint Pre-Trial Order.

December 18, 2017. (JPTO ¶ 5(A)(6); Defs. Ex. QQ.)  The addendum with respect to the 1988

Morris Ave. Contract (the "1988 Morris Addendum") required the Plaintiff to pay the monthly

mortgage interest for the property in the amount of $2,957.50 from the date of the addendum

through the closing on that property.   (Defs. Ex. QQ.)   The addendum for with respect to 1821

Topping Ave. Contract (the "1821 Topping Addendum") required the Plaintiff to pay the

monthly mortgage interest for that property in the amount of $3,920 from the date of that

addendum through the closing on that property.  (Defs. Ex. QQ.) The addenda relating to the

remaining Contracts did not require monthly payments.  (Defs. Ex. QQ.) The Plaintiff did not

make any of the monthly payments required by the 1988 Morris Addendum or the 1821 Topping

Addendum.  (JPTO ¶¶ 5(B)(3), 5(B)(4).)

On October 17, 2017, 1988 Morris Ave LLC, 1974 Morris Ave LLC, and the Plaintiff

executed a license agreement (the "License Agreement") authorizing the Plaintiff to access 1974

Morris Ave. and 1988 Morris Ave. to perform specified work at those properties.[3] (JPTO

¶ 5(A)(7).)

 On October 19, 2017, the down payments were released to the Defendants in accordance

with the Addenda, and the Plaintiff made the additional $169,000 deposit under each Contract.

(JPTO ¶ 5(A)(8).)

On November 27, 2017, the Defendants' former real estate counsel informed the

Plaintiff's representative, Joseph Riegler, that the Defendants retained new counsel.  (JPTO ¶

5(A)(10).)  The Defendants' representative, Jackson Strong, provided Mr. Riegler with the new

counsel's contact information on December 3, 2017.  (JPTO ¶ 5(A)(10).)

---

[3] The License Agreement mistakenly lists 1988 Morris Avenue LLC twice in the introductory paragraph, and does not list 1974 Morris Avenue LLC, but the agreement relates to access to 1998 Morris Ave. and 1974 Morris Ave. and is executed by both entities.

On December 6, 2017, the Defendants' new real estate counsel, Brian Hsu, Esq., sent five letters to the Plaintiff's counsel scheduling time of the essence closings for each Contract for December 18, 2017 at 10 a.m. (JPTO ¶ 5(A)(11).)

On December 9, 2017, Mr. Riegler requested access to the properties from Mr. Strong. (JPTO ¶ 5(A)(13).)

On the morning of December 18, 2017, the Plaintiff's counsel emailed letters dated December 15, 2017 to the Defendants' counsel rejecting the December 18, 2017 closing (the "TOE Rejection Letters").  (JPTO ¶ 5(A)(15); Ex. 40.) The Plaintiff did not appear at the closings.

On April 23, 2018, the Plaintiff filed a voluntary petition under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), and commenced this action for specific performance, or alternatively, for damages for breach of contract.  On June 27, 2018, the Defendants filed a motion to dismiss the complaint, which was denied on August 2, 2018.  On September 7, 2018, the Defendants filed an answer and asserted counterclaims for breach of contract based upon the Plaintiff's failure to pay the monthly amounts owed pursuant to 1988 Morris Addendum and the 1821 Topping Addendum.  Thereafter, on August 14, 2019, the Defendants filed a motion for summary judgment, which was denied on January 13, 2020.  A trial on the claims and counterclaims was held on June 10, 2020 and June 11, 2020.

## DISCUSSION

The Plaintiff seeks specific performance under the Contracts, "including an abatement of the purchase prices to take into account the damages sustained by Plaintiff as a result of Defendants' breaches and monies paid to remedy property damage and other pre-closing

payments demanded by Defendants." (JPTO ¶ 4(A).  Alternatively, the Plaintiff seeks damages sustained from the Defendants' breach of the Contracts, including (a) return of all deposits paid under the Contracts and the Addenda; (b) the amounts expended to improve each property, approximately $230,430; (3) mortgage payments made by the Plaintiff; and (4) attorneys' fees. The Plaintiff also seeks use and occupancy of the properties equal to the rental revenue received by the Defendants since December 18, 2017.

The Defendants seek dismissal of the complaint.  The Defendants argue that the Plaintiff has not shown it was ready, willing, and able to close on December 18, 2017, and seek to retain the deposits made under the Contracts and the Addenda.  Defendants 1988 Morris Ave LLC and 1821 Topping Ave LLC also seek judgment on their counterclaims for the unpaid monthly amounts under the 1988 Morris Addendum and the 1821 Topping Addendum.

The Plaintiff argues that the Defendants breached each Contract, thereby excusing its appearance at the closings, by: (1) refusing to provide access to the Properties prior to closing; (2) failing to cure violations and other title issues against the Properties; (3) being unable to deliver 700 Beck St., 1821 Topping Ave., and 1143 Forest Ave. vacant of residential tenants; (4) making a material misrepresentation of an existing commercial tenant at 700 Beck St.; and (5) failing to repair the roof at 1988 Morris Ave.

I.    The "mend the hold" doctrine does not apply.

The Defendants argue that the "mend the hold" doctrine prohibits the Plaintiff from alleging "post-hoc allegations of breach" other than those specified in the Plaintiff's TOE Rejection Letters.  As such, the Defendants seek to preclude the Plaintiff from relying upon claims that the Defendants refused to provide access to the Properties, and failed to deliver 700 Beck St., 1821 Topping Ave., and 1143 Forest Ave vacant of residential tenants.  The

Defendants further argue that this doctrine prohibits the Plaintiff from seeking the additional damages for use and occupancy.   The Plaintiff argues that this doctrine is inapplicable.

The common law "mend the hold" doctrine "prohibits a party to a contract from taking one position and, after litigation has begun, changing its ground." Primetime 24 Joint Venture v. DirecTV, Inc., No. 99 CIV 3307(RMB)(MHD), 2000 WL 426396, at *8 (S.D.N.Y. Apr. 20, 2000).  Although the underlying principle of estoppel was already well established, the name of the doctrine originated in 1877, when the Supreme Court stated:

> Where a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law.

Ohio & Miss. Ry. Co. v. McCarthy, 96 U.S. 258, 267–68 (1877).

"Viewed as prohibiting a party from changing its position in litigation, the doctrine 'is a cousin to judicial estoppel,' which bars a party from changing positions in successive suits—in contrast to 'mend the hold,' which may apply within a single suit." Primetime 24 Joint Venture, 2000 WL 426396, at *8 (quoting Harbor Ins. Co. v. Cont'l Bank Corp., 922 F.2d 357, 364 (7th Cir. 1990).) The doctrine "can be seen as a corollary of the duty of good faith." Harbor Ins. Co. v. Cont'l Bank Corp., 922 F.2d at 363.  "A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." Id.

In support of its argument to apply the doctrine, the Defendants cite to Rode & Brand v. Kamm Games, Inc., 181 F.2d 584 (2d Cir. 1950).  In that case, the plaintiff, which was in the lithographing business, entered into a contract to sell 110,000 novelty baseball games to the defendant.  Rode & Brand v. Kamm Games, Inc., 181 F.2d 584, 585 (2d Cir. 1950).  The

defendant accepted and paid for 46,100 games, but then directed the plaintiff to cease

production.  Id. at 586-87.   After the plaintiff commenced a breach of contract action against the

defendant, the defendant argued that games supplied did not comply with the contract's

specification. Id. at 586.   In rejecting this defense, the Second Circuit noted that the initial

explanation for the defendant's request to cease production was the defendant's inability to

obtain enough cartons to distribute the games, and not that the games did not comply with the

contract's specifications.   Id. at 587.   The court noted that the "defendants received, paid for,

and distributed to the retail trade thousands of these games without ever once complaining that

they did not comply with the terms of the contract." Id.   The court stated:

> [A] party to a contract may not repudiate the contract on one ground
> and later assert entirely different grounds as a defense for such
> refusal to perform. It is of course familiar tactics for buyers, caught
> by a drop in the cost of goods or failure to sell them as planned, to
> seek some a posteriori justification for nonacceptance . . .  but the
> law does not look with favor on this method of avoiding the
> consequences of unfortunate business ventures.

Id. (citation omitted).

The court in Primetime 24 Joint Venture noted that the "mend the hold" doctrine is "not

at all certain" under New York law.  Primetime 24 Joint Venture, 2000 WL 426396, at *9 ("The

last New York case to invoke the doctrine by name was decided in 1970, and that decision rested

on the doctrine of equitable estoppel.").  The Defendants also cite Engelbert v. Zeitlin, No.

653189/2016, 2018 WL 5255244 (N.Y. Sup. Ct. Oct. 22, 2018), to show that the doctrine was

applied by New York state courts as recently as 2018.  In Engelbert, a buyer cancelled a contract

to purchase cooperative apartments due to the seller's failure to remove a "Partial Stop Work

Order" as required by the contract. Engelbert v. Zeitlin, No. 653189/2016, 2018 WL 5255244, at

*6 (N.Y. Sup. Ct. Oct. 22, 2018).  The purchaser then commenced an action seeking the return of

the down payment and sought summary judgment.  Id. at *1.  The court denied summary judgment, ruling that triable issues of fact existed whether the purchaser waived his right to cancel the contract for the reason specified in the notice of cancellation.  Id. at *7.  The court rejected the purchaser's argument that it was entitled to summary judgment based upon the seller's failure to obtain consent from the cooperative corporation.  Id. at *8. The court rejected the purchaser's argument based upon "persuasive authority that 'where a party to a contract terminates the contract and presents a specific reason for the termination, that party is estopped from raising a different reason upon the commencement of an action.'"[4] Id. (citations omitted).

This case is distinguishable from Rode & Brand.  Unlike the defendant in Rode & Brand, which failed to raise any challenge to the quality of the games before litigation, the Plaintiff in this case was not silent with respect to other alleged breaches of the Contracts by the Defendants. As will be discuss below, although the TOE Rejection Letters did not list all the reasons why the time of essence closings were premature, the Plaintiff raised issues regarding access to the Properties and the condition of the roof of 1988 Morris Ave prior to the issuance of the TOE Rejection Letters.[5]  Additionally, the Defendants knew that 700 Beck St., 1143 Forest Ave., and 1821 Topping Ave. were occupied by residential tenants, and should have known that the Contracts required those properties to be delivered vacant at closing.  These are not allegations that should catch the Defendants by surprise.  Unlike Rode & Brand, there is no conduct by the Plaintiff that gives rise to estoppel.  Compare Calmar S.S. Corp. v. Scott, 209 F.2d 852, 857 (2d Cir. 1954) (rejecting the argument that an insured should not be able to substitute another ground for its action, and stating that "[w]e should not wish by implication to assent to the notion that, in

---

[4] The court did not expressly cite to the "mend the hold" doctrine.
[5] The Defendants have cited no authority that a party must specify each possible default when rejecting a time of the essence closing deadline.

the absence of some genuine estoppel, such as existed for instance in <u>Rode & Brand v. Kamm Games</u>, . . . the insured will forfeit his privilege by failing to put his best foot forward in the beginning") <u>with</u> <u>Leventhal v. New Valley Corp.</u>, No. 91 CIV. 4238 (CSH), 1992 WL 15989, at *5 (S.D.N.Y. Jan. 17, 1992) (barring defense because "New Valley paid Leventhal in accordance with the Agreement for over three years, without ever suggesting that the contract was void for lack of consideration or unconscionability").

Nor is this case like <u>Engelbert</u>, where the plaintiff terminated a contract based upon a specific default of the defendant, and then sought to obtain judgment based upon a different default.  The Plaintiff in this case did not change its allegations of breach after litigation began.  Additionally, unlike the plaintiff in <u>Engelbert</u>, the Plaintiff did not seek to terminate the Contracts and avoid performance; to the contrary, the Plaintiff's TOE Rejection Letters sought to preserve the Contracts until the Defendants were able to transfer the properties in compliance with the Contracts.  Rather, the Defendants, even though they knew, or should have known, that the Plaintiff was entitled to inspect the Properties prior to closing, and that the Defendants were unable to transfer the Properties in accordance with the Contracts because the Properties were subject to existing tenants, violations, and title defects, nonetheless scheduled time of the essence closings.

It is noteworthy that Dwane Jones, the Defendants' real estate broker for the Properties, testified that, after the Contracts were executed, a copy of a sales contract between the Plaintiff and other entities was mistakenly sent to him.  (Tr. 6/11/20 at 296, 308-309, 312-13.)[6]  That contract provided for the sale of the Properties, together with two other properties, for $6,995,000, which is more than double the aggregate purchase price under the Contracts.  (Tr.

---

[6] "Tr." refers to the transcript of the trial held on the date specified. The transcript of the trial held on June 10, 2020 is filed as ECF No. 72, and the transcript of the trial held on June 11, 2020 is filed as ECF No. 69.

6/11/20 at 312; Defs. Ex. D.)  He explained that he "took a quick look when [he] received information with the additional properties, that the [two other] buildings weren't of a value that it would make sense for those two additional buildings to more than double the price of what the contract for the five buildings was."  (Tr. 6/11/20 at 312:19-23.)

In <u>Rode & Brand</u>, the Second Circuit noted that when a buyer asserts "some a posteriori justification for nonacceptance," the law does not look with favor on this method of "avoiding the consequences of unfortunate business ventures," <u>Rode & Brand</u>, 181 F.2d at 587.  Scheduling time of the essence closings when the Defendants themselves were not ready, willing, and able to transfer the Properties, and seeking to hold the Plaintiff in default and retain the deposits, is similarly disfavored, whether or not motivated by a desire to get out of a bad deal.

II.    <u>Specific Performance</u>

 Under New York law, "'[a] plaintiff seeking to maintain an action for specific performance or for damages for nonperformance of a contract must demonstrate that a tender of his or her own performance was made, unless tender was waived or the necessity for such a tender was obviated by acts of the other party amounting to an anticipatory breach of the contract or establishing that such party would be unable to perform.'" <u>Lower v. Vill. of Watkins Glen</u>, 794 N.Y.S.2d 140,142 (N.Y. App. Div. 2005) (quoting <u>Madison Invs. v Cohoes Assoc.</u>, 176 A.D.2d 1021, 1021-1022 (N.Y. App. Div. 1991)).  A seller's anticipatory breach of contract relieves a purchaser of its obligation to tender performance, but does not "discharge [the purchaser's] obligation to show that it was ready and able to perform its own contractual undertakings on the closing date, in order to secure specific performance."  <u>Huntington Mining Holdings, Inc. v. Cottontail Plaza, Inc.</u>, 459 N.E.2d 492, 492 (N.Y. 1983). <u>See also, e.g.</u>, <u>533 Park Ave. Realty, LLC v. Park Ave. Bldg. & Roofing Supplies, LLC</u>, 68 N.Y.S.3d 110, 114

(N.Y. App. Div. 2017) ("An anticipatory breach of the contract excuses the purchaser from tendering performance, but does not excuse the purchaser from the requirement that it be ready, willing, and able to perform."); Zeitoune v. Cohen, 887 N.Y.S.2d 253, 255 (N.Y. App. Div. 2009) ("An anticipatory breach by the party from whom specific performance is sought excuses the party seeking specific performance from tendering performance, but not from the requirement that the party seeking specific performance establish that he or she was ready, willing, and able to perform."); Fridman v. Kucher, 826 N.Y.S.2d 104, 105 (N.Y. App. Div. 2006) ("A purchaser who seeks specific performance of a contract for the sale of real property must demonstrate that he or she was ready, willing, and able to perform the contract, regardless of any anticipatory breach by a seller.").

A.    The Plaintiff was ready, willing, and able to close.

New York law is clear that the Plaintiff was not required to tender performance under the Contracts and appear on law day if the Defendants breached, or anticipatorily breached, the Contracts. However, before addressing that issue, this Court must address whether the Plaintiff established that it was ready, willing, and able to close on the Contracts on law day, because if the Plaintiff has not met this burden, any breach or anticipatory breach by the Defendants is irrelevant.

To support a finding that the Plaintiff was ready, willing, and able to close on each Contract, the Plaintiff offered the testimony of Joel Leifer, a former member of the Plaintiff.  Mr. Leifer testified that, if the Plaintiff was unable to obtain conventional or hard money financing to close under the Contracts, he would fund the purchase, either directly or through an entity owned by him.[7]  (Tr. 6/11/20 at 134:9-13.) Mr. Leifer testified that he had in excess of $5 million

_____

[7] Schedule F identifies Mr. Leifer as an unsecured creditor; Schedule H identifies him as a co-obligor, and the Statement of Financial Affairs identifies him as a former member of the Plaintiff and a source of payment for the

available to him to fund the purchase. (Tr. 6/11/20 at 134:22.) This testimony is supported by a bank statement reflecting that River Manor Corp. ("River Manor"), a nursing home owned by Mr. Leifer and his mother, had a balance in excess of $3.8 million as of December 18, 2017, which was more than sufficient to fund the purchase of the properties.[8] (Ex. 45.) The Plaintiff also submitted evidence that a deposit of $6,354,429.74 was made into Mr. Leifer's account on December 21, 2017. (Tr. 6/11/20 at 135-136, Ex. 45.) Though this occurred three days after December 18, 2017, it supports Mr. Leifer's testimony that he had funds accessible to him.

The Defendants argue that, according to the bank statement, Mr. Leifer only had $62,075.82 in his personal account on December 18, 2017. (Ex. 45.) The Defendants argue that Mr. Leifer was not free to use River Manor's funds absent prior approval by the New York State Commissioner of Health pursuant to New York Code Rules and Regulations § 415.26. According to the Defendants, that provision requires a nursing home to obtain prior approval to lend more than $25,000 to purchase real estate. (Tr. 6/11/20 at 137-138.)

The Defendants' argument that funds in a River Manor bank account cannot be relied upon by the Plaintiff to show that it was ready, willing, and able to close on law day must be rejected for two reasons. First, Mr. Leifer testified that his office staff informed him that the necessary approval from the New York State Commissioner of Health was received. (Tr. 6/11/20 at 139.) Though the Plaintiff did not introduce documentary evidence to support this testimony, this Court finds the testimony to be credible.

---

Plaintiff's bankruptcy counsel's pre-petition fee. (Schedules F, H, Stmt. of Fin. Affairs ¶ 29, Case No. 18-42228-CEC, ECF No. 1.)

[8] The Plaintiff would have been required to pay $2,113,755 at closing, which is calculated by crediting the initial deposits under the Contracts of approximately $155,000 and the subsequent deposits under the Addenda of $845,000 against the total purchase price of $3.1 million, and adding $13,755, which were the amounts owed through December 18, 2017 under the 1988 Morris Addendum and the 1821 Topping Addendum.

Second, New York Code Rules and Regulations § 415.26 is irrelevant to whether the Plaintiff was ready, willing, and able to close under the Contracts. That provision provides, in pertinent part: "No facility or governing body may withdraw or reduce a facility's equity so as to create or increase a negative net worth by means of a withdrawal without the prior approval of the commissioner." N.Y. Comp. Codes R. & Regs. tit. 10, § 415.26(h)(7). "Withdrawal," in turn, is defined as:

> (a) any payment of cash or transfer of other assets by a facility directly or indirectly to or for the benefit of its operator or owner; and (b) any liability or contingent liability incurred within any period of 12 consecutive months by a facility or its operator by reason of a mortgage, lease, borrowing or other transaction relating to such facility that exceeds, in the aggregate, $25,000.

N.Y. Comp. Codes R. & Regs. tit. 10, § 415.26(h)(7)(i).

It appears that the Defendants misread § 415.26(h)(7). The $25,000 limit relates to liability incurred by a nursing home and does not apply to lending by the nursing home. Additionally, even if the loan is a payment for the benefit of the operator or owner, the Defendants have not provided any evidence to establish that using River Manor's funds to close under the Contracts would "create or increase a negative net worth," as prohibited by the regulation.[9] Even if that were the case, the conclusion does not follow that the funds were unavailable to close on the Contracts on December 18, 2017. It may be that River Manor and/or Mr. Leifer would have been subject to a penalty or other liability for failure to comply with this regulation, but the evidence nevertheless shows that the funds were, in fact, accessible to Mr. Leifer on that date.

---

[9] There was no evidence that the lender under such loan would be Mr. Leifer personally, and not River Manor.

14

B.      Plaintiff's Allegations of Defendants' Breach

(1)      The Defendants denied access to the buildings.

The Plaintiff argues that the Defendants failed to provide access to the properties as required by the Contracts, constituting a breach that excused the Plaintiff from tendering performance on law day.

The Contracts explicitly required the Defendants to allow the Plaintiff to access the properties and contains conditions to closing that would necessitate the Plaintiff's access to verify that the conditions were satisfied.  Each contract contains the following provisions:

> 12.  Condition of Property:  . . . Purchaser and its authorized representatives shall have the right, as reasonable times and upon reasonable notice (by telephone or otherwise) to Seller, to inspect the Premises before Closing.
>
> *           *           *
>
> 16.  Conditions to Closing.  This contract and Purchaser's obligation to purchase the Premises are also subject to and conditioned upon the fulfillment of the following conditions precedent:
>
> *           *           *
>
> > (d) the delivery of the Premises and all buildings(s) and improvements comprising a part thereof in broom clean condition, vacant and free of leases or tenancies, together with the keys to the Premises.
> >
> > (e) All plumbing (including water supply and septic systems, if any), heating and air conditioning, if any, electrical and mechanical systems, equipment and machinery in the buildings(s) located on the property and all appliances which are included in this sale being in working order as of the date of Closing.

(Exs. 1-5 at ¶¶ 12, 16.)

The riders to the Contracts each provide that the premises are being sold "AS IS . . . subject to reasonable use, wear, tear and natural deterioration between now and the closing date," but that "the appliances, plumbing, heating and electrical systems shall be in working order and roof should be free of leaks at closing."  (Exs. 1-5 at Seller's Rider to Contract ¶ 5.)

In support of its allegation that the Defendants refused access to the properties as required by the Contracts, the Plaintiff introduced the testimony of Joseph Riegler, a former member of the Plaintiff.[10]  He testified that, on around November 30, 2017, after the Contracts and License Agreement was executed, and after the Plaintiff's contractors commenced construction in 1988 Morris Ave. and 1974 Morris Ave. the locks to the buildings were changed.  (Tr. 6/10/20 at 133-134.)  He contacted Mr. Strong, who was the designated agent under the License Agreement, for access.[11] (Tr. 6/10/20 at 134; Ex. 11 at ¶ 7(b).)  Although the License Agreement is a separate contract from the Contracts, as amended by the Addenda, the failure to provide access to those properties in December 2017 also constitutes a breach under the Contracts, which specifically granted the Plaintiff the right to inspect the premises.[12] (Exs. 1-5 at ¶ 12.)

Mr. Riegler further testified that he contacted Mr. Strong for access to the properties multiple times prior to December 18, 2017, but the Defendants did not provide access.  (Tr.

---

[10] Mr. Riegler is identified on the Statement of Financial Affairs as a former member of the Plaintiff.  (Stmt. of Fin. Affairs ¶ 29, Case No. 18-42228-CEC, ECF No. 1.) The Plaintiff's Operating agreement lists Mr. Riegler as the sole member of the Plaintiff, but he ultimately transferred his interest in the Plaintiff to Mr. Leifer on April 4, 2018. (Defs. Exs. B, E.)  On April 14, 2018, Mr. Leifer transferred his interest in the Plaintiff to Mordechai Ehrenfeld. (Defs. Ex. F.)  The Plaintiff, by Mr. Ehrenfeld, filed a voluntary petition under chapter 11 of the Bankruptcy Code on April 23, 2018.

[11] Mr. Strong testified that he was the "on the ground presence" with respect to the properties.  (Tr. 6/11/20 at 89:14.)

[12] The Defendants argue that the Plaintiff's work at 1988 Morris Ave. went beyond the scope of the License Agreement, "resulting in Defendant terminating the License Agreement for cause and restricting access to the premises."  (Defs.' Post-Trial Brief at 16, ECF No. 68.)  However, irrespective to whether the License Agreement was properly terminated, access to 1988 Morris Ave. and 1974 Morris Ave.  was separately required under the Contracts.

6/10/20 at 137:24-138:6.)    The Defendants concede that the Plaintiff requested access to all properties from Mr. Strong, their representative.   (JPTO ¶ 5(A)(13).)

Mr. Strong testified that he was directed to deny access at some point towards the closing date.   (Tr. 6/11/20 at 99-100.)  Although the Defendants cite to Mr. Riegler's testimony that, after being locked out of 1988 Morris Ave. and 1974 Morris Ave, he said "let's forget about it, let's just close and finish," (Tr. 6/10/20 at 137:6-7), the Court does not view this testimony as a waiver of the right to inspect the Properties under the Contracts prior to closing. Rather, when viewed within the context of Mr. Riegler's full testimony, it reads as an expression of frustration with the Defendants and a desire to close the deals.  At most, it could be viewed as a decision to complete the work at 1988 Morris Ave. and 1974 Morris Ave. after closing instead of pre-closing pursuant to the License Agreement.

Abraham Weisel, one of the Plaintiff's two real estate attorneys, testified that he contacted the Defendants' real estate counsel, Mr. Hsu, by phone and by email on December 11, 2017, trying to obtain access for the Plaintiff.  (Tr. 6/11/20 at 188-190; Exs. 25, 28, 29.)   On that date, Mr. Hsu denied access, stating "I am not authorized at this time to provide that access.  We need to see real movement from your side to get to a closing date."  (Ex. 30, email from Hsu to Weisel dated December 11, 2017 at 1:46 p.m.). It is unclear what "movement" from the Plaintiff was needed at that point other than closing on the Contracts.  Mr. Weisel informed the Defendants' counsel on that date that the Plaintiff is "ready[,] willing[,] and able to close in accordance with your untimely TOE declaration, provided that your client provide my client

access NOW to the premises." (Ex. 30, email from Weisel to Hsu dated December 11, 2017 at 3:04 p.m.)[13]

The Debtor's other real estate counsel, Izidor Mikhli, testified that it is typical for a buyer to seek access to a property shortly before closing to inspect the premises (Tr. 6/10/20 at 105-106.) Indeed, the Contracts expressly permitted access for that purpose: the purchaser "shall have the right, at reasonable times and upon reasonable notice (by telephone or otherwise) to Seller to inspect the Premises before Closing." (Exs. 1-5 at ¶ 12.)

The Defendants argue that the Plaintiff's request for access on short notice was unreasonable. This argument is unpersuasive given the circumstances that were present at the time. On December 6, 2017, Mr. Hsu scheduled the time of the essence closings. (JPTO ¶ 5(A)(11).) On December 9, 2017, Mr. Riegler requested access to the Properties. (JPTO ¶ 5(A)(13).) That request was ignored, as Mr. Strong was directed not to provide access to the Plaintiff. (Tr. 6/11/20 at 99-100.) Mr. Weisel requested same day access on December 11, 2017. (Exs. 25, 28, 29.) That request was denied by Mr. Hsu, even though closing was scheduled for the following week. It must also be noted that the License Agreement provided for same day notice when the Plaintiff's contractor was going to access 1988 Morris Ave. and 1974 Morris Ave. (Ex. 11 at ¶ (7)(b), and Mr. Strong's job was to be an "on-the-ground presence with respect to . . . basic property management services." (Tr. 6/11/20 at 89:13-15.) The Defendants have not established that, under these circumstances, same day access was unreasonably requested for December 11, 2017.

---

[13] The subject of these emails is "Bronx package (specifically – Beck, Forest, Topping)," (Ex. 30) but it is clear from the testimony that the Plaintiff was also unable to access to 1988 Morris Ave. and 1974 Morris Ave. after the locks were changed at the end of November, 2017.

Based upon the testimony presented at trial, and the email exchange between Mr. Weisel and Mr. Hsu, the Court concludes that the Plaintiff's requests for access to the Properties prior to closing was denied in violation of the Contracts.

(2)    <u>The properties were occupied by residential tenants.</u>

The Plaintiff alleges that the Defendants were unable to transfer 700 Beck St., 1143 Forest Ave., and 1821 Topping Ave. in compliance with the Contracts on December 18, 2017 because those properties were not vacant of residential tenants as required by the Contracts. Indeed, the Defendants concede that those properties were not vacant by December 18, 2017. (JPTO ¶ 5(A)(17).) Mr. Strong also testified that tenants were residing in those properties as of December 18, 2017.  (Tr. 6/11/20 at 110:12.)

In the Joint Pre-Trial Order, the Defendants contend that the failure to strike that requirement from those Contracts was a "typographical error," and that "written and oral communication before, during and after signing Plaintiff and Defendant reaffirmed . . . status of the occupancy in place in the respective buildings." (JPTO at ¶ 7(B)(19).)  The Defendants further argue that they apprised Yaakov Lefkowitz, the individual who originally made the offer to purchase the properties, and the Plaintiff's counsel of the tenancies at the properties.  (JPTO ¶ 7(C)(20).)  The Defendants contend that a residential lease for 1821 Topping Ave. expired and the tenant vacated, and that Mr. Lefkowitz consented to the Defendants' marketing and lease of that unit at substantially similar terms.  (JPTO at ¶¶ 7(A)(4)-(8), 7(C)(20), 7(C)(25).)  The Defendant also asserted that "[t]he Plaintiff was aware and agreed to all the tenancies on the Properties."  (JPTO at ¶ 7(I)(66).) However, Mr. Lefkowitz was not a member of the Plaintiff and it is unclear what authority, if any, he had to act on behalf of the Plaintiff.

In any event, the Defendants did not raise these issues at trial or address the existing tenants in the post-trial memorandum of law.  The argument that the Plaintiff knew that these properties were occupied by existing tenants and consented to the leases must be rejected because the Contracts unequivocally provide that the properties be free and clear of tenants by closing.  (Exs. 1-5 at ¶ 16(d).)  Additionally, the Contracts contain merger clauses providing:

> All prior understandings, agreements, representations and warranties, oral or written, between Seller and Purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this contract.

(Exs. 1-5 at ¶ 28(a).)

The Contracts further provide that they cannot "be waived, changed, or cancelled except in writing."  (Exs. 1-5 at ¶ 28(b).)   The Defendants have not produced any evidence that the Contracts' requirement that the buildings be free and clear of tenancies was modified in writing.  As such, the inability to transfer 700 Beck St., 1821 Topping Ave., and 1143 Forrest Ave. vacant constituted a breach under those respective contracts.

(3)     Misrepresentation of Commercial Tenant

The Plaintiff alleges that Defendant 700 Beck St LLC misrepresented the existence of a commercial lease at 700 Beck St.  The Plaintiff asserts that the existence of this lease was an exception to contract's requirement to deliver the property vacant.  (JPTO ¶ 6 (34).)  However, for the same reason as the Defendants' argument regarding the residential tenants must fail, so too must the Plaintiff's argument regarding the commercial tenant.  Nothing in the 700 Beck St. Contract or the addendum thereto provided that the property be conveyed subject to an existing

commercial tenant.[14]   However, as discussed above, 700 Beck St LLC breached the Contract by refusing Plaintiff access to the building prior to closing and by not having the property free of tenants.

(4)    Violations/Defects/Title Issues

The Plaintiff argues that its title insurer, Riverside Abstract, LLC ("Riverside Abstract") reported multiple violations and title issues with respect to the Properties, which were required to have been cleared prior to the closings.  The Defendants argue that no evidence established that the title objections were provided to Mr. Hsu in advance of the closing, and, in any event, the issues could have been addressed at closing had the Plaintiff appeared.  (Defs.' Post-Trial Brief at 2, 5, ECF No. 68.)

The evidence shows that the title report or list of objections was provided to the Defendants' counsel.  Mr. Mikhli testified that either he or an employee of the title company, Riverside Abstract, provided the Defendants' former real estate counsel with the title report, including the list of title objections.  (Tr. 6/10/20 at 65:20-22.)  The Defendants did not provide testimony from their former real estate counsel, Malik Pearson, or Mr. Hsu, denying receipt of the title objections.   Additionally, Exhibits 35, 36, and 77 contain an email dated December 14, 2017 from Mr. Hsu to a Riverside Abstract employee, which, in part, addresses specific title report exceptions.  During cross-examination of Karla Miller, chief counsel at Riverside Abstract, Defendants' counsel inquired regarding Mr. Hsu's December 14, 2017 email.  (Tr.

---

[14] This determination is not inconsistent with this Court's prior decision denying summary judgment, where it was noted that "the parties do not dispute that the sale of 700 Beck St. included an existing commercial lease to a day care facility," because the question at that juncture was whether the Plaintiff raised a genuine issue of material fact to defeat the Defendants' motion for summary judgment. That is an entirely different inquiry from the issue being decided now: whether the Plaintiff met its burden to establish that Defendant 700 Beck St LLC breached the 700 Beck St. Contract by failing to inform the Plaintiff that the commercial tenant never took possession.

21

6/11/20 at 44-52.)  The argument that the Defendants' counsel may not have been provided with the title report or list of objections is disingenuous and must be rejected.

Also introduced into evidence was a title report dated January 2, 2018.  (Ex. 41.)  Though the time of the essence closing pre-dates that report, Karla Miller, chief counsel at Riverside Abstract LLC, testified that all the violations and issues noted therein were of record on December 18, 2017.  (Tr. 6/11/20 at 31.)  She further testified that Mr. Hsu and Riverside Abstract continued to communicate after December 18, 2017 to clear some of the issues.  (Tr. 6/11/20 at 24-26.)

The title report reflects various violations and issues with respect to each Property.  (Ex 41.)  With respect to 770 Beck St., it noted (i) Environmental Control Board liens ("ECBs"); (ii) four violations issued by the Rent & Housing Maintenance Department of the City of New York, including the failure to file a valid registration statement; (iii) a sidewalk violation; (iv) a New York City Fire Department Violation; (v) an issue regarding a no consideration deed; and (vi) a UCC-1 Financing Statement filed by RCN Capital Funding.   (Ex. 41; Tr. 6/11/20 at 30, 32, 61-62.)

With respect to 1143 Forest Ave., there existed: (i) ECBs; (ii) a UCC-Financing Statement filed by Loan Funder LLC Series 496; (iii) a no consideration deed; (iv) an issue requiring proof that the deed was during lifetime of Saleem Grantor (dated October 2015); (v) 4 landmark violations; (vi) 52 violations from the Rent & Housing Maintenance Department;  and (vii) two Parking Violation Bureau judgment liens.  (Ex. 41; Tr. 6/11/20 at 30-33, 43, 62-63)

With respect to 1974 Morris Ave, the title report noted: (i) ECBs; (ii) Parking Violation Bureau judgment liens; (iii) a tax lien certificate; (iv) a UCC-1 Financing Statement filed by RCN Capital Funding, LLC; (v) a no consideration deed; (vi) a correction deed was needed for

deed dated July 1, 2015; (vi) a lis pendens;  (v) a sidewalk violation; (vi) five violations from the

Rent & Housing Maintenance Department; and (vi) landmark violations. (Ex. 41; Tr. 6/11/20 at

38-43, 64-65, 68.)

 With respect to 1821 Topping Ave., the title report listed two violations from the Rent &

Housing Maintenance Department and an ECB violation.  (Ex. 41; Tr. 6/11/20 at 63-64.)

 Lastly, with respect to 1988 Morris Ave., the title report reflected a Rent & Housing

Maintenance Department violation, a Parking Violation Bureau judgment lien, and a sidewalk

violation.  (Ex. 41; Tr. 6/11/20.)

 Mr. Mikhli testified that ECB violations, outstanding registration statements, open

mortgages and credit lines, UCC-1 Financing Statements, and issues regarding no consideration

deeds are typically resolved at closing.  (Tr. 6/10/20 at 69-71, 76-77, 79, 81.)  However, he also

testified that "sidewalk violations don't carry any monetary penalty," and must "be remedied and

removed from the city's records," and are therefore resolved prior to closing.  (Tr. 6/10/20 at

72:5-8, 81.)   Mr. Mikhli further testified that landmark violations must be addressed prior to

closing.  (Tr. 6/10/20 at 81.)

 When asked about violations, Ms. Miller testified that violations are not title defects and

could "theoretically" be dealt with at closing, adding "[i]t all depends on the contract.  (Tr.

6/11/20 at 39, 43.)  She conceded that Riverside Abstract could not find an email response to Mr.

Hsu's December 14, 2017 email, which attached documents addressing certain title exceptions,

and asking for the Riverside Abstract employee to "[l]et me know if I have not taken [care] of

anything."  (Tr. 6/11/20 at 47, Ex. 77.)

 The Defendants' post trial memorandum argues that the violations and other title

concerns could have been addressed at closing had the Plaintiff appeared.  (Defs.' Post-Trial

Brief at 2, ECF No. 68.)   This argument must be rejected because, even if these violations and other title issues could normally be addressed at a closing, as Mr. Mikhli and Ms. Miller testified, the Contracts govern this dispute, and required them to be addressed prior to closing.

Each Contract contains the following provisions:

> Governmental Violations and Orders.  (a) Seller shall comply with all notes or notices of violations of law or municipal ordinances, orders or requirements noted or issued as of the date of closing by any governmental department having authority as to lands, housing, buildings, fire, health, environmental and labor conditions affecting the Premises.  The Premises shall be conveyed free of them at Closing.  Seller shall furnish Purchaser with any authorizations necessary to make the searches that could disclose these matters.  (b) . . .  All obligations affecting the Premises pursuant to the Administrative Code of the City of New York incurred prior to Closing and payable in money shall be discharged by Seller at or prior to Closing.

(Exs. 1-5 at ¶ 10.)

> Title Examination; Seller's Inability to Convey; Limitations of Liability.  (a) Purchaser shall order an examination of title in respect of the Premises from a title company licensed to issue title insurance by the New York State Insurance Department or any agent for such title company promptly after the execution of this contract . . ..  Purchaser shall cause a copy of the title report and of any additions thereto to be delivered to the attorney(s) for Seller promptly after receipt thereof.
> (b)(i) If at the date of Closing Seller is unable to transfer title to Purchaser in accordance with this contract, or Purchaser had other valid grounds for refusing to close, whether by reason of liens, encumbrances or other objection to title or otherwise (herein collectively called "Defects"), other than those subject to which Purchaser is obligated to accept title hereunder or which Purchaser may have waived and other than those which Seller has herein expressly agreed to remove, remedy or discharge and if Purchaser shall be unwilling to waive the same and to close title without abatement of the purchase price, then, except as hereinafter set forth, Seller shall have the right, at Seller's sole election, either to take such action as Seller may deem advisable to remove, remedy, discharge or comply with such Defects or to cancel this contract; (ii) if Seller elects to take action to remove, remedy or comply with such Defects, Seller shall be entitled from time to time, upon Notice to

> Purchaser, to adjourn the date for Closing hereunder for a period or periods not exceeding 60 days in the aggregate . . . and the date for Closing shall be adjourned to a date specified by Seller not beyond such period. If for any reason whatsoever, Seller shall not have succeeded in removing, remedying or complying with such Defects at the expiration of such adjournment(s), and if Purchaser shall still be unwilling to waive the same and to close without abatement of the purchase price, then either party may cancel this contract by Notice to the other given within 10 days after such adjourned date; (iii) notwithstanding the foregoing, the existing mortgage . . . and any matter created by Seller after the date hereof shall be released, discharge or otherwise cured by Seller at or prior to Closing.
>
> (c) If this contract is cancelled pursuant to its terms, other than as a result of Purchaser's default, this contract shall terminate and come to an end, and neither party shall have any further rights, obligations or liabilities against or to the other hereunder or otherwise, except that; (i) seller shall promptly refund or cause the Escrowee to refund the Downpayment to Purchaser . . . .

(Exs. 1-5 at ¶ 21.)

The riders to the Contracts, which expressly provide that the terms of each rider "shall govern and be binding" in the event of any inconsistency or conflict with the Contract, provide:

> Purchaser shall deliver to the Seller's attorney a list of title objections or violations, if any, as may appear on any title examination Purchaser may obtain at least ten (10) days prior to the closing date, and if any objection or violation appearing on said examination cannot be cleared, removed or remedied by Seller *before the time fixed for closing of title or any adjournment thereof*, then Seller shall be entitled to a reasonable adjournment for the purpose of clearing, removing or remedying such objections or violations. In the event that Seller chooses not to remove such violations or if the costs of removal exceed $[], Seller shall have the right to cancel this contract by returning to Purchaser all sums paid hereunder plus the net cost of title examination, and upon such repayment, the contract shall be deemed null and void, and neither of the parties herein shall have any claims against the other party. Purchaser may also take title subject to such violations without any abatement to the purchaser price, and Seller shall be released from any and all liability in connection with said violations.

(Exs. 1-5 at Rider to Contracts ¶¶ 1, 7) (emphasis added).

The riders further provide:

> Anything to the contrary herein notwithstanding, if there are any notes or notices of violations against the premises as of the date of closing, the Sellers not [sic] be obligated to expend any sum in excess of [___] to remove said violations.  In the event of any violations, the Sellers may cancel this Contract, subject to the Purchaser's right to accept title to the premises with such violations outstanding and without any reduction of the purchase price.  In the event of such cancellation, the sole liability of the Seller will be to refund to the Purchaser, the down payment and to pay the net cost of examining the title . . . upon such refund and payment being made, this Contract shall be cancelled.

(Ex. 1-5 at Riders to Contracts ¶ 21.)  Each rider contained a different cost limit in paragraphs 7 and 21.

The Defendants argue that the violations and issues in the title report could have been addressed at closing had the Plaintiff appeared.  (Defs.' Post-Trial Brief at 2, ECF No. 68.)   This argument must be rejected because, even if these violations and other title issues may be addressed at a closing, the riders to the Contracts required them to be addressed prior to closing. The riders specifically provide: "if any objection or violation appearing on said examination cannot be cleared, removed or remedied by Seller *before the time fixed for closing of title or any adjournment thereof,* then Seller shall be entitled to a reasonable adjournment for the purpose of clearing, removing or remedying such objections or violations."  (Exs. 1-5 at Rider to Contracts ¶ 7.)  This provision controls, and supersedes paragraph 10 of the Contract, which provides that monetary obligations pursuant to the Administrative Code of the City of New York could be paid at closing.

If the Defendants did not want to cure the violations, or if the cost to remove the violations exceeded the limits provided in paragraphs 7 and 21 of the riders, the Defendants had the right to cancel the Contracts and return all deposits made.  (Exs. 1-5 at Rider to Contracts ¶¶

7, 21.)  The Defendants did not exercise this right to cancel and return the deposits.  Rather, they are seeking to retain the deposits based upon the Plaintiff's refusal to appear at the closings.  The Defendants have not cited to any provision in the Contracts or riders, or to any applicable law, that gives a seller the right to schedule a time of the essence closing when it is not ready, willing, and able to perform in accordance with the contract, and to retain the deposit when the buyer refuses to attend a futile closing.

The Defendants argue that the Plaintiff did not provide any notice that it would not take the Properties subject to the violations, but nothing in the Contracts require such notice. Additionally, the Plaintiff's TOE Rejection Letters, which specifically rejected the closings based upon, among under things, unaddressed issues raised by Riverside Abstract, are clear statements that the Plaintiff was unwilling to take title to the Properties subject to the violations. For these reasons, the Defendants' failure to address the issues raised in the title report in advance of the closing constituted a breach under the Contracts.

(5)     Roof Leaks

Mr. Riegler testified that 1988 Morris Ave. sustained significant damage to the roof in September 2017. (Tr. 6/11/20 at 341-342.)  This testimony was corroborated by Mr. Strong.  (Tr. 6/11/20 at 103:17.) Although Mr. Telahun testified that the roof was leaking at the time the 1988 Morris Ave. Contract was executed (Tr. 6/10/20 at 242:15-17), this is irrelevant because, although the property was being sold "as is," the contract specifically required the roof to "be free of leaks at closing"  (Exs. 1-5 at Seller's Rider to Contract ¶ 5).

Mr. Mikhli testified that the parties executed the License Agreement to permit the Plaintiff, and its own cost, to repair the damage sustained by 1988 Morris Ave.  (Tr. 6/10/20 at 35.)   However, nothing in the License Agreement modified the 1988 Morris Ave. Contract's

requirement for the roof to be free of leaks.  As discussed above, the Plaintiff was locked out of 1988 Morris Ave. prior to the completion of the work and was not given access to inspect the property prior to closing.[15]  No evidence with respect to the condition of the roof as of December 18, 2017 was introduced.  Therefore, it cannot be determined whether the roof was free of leaks as of December 18, 2017.

CONCLUSION

For the foregoing reasons, each of the Defendants breached their respective Contract and were unable to transfer the Properties in accordance with the Contracts.  The Plaintiff did not default under the Contracts by failing to appear at the time of the essence closings on December 18, 2017.

However, at this juncture, the Plaintiff cannot obtain specific performance requiring the Defendants to perform under the Contracts, nor can the Defendants seek damages from the Plaintiff's failure to pay the monthly payments required under the 1988 Morris Addendum or the 1821 Topping Addendum.  The specific performance claim and the Defendants' counterclaim must be addressed in the context of the Plaintiff's bankruptcy case and the Bankruptcy Code.

The Plaintiff has not assumed each Contract pursuant to 11 U.S.C. § 365, and therefore any judgment directing the Defendants to perform under those Contracts is premature.  Although the Plaintiff's third claim in this adversary proceeding sought to assume the Contracts, the Plaintiff has not made any showing that it is entitled to assume the Contracts under § 365.  That section permits a debtor in possession to assume or reject any executory contract, and provides, in pertinent part:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee [or debtor in possession] may not

---

[15] Presumably, a contractor would first repair the roof of a building prior to commencing interior work.

> assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee [or debtor in possession]—
>
> (A) cures, or provides adequate assurance that the trustee [or debtor in possession] will promptly cure, such default . . .;
>
> (B) compensates, or provides adequate assurance that the trustee [or debtor in possession] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

Although the Plaintiff established that it had sufficient funds to purchase the properties as of December 18, 2017, there has been no showing that the Plaintiff is able to cure, or to provide adequate assurance that it can promptly cure, the monetary defaults under the 1988 Morris Addendum or the 1821 Topping Addendum.  Nor has the Plaintiff shown that it has the funding necessary to close under the Contracts.

It is similarly inappropriate to award 1988 Morris Ave LLC and 1821 Topping Ave LLC judgments on their counterclaims at this time.   In the event the Plaintiff assumes the Contracts under § 365, the Plaintiff's default in failing to pay amounts owed under the 1988 Morris Addendum or the 1821 Topping Addendum must be cured as required by 11 U.S.C. § 365(b)(1). On the other hand, if the Plaintiff does not assume the Contracts, 1988 Morris Ave LLC and 1821 Topping Ave LLC may have pre-petition claims for those amounts.  Under either scenario, entry of a post-petition judgment on pre-petition claims would be inappropriate.

A separate order will issue.



**Dated: Brooklyn, New York**
**September 2, 2020**

_____
**Carla E. Craig**
**United States Bankruptcy Judge**